IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

|  |  |  |
|---|---|---|
| JARED MODE, *et al.* | : | 3:18-cv-00150-RJC-DSC |
|  | : |  |
| v. | : | **PLAINTIFFS' BRIEF IN** |
|  | : | **SUPPORT OF THEIR MOTION FOR** |
| S-L DISTRIBUTION COMPANY, LLC, *et al.* | : | **CONDITIONAL CERTIFICATION** |
|  | : |  |
|  | : |  |

Plaintiffs in this Fair Labor Standards Act ("FLSA") collective action lawsuit are 56 individuals[1] who deliver snack foods made by Snyders-Lance, Inc. and distributed by S-L Distribution Company, LLC, S-L Distribution Company, Inc., and S-L Routes, LLC (together "S-L"). Plaintiffs are blue collar workers. Their jobs generally entail delivering S-L's snack food products to stores, stocking the store shelves, and ordering replacement products. Plaintiffs want to be paid minimum wages and overtime compensation under the FLSA.[2]

In this motion, plaintiffs seek conditional certification of the following FLSA collective:

> All individuals who, during any time within the past three years, worked pursuant to a Distributor Agreement with S-L Distribution Company, Inc. or any related company other than individuals covered by: (i) the class/collective action settlement in Tavares v. S-L Distribution Co., Inc., 1:13-cv-01313-JEJ (M.D. Pa.); (ii) the class/collective action settlement in Roxberry v. S-L Distribution Company, Inc., 1:16-cv-02009-JEJ (M.D. Pa.); or (iii) the class action settlement in Bankalter v. S-L Distribution Company, Inc., 2017-SU-000549 (Pa. Common Pleas, York County).

---

[1] Plaintiff Jared Mode started the lawsuit in March 2018 by filing a complaint. See Doc. 1. Since then, 55 additional plaintiffs have joined the lawsuit. See Docs. 4, 8, 9, 21, 24, 48, 78, 87, 91, 95, 98, 105, 106, and 108.

[2] Mr. Mode, who worked in North Carolina, also asserts a Rule 23 class action claim under the North Carolina Wage and Hour Act. See Doc. 1. Magistrate Judge Cayer has recommended that this claim be dismissed, see Doc. 97, and Mr. Mode has objected to the recommendation, see Doc. 104. Regardless, Mr. Mode's state law claim is not relevant to the current motion, which focuses entirely on the FLSA claim.

If the Court grants this motion, the above workers will "receiv[e] accurate and timely notice [of the lawsuit] . . . so that they can make informed decisions about whether to participate." Hoffman-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989). Early notice is important because, in FLSA lawsuits, the statute of limitations continues to run until a worker affirmatively opts-in to the FLSA collective. See Lorenzo v. Prime Communications, L.P., 12-cv-00069, 2014 U.S. Dist. LEXIS 93123, *5-6 (E.D.N.C. Mar. 8, 2014).

Conditional certification motions "proceed[] under a fairly lenient standard and require[] only minimal evidence." Long v. CPI Security Systems, Inc., 292 F.R.D. 296, 298 (W.D.N.C. 2013) (Conrad, J.) (internal quotations omitted); accord Dearman v. Collegiate Housing Services, Inc., 17-cv-00057, 2018 U.S. Dist. LEXIS 54692, *4-6 (W.D.N.C. Mar. 30, 2018) (Conrad, J.). As discussed in the accompanying brief, plaintiffs satisfy the lenient standard.

## I. PRELIMINARY POINTS

Before going any further, plaintiffs wish to make a few preliminary points to provide some context to this lawsuit and plaintiffs' FLSA claim:

First, the "merits" of plaintiffs' FLSA claim are not before the Court at the conditional certification stage. See Adams v. Citicorp Credit Services, Inc., 93 F. Supp. 3d 441, 454 (M.D.N.C. 2015); Long, 292 F.R.D. at 302. Notwithstanding, it's worth observing that the predominant issue is whether, *under the FLSA*, plaintiffs and other collective members are "employees" (in which case they enjoy the FLSA's minimum wage and overtime pay protections) or non-employee "independent contractors" (in which case they have no FLSA rights). Eventually, after discovery has been conducted, the Court (in the event of summary judgment) or the jury (in the event of trial) will decide this issue by applying a multi-factor "economic realities" test that focuses on "whether the worker is economically dependent on the

business to which he renders service or is, as a matter of economic [reality], in business for himself." Schultz v. Capital International Security, Inc., 466 F.3d 298, 304 (4th Cir. 2006) (internal quotations omitted); see also McFeeley v. Jackson Street Entertainment, LLC, 825 F.3d 235 (4th Cir. 2016) (applying economic realities test). In this regard, the fact that plaintiffs sign a contact containing the "independent contractor" label or contemporaneously call themselves "independent contractors" is of little consequence. See, e.g., id. (finding exotic dancers to be FLSA employees even though they signed contacts stating that they were "independent contractors"); accord Montoya v. S.C.C.P. Painting Contractors., Inc., 589 F. Supp. 2d 569, 577-78 (D. Md. 2008) (citing cases).[3]

Second, plaintiffs' misclassification claim is

> of great importance not just to this case but to the structure of the American workplace. The number of independent contractors in this country is growing. There are several economic incentives for employers to use independent contractors and there is a potential for abuse in misclassifying employees as independent contractors. Employees misclassified as independent contractors are denied access to certain benefits and protections. Misclassification results in significant costs to government: "[B]etween 1996 and 2004, $34.7 billion of Federal tax revenues went uncollected due to the misclassification of workers and the tax loopholes that allow it." *And misclassification "puts employers who properly classify their workers at a disadvantage in the marketplace[.]"*

Craig v. FedEx Ground Package System, Inc., 686 F.3d 423, 430-31 (7th Cir. 2012) (internal citations omitted; emphasis supplied). Here, S-L asserts that its use of non-employee IBOs to distribute food product creates "a significant competitive advantage." Snyder's Lance, Inc. SEC Form 10-K for FYE Dec. 30, 2017 ("Form 10-K") (Ex. A) at p. 11. So it is especially important that S-L's business practice of avoiding the FLSA's minimum wage and overtime mandate be

---

[3] See also Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1311 (11th Cir. 2013) ("inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling th[e] relationship"); Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 (2d Cir. 1988) ("an employer's self-serving label of workers as independent contractors is not controlling").

3

tested.

Third, this lawsuit is typical of many recent FLSA cases challenging the increasingly widespread phenomenon of food manufacturers classifying delivery drivers/distributors as non-employee contractors. For a good example of such a lawsuit in this judicial district, the Court is referred to Rehberg v. Flowers Baking Company of Jamestown, LLC, 162 F. Supp. 3d 490 (W.D.N.C. 2016).

Finally, this is not the first time individuals working as S-L distributors have sought to be treated as employees under the FLSA and/or state wage and hour laws. On at least three other occasions, judges have approved class action settlements and, in so doing, determined that large groups of distributors are sufficiently similar to warrant certification of the pertinent settlement class. See Tavares v. S-L Distribution Co., Inc., 13-cv-01313, 2016 U.S. Dist. LEXIS 57689, *14-23 (M.D. Pa. May 2, 2016) (certifying settlement class of Massachusetts IBOs allegedly misclassified under Massachusetts law); Roxberry v Snyders-Lance, Inc., 16-cv-02009, 2017 U.S. Dist. LEXIS 193573, *3-4 (M.D. Pa. Nov. 15, 2017) (certifying settlement class of IBOs allegedly misclassified under Tennessee law and settlement collective of IBOs allegedly misclassified under FLSA); Bankalter v. S-L Distribution Company, Inc., 2017-SU-000549 (Pa. Common Pleas, York County Apr. 27, 2017) (Ex. D) (certifying settlement class of IBOs allegedly misclassified under Connecticut law).

## II. FACTS

### A. S-L uses "IBOs" to distribute snack foods to customers.

S-L is "engaged in the manufacturing, distribution, marketing and sale of snack food products." Form 10-K (Ex. A) at p. 3. The company "distribute[s] snack food products throughout the United States using [its] DSD network," id. at p. 5, which stands for "direct-store-

4

delivery distribution network," id. at p. 3. This "DSD network is made up of over 3,200 [delivery] routes that are primarily owned and operated by IBOs," id. at p. 5, which stands for "independent business owners," id. at p. 3. For the remainder of this brief, we will refer to plaintiffs and other distributors as "IBOs."

S-L "relies on over 2,800 IBOs for the sale and distribution" of its snack food products. See Form 10-K (Ex. A) at p. 11. S-L purports to sell its snack foods to the IBOs, who, in turn, sell the products to retail stores and outlets. See id. at p. 6. Notwithstanding, S-L refers to these retail stores and outlets as customers of *S-L*, not the IBOs. See, e.g., id. ("Sales to *our* largest retail customer, Wal-Mart Stores, Inc. ('Wal-Mart'), either through IBOs or our direct distribution network, were approximately 13% of net revenue in 2017"); id. at p. 6 ("*Our* top ten retail customers accounted for approximately 55% of our net revenue . . . .").

IBO's buy their delivery routes from S-L. See Form 10-K (Ex. A) at 11. Since many IBOs have little disposable income, "[c]ertain financing arrangements, through third-party lending institutions" are made available to IBOs. Id. In 2017, S-L netted $2.3 million from the sale of routes to IBOs. See id.

S-L has wide discretion to "re-engineer" or terminate an IBO's route. S-L explains re-engineering as follows:

> Periodically, we undertake a route reengineering project for a particular geography or zone. The reasons for route reengineering projects vary, but are typically due to increased sales volume associated with new retail locations and/or the addition of new Branded or Partner brand products to the routes in that zone. In these cases, we repurchase all of the IBO routes in that zone. The repurchased routes are then reengineered, which normally results in the addition of new IBO routes (territories) because of the additional volume. Routes are then resold, usually to the original IBO, however, the original IBO has no obligation to repurchase. Upon completion, these route reengineering projects may result in modest net gains on the sale of route businesses due to the value added during the reengineering through additional volume and/or retail locations.

5

Form 10-K (Ex. A) at 5.  S-L summarizes its termination practices as follows:

> There are times when the IBOs are not successful and the IBO's distributor agreement with us is terminated. In these instances, if the existing IBO is unable to sell the route to another third party, we may repurchase the route at a price defined in the distributor agreement. We generally put the repurchased route up for sale to another third-party IBO. The subsequent sales transaction generally results in a nominal gain or loss.

Id. at 6.

For litigation purposes, S-L asserts that the IBO's operate independent businesses. However, S-L's Annual Report acknowledges that IBOs "do not meet the definition of a business for accounting purposes."  Form 10-K (Ex. A) at 39; accord id. at 49, 53-54.

### B.  IBOs sign virtually identical Distributor Agreements.

All IBOs enter into Distributor Agreements with S-L.  See generally S-L Counterclaims (Doc. 25).  S-L already has provided the Court with Distributor Agreements signed by 22 plaintiffs.  See Doc. 25 at Ex. A-W.  As indicated, these Distributor Agreements are standardized and do not substantially differ from one IBO to another.  See id.  In fact, Middle District of Pennsylvania Judge John E. Jones already has observed that S-L's Distributor Agreements "largely constrain[]" IBOs' work and are "substantially similar to one another."  Tavares, 2016 U.S. Dist. LEXIS 57689, at *22.  Notable provisions in the standardized Distributor Agreements include, *inter alia,* the following:

- IBOs must purport to be "independent contractors.  See Doc. 25-1 (Agreement signed by Mr. Mode) at Article 2.
- S-L issues "Suggested Operating Guidelines" that include "suggested guidelines" and "various procedures" applicable to the IBO job.  See id. at Article 1.F.
- S-L may "in its sole discretion, vary the Suggested Operating Guidelines."  Id. at Article 25.E.
- IBOs are limited to delivering "Authorized Products" and "Other Products."  *See id.* at Article 3.A-B.  And these products (whether "Authorized" or "Other") must appear on a Price List published by S-L.  See id. at Article 1.B, C, E.

6

- IBOs are effectively prohibited from delivering products outside of their assigned "Territory." See id. at Article 1.G, 3.A-B.
- S-L issues a "Price List" for all products. See id. at Article 1.E, 10.A.
- IBO's must submit product orders "in accordance with S-L's then applicable procedures." Id. at Article 4.C.
- S-L dictates the location where the IBO must pick-up the products. See id. at Article 4.D.
- IBOs must transmit purchases and "any other transactions" to S-L using a "specific file format" dictated by S-L. See id. at Article 5.L.
- When a retail store alters its "channel of distribution," S-L can terminate the IBO's right to deliver to the store. See id. at Article 7.A-B.
- IBOs must reimburse SL for certain costs, such as, for example, "leasing costs," through pay deductions made by S-L. See id. at Article 10.A.
- S-L has broad discretion to terminate or alter the scope and composition of an IBOs' assigned route. See id. at Article 13, 15.B. Indeed, S-L can terminate the Agreement "for other just cause as may arise from time to time including, but not limited to, for business or economic reasons of S-L." Id. at Article 15.B.3.

### C. Standardized "Suggested Operating Guidelines" apply to all IBOs.

As noted above, the Distributor Agreements reference a set of Suggested Operating Guidelines ("Guidelines"). Under the Agreement, "S-L may, in its sole discretion , vary the [Guidelines] . . . ." Doc. 25-1 at Article 25.E. "Such variations may lead to different costs and obligations among distributors." Id.

A sample set of Guidelines is attached as Exhibit F. As indicated, the IBO must acknowledge that he "has read [the Guideliness] thoroughly and understands them" and that "the Guidelines may be amended, from time to time, by S-L." Ex. F at p. 5. The Guidelines include standardized "suggestions" addressing the terms and conditions of the IBO position. See id. at pp. 1-4. These standardized suggestions cover in great detail virtually every aspect of the IBOs' work and fall under headings such as "Promotion Items," "Servicing Accounts," "Unsalable Product Credit," "Settlement of Accounts," and "other Suggested Guidelines." See id. The

7

Guidelines list standardized charges and fines that IBOs must pay to S-L for, inter alia, failing to follow S-L's procedures. See id. at pp. 2-3.

## D. Declarations gathered from 22 plaintiffs demonstrate that IBOs are similarly situated.

The basic characteristics of each IBO's job are so similar that Plaintiffs' lawyers have been able to obtain standard, sworn declarations from 22 plaintiffs working in Florida, Georgia, Illinois, Massachusetts, North Carolina, Virginia, and Wisconsin. See Ex. B at ¶ 3. These declarations demonstrate that each IBO:

- is required to form a company in order to work for S-L. See Ex. B at ¶ 2.
- performs the same basic delivery, merchandising, and ordering tasks on a daily basis. See id. at ¶ 3-4.
- agrees that the job requires no special skill other than driving, delivering food products, stocking shelves, removing products from shelves, and ordering products. See id. at ¶ 5.
- was able to learn the all job requirements through on-the-job training. See id. at ¶ 5.
- is restricted from delivering products outside of his specific territory. See id. at ¶ 6.
- is not allowed to deliver unauthorized products. See id. at ¶ 6.
- plays no role in negotiating product prices with customers. See id. at ¶ 7.
- plays no role in deciding or negotiating the amount or location of shelf space available for S-L products in customer's stores. See id. at ¶ 9.
- reports to an S-L District Manager who generally oversees his work and makes sure he follows S-L's rules and directives. See id. at ¶ 10.
- is bound by S-L's rules and directives and can be subjected to a "breach letter" if he fails to follow such rules and directives. See id. at ¶ 11.
- has his activities and whereabouts monitored by S-L through a standard and mandatory handheld computer device. See id. at ¶ 12.
- routinely works over 40 hours per week. See id. at ¶ 13.
- never receives overtime premium pay for working over 40 hours per week. See id. at ¶ 14.
- is subjected to pay deductions that occasionally drive his weekly take-home pay to under $7.25 per hour. See id. at ¶ 15.

### E. Declarations gathered in the Roxberry lawsuit further confirm that IBOs are similarly situated.

As mentioned at page 3 supra, S-L has settled at least three other class and/or collective action lawsuits in which IBOs allege that they should have been treated as employees under the FLSA or state wage laws. One of these lawsuits was handled by the undersigned lawyers and was styled Roxberry v. S-L Distribution Company, Inc., 1:16-cv-02009-JEJ (M.D. Pa.). The Roxberry lawsuit involved claims under the FLSA and Tennessee state law and settled. See Roxberry, 2017 U.S. Dist. LEXIS 193573. Prior to settlement negotiations, the Roxberry plaintiffs moved for FLSA conditional certification. However, that motion was never decided due to the settlement.[4]

Regardless, the Roxberry conditional certification motion included sworn declarations from 10 individual IBOs. See Ex. C. The declarations are less than two years old and add further support to the notion that IBOs' share many common characteristics, including, *inter alia*, working over 40 hours per week without receiving overtime premium pay, being generally subjected to S-L's day-to-day oversight and work rules, and playing no role in pricing decisions and other customer negotiations. See generally id.

### F. IBO's are disciplined and terminated for failing to follow S-L's standard rules and expectations.

Discovery is not developed in this case. However, documents gathered in other cases reveal that IBOs are frequently disciplined and terminated for failure to comply with S-L's common rules and expectations. See Ex. E (collection of Breach Letters).

---

[4] At the time of settlement, the Roxberry FLSA collective consisted of 101 individuals who (like the 55 IBOs who already have joined the current lawsuit) learned about the litigation through word-of-mouth and joined without judicial notice being issued.

9

### III. ARGUMENT.

#### A. FLSA conditional certification merely facilitates notice.

FLSA collective actions provide employees with "the advantage of lower individual costs to vindicate rights by the pooling of resources." Hoffman-LaRoche, 493 U.S. at 170. These advantages, however, "depend[] on employees receiving accurate and timely notice . . . so that they can make informed decisions about whether to participate." Id. So judges have a "managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way." Id. at 170-71.

Conditional certification merely facilitates the notice process. As the Third Circuit has explained, conditional certification has nothing to do with "class certification" in the traditional sense: "the certification we refer to here is only the district court's exercise of [its] discretionary power, upheld in Hoffman-LaRoche, to facilitate notice to potential class members, and is neither necessary nor sufficient for the existence of a representative action under FLSA." Symczyk v. Genesis Healthcare Corp., 656 F.3d 189, 194 (3d Cir. 2011). In other words, "'conditional certification' is not really a certification." Zavala v. Wal Mart Stores, Inc., 691 F.3d 527, 536 (3d Cir. 2012); accord Rosinbaum v. Flowers Foods, Inc., 238 F. Supp. 3d. 738, 744 (E.D.N.C. 2017).

#### B. The conditional certification standard is "lenient" and requires "minimal evidence."

In Long, supra, Your Honor cogently described the standard under which FLSA conditional certification motions should be measured:

> The FLSA "embodies a federal legislative scheme to protect covered employees from prohibited employer conduct." Houston v. URS Corp., 591 F. Supp. 2d 827, 831 (E.D. Va. 2008). The FLSA allows a plaintiff alleging a violation of the statute to bring suit on his own behalf or on behalf of other employees who are similarly situated. See 29 U.S.C. § 216(b). Section 216(b) of the FLSA expressly

provides for the procedure for collective actions as follows:

> An action to recover the liability prescribed [under the FLSA] may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Id. Thus, there are two requirements for the certification of a FLSA collective action: (1) the members of the proposed class must be "similarly situated," and (2) the class members must "opt-in" by filing their consent to suit. Id.; see also Romero v. Mountaire Farms, Inc., 796 F. Supp. 2d 700, 705 (E.D.N.C. 2011).

The term "similarly situated" is not defined in the FLSA and the Fourth Circuit has not provided guidance on how the "similarly situated" requirement of § 216(b) should be applied. Gregory v. Belfor USA Group, Inc., No. 2:12CV11, 2012 U.S. Dist. LEXIS 104573, 2012 WL 3062696, at *2 (E.D. Va. July 26, 2012) (slip copy). However, federal district courts in the Fourth Circuit typically follow a two-step approach when deciding whether the named plaintiffs are similarly situated to potential plaintiffs for the purposes of certifying the collective action. See, e.g., Butler v. DirectSAT USA, LLC, 876 F. Supp. 2d 560, 566 (D. Md. 2012); Romero, 796 F. Supp. 2d at 705; Choimbol v. Fairfield Resorts, Inc., 475 F. Supp. 2d 557, 562-63 (E.D. Va. 2006).

At the first stage, the court makes a preliminary determination whether to conditionally certify the class based upon the limited record before the court. Romero, 796 F. Supp. 2d at 705. "Consistent with the underlying purpose of the FLSA's collective action procedure, this initial inquiry proceeds under a 'fairly lenient standard' and requires only 'minimal evidence.'" Id. (quoting Choimbol, 475 F. Supp. 2d at 562); see also Romero, 796 F. Supp. 2d at 705 ("The standard for conditional certification is fairly lenient and requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.") (quotation omitted). The primary focus in this inquiry is whether the potential plaintiffs are "'similarly situated with respect to the legal and, to a lesser extent, the factual issues to be determined.'" De Luna-Guerrero v. The North Carolina Grower's Assoc., 338 F. Supp. 2d 649, 654 (E.D.N.C. 2004) (quoting Ellen C. Kearns, The Fair Labor Standards Act, § 18.IV.D.3, at 1167 (1999)). If the class is conditionally certified, the court typically authorizes plaintiffs' counsel to provide the putative class members with notice of the lawsuit and their right to opt-in. Romero, 796 F. Supp. 2d at 705.

The court proceeds to stage two if the defendant files a motion for decertification, usually after discovery is virtually complete. Choimbol, 475 F. Supp. 2d at 563 (citation omitted). Accordingly, throughout the second stage, courts apply a

11

heightened fact specific standard to the "similarly situated" analysis. Id. Upon a determination that the plaintiffs established the burden of proving they are "similarly situated," the collective action proceeds to trial. Id. On the contrary, if the court determines that the plaintiffs are in fact, not "similarly situated," the class is decertified and the original plaintiffs may proceed on their individual claims. Id.

Long, 292 F.R.D. at 298-99. Moreover:

> a fact-intensive inquiry is inappropriate at the notice stage, as Plaintiff is seeking only conditional certification. See Essame, 847 F. Supp. 2d at 826 (a fact-intensive inquiry "delves too deeply into the merits of the dispute; such a steep plunge is inappropriate for such an early stage of a FLSA collective action"); see also McLaurin v. Prestage Foods, Inc., 271 F.R.D. 465, 470 (E.D.N.C. 2010) ("[C]courts have routinely recognized that where an employer has a common practice of failing to pay employees for all hours worked, factual distinctions of the type claimed by [defendant] provide no basis to deny initial certification of a collective action under the FLSA."). CPI will have an opportunity to argue that individual inquiries predominate over common issues, based upon the discovery, at the second phase. See, e.g., Syrja v. Westat, Inc., 756 F. Supp. 2d 682, 686 (D. Md. 2010) ("In the second stage, following the conclusion of discovery, the court engages in a more stringent inquiry to determine whether the plaintiff class is [in fact] 'similarly situated' in accordance with the requirements of § 216, and renders a final decision regarding the propriety of proceeding as a collective action.") (quotation omitted); Quinteros v. Sparkle Cleaning, Inc., 532 F. Supp. 2d 762, 772 n.6 (D. Md. 2008) ("the Court will entertain, after discovery has largely been complete, a motion for 'decertification' by the Defendants"). Accordingly, Defendant's argument is premature. McLaurin, 271 F.R.D. at 470 (Defendant's "objections are premature and are more appropriately considered during the second stage of the collective action certification"); see also Salomon v. Adderley Indus., Inc., 847 F. Supp. 2d 561, 565 (S.D.N.Y. 2012).

Id. at 303.

### C. Conditional certification has been granted in similar lawsuits.

As noted at page 3 supra, food manufacturers have been subjected to several FLSA lawsuits in which purported "independent contractors" who perform food delivery and merchandising duties seek FLSA protections. Here are some examples district courts conditionally certifying FLSA collectives in such cases:

12

- Rehberg v. Flowers Foods, Inc., 12-cv-00596, 2013 U.S. Dist. LEXIS 40337 (W.D.N.C. March 22, 2013) (Cogburn, J.) (workers distributed bakery products in North Carolina, South Carolina, Virginia, and West Virginia).
- Rosinbaum v. Flowers Foods, Inc., 238 F. Supp. 3d. 738 (E.D.N.C. 2017) (workers distributed bakery products in North Carolina and South Carolina).
- Carr v Flowers Foods, Inc., 15-cv-06391, 2017 U S Dist LEXIS 11347 (E.D. Pa. Jan 26, 2017) (workers distributed bakery products from warehouses in the mid-Atlantic region of the United States).
- Drummond v. Herr Foods Inc., 13-cv-05991, 2015 U.S. Dist. LEXIS 25302 (E.D. Pa. Mar. 2, 2015) (workers distributed snack foods throughout the country).
- Scott v. Bimbo Bakeries, Inc., 10-cv-03154, 2012 U.S. Dist. LEXIS 175016 (E.D. Pa. Dec. 11, 2012) (workers distributed bakery products throughout the country).

Notably, in the above opinions, the judges deemed premature the defendants' attempts to present detailed evidence and get bogged down in too many particulars. See Rosinbaum, 238 F. Supp. 3d at 746 (defendants "conflate[e] the ultimate merits determination regarding plaintiffs' proper FLSA classification with the pertinent question whether members of the proposed class are similarly situated"); Carr, 2017 U S Dist LEXIS 11347, at **11 n.3 ("issues that the defendants raise are more appropriate for consideration at the second step"); Drummond, 2015 U.S. Dist. LEXIS 25302, at *7 ("The vast majority of Herr's arguments are better left for another day."); Rehberg, 2013 U.S. Dist. LEXIS 40337, at *2-5 (summarizing evidence); Scott, 2012 U.S. Dist. LEXIS 175016, *37 ("at this preliminary certification stage, these differences among proposed class members and the potential impact of FLSA exemptions do not undermine Plaintiffs' modest factual showing").

**D. Conditional certification is warranted here.**

Applying the standard described in Long, supra, the Court should conditionally certify an FLSA collective consisting of:

> All individuals who, during any time within the past three years, worked pursuant to a Distributor Agreement with S-L Distribution Company, Inc. or any related company other than individuals covered by: (i) the

13

class/collective action settlement in Tavares v. S-L Distribution Co., Inc., 1:13-cv-01313-JEJ (M.D. Pa.); (ii) the class/collective action settlement in Roxberry v. S-L Distribution Company, Inc., 1:16-cv-02009-JEJ (M.D. Pa.); or (iii) the class action settlement in Bankalter v. S-L Distribution Company, Inc., 2017-SU-000549 (Pa. Common Pleas, York County).

As already noted: "'The standard for conditional certification is fairly lenient and requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'" Long, 292 F.R.D. at 298-99 (quoting Romero, 796 F. Supp. 2d at 705). Plaintiffs satisfy this standard for the following reasons:

*First*, it is undisputed that S-L has implemented an across-the-board policy of classifying all IBOs as non-employee independent contractors not covered by the FLSA. This policy, standing alone, can justify conditional certification. As one judge observed in another independent contractor misclassification case: "Numerous federal courts . . . have granted conditional certification and authorized dissemination of judicial notice based on a simple showing that other employees may also have been subjected to the employer's practice of 'misclassifying' employees." Verma v. 3001 Castor, Inc., 13-cv-03034, 2014 U.S. Dist. LEXIS 88459, *38-39 (E.D. Pa. June 30, 2014); accord McCurley v. Flowers Foods, Inc., 16-cv-00194, 2016 U.S. Dist. LEXIS 146739, *15-16 (D.S.C. Oct. 24, 2016); see also Long, 292 F.R.D. at 304 ("Finally, and most importantly, the Court finds that the putative class members are similarly situated with regard to CPI's policy and practice of treating them as uniformly exempt under the FLSA's 'retail sales exemption'. . .").

*Second*, all IBOs are required to enter into standard Distributor Agreements, are given standardized Guidelines, and are subject to discipline or termination for failing to comply with S-L's across-the-board work rules and expectations. See Section II supra. Such standardized directives, standing alone, provide enough similarity among IBOs to justify conditional

14

certification. In fact, when the Middle District of Pennsylvania certified a settlement class of S-L's 224 Massachusetts IBOs under Rule 23's more demanding class certification criteria, it relied on the common Distributor Agreements in support of its finding that Rule 23(b)(3)'s "predominance" requirement was satisfied: "Further, the facts of each case are largely constrained by the Distributor Agreements, which we have already described as substantially similar to one another." Tavares, 2016 U.S. Dist. LEXIS 57689, at *22; see also Williams v. Jani-King of Philadelphia Inc., 837 F.3d 314 (3d Cir. 2016) (relying on franchise agreement in affirming Rule 23 certification of janitors who alleged they had been misclassified as non-employee franchisees).

***Third***, plaintiffs have submitted 32 separate declarations (22 from the plaintiffs in this case and 10 from IBOs in the Roxberry case) confirming that IBOs share many common characteristics with respect to their job duties and their work relationship with S-L. See Ex. B-C.

In sum, conditional certification is warranted because Plaintiffs have presented the Court with "minimal evidence" sufficient to demonstrate that the "'putative class members were together the victims of a single decision, policy, or plan.'" Long, 292 F.R.D. at 298-99 (quoting Romero, 796 F. Supp. 2d at 705).

## IV. CONCLUSION

For the above reasons, plaintiffs respectfully request that the Court grant this motion by: (i) conditionally certifying the above-described FLSA collective; (ii) requiring S-L to provide to plaintiffs' counsel the last known names, mailing addresses, and email addresses of all putative collective members: and (iii) requiring the parties to promptly agree upon appropriate notice and

15

opt-in forms for submission to the Court for approval.

Date:  August 14, 2018                                   Respectfully,

/s/ Peter Winebrake
Peter Winebrake
Winebrake & Santillo, LLC
715 Twining Road, Suite 211
Dresher, PA 19025
(215) 884-2491

J. Chadwick Hatmaker
J. Keith Coates, Jr.
Woolf, McClane, Bright,
  Allen & Carpenter, PLLC
PO Box 900
Knoxville, TN  37901-0900
(865) 215-1000

*For Plaintiffs*