**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

<table>
<tr><td>

JARED MODE, on behalf of himself and all others similarly situated,

                Plaintiffs,

     v.

S-L DISTRIBUTION COMPANY, LLC,
S-L DISTRIBUTION COMPANY, INC., and
S-L ROUTES, LLC

               Defendants.

</td><td>

No. 3:18-cv-00150-RJC-DSC

</td></tr>
</table>

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................1

II.  BACKGROUND ................................................................................................3

    A.   S-L Contracts with Independent Businesses to Distribute Products.....................3

    B.   The Distributor Agreements, the Form of Which Has Varied Materially, Vest IBOs with Significant Control Over Their Businesses' Dealings with S-L................................................................................................................4

    C.   Testimony Confirms that IBOs Operate Their Companies in Different Ways.......................................................................................................6

III. ARGUMENT .....................................................................................................9

    A.   The "Conditional" Certification Standard Does Not Require that the Court Ignore Existing Evidence and the Individualized Nature of Plaintiffs' Claims ......................................................................................................9

        1.   "Conditional" Certification Is a Discretionary Case-Management Device that Should Facilitate Judicial Efficiency .....................................9

        2.   Plaintiffs Must Identify a Common, Unlawful Policy or Practice Causing a Violation of the FLSA for All Putative Collective Members .........................................................................................11

        3.   The Court May Consider the Record in Deciding Whether to Authorize Nationwide Notice to Several Thousand IBOs and Their Employees ...............................................................................12

    B.   The Court Should Deny Conditional Certification Because Plaintiffs Have Not Shown They Are "Similarly Situated" to Mode or Others Across the Country........................................................................................................14

        1.   Plaintiffs Have Not Shown Any Common Unlawful Policy or Practice .......................................................................................15

            a.   Plaintiffs' Status as Independent Contractors Is Not Enough ......15

            b.   The Distributor Agreements Only Beg the Key Questions and Do Not Suggest a Common Unlawful Policy or Practice .........................................................................................15

            c.   Plaintiffs' Conclusory, Template Declarations Do Not State Any Common Unlawful Policy or Practice—and Actually Underscore Precisely Why Nationwide Notice Is Inappropriate Here ...................................................................17

                (1)   Plaintiffs' Declarations Lack Foundation and Reliability........................................................................18

# TABLE OF CONTENTS
(continued)

**Page**

        (2)    Plaintiffs' Declarations Identify No Common Policy or Practice Resulting in a Violation of the FLSA ............19

    2.    Plaintiffs Cannot Establish Their Claims Through Common Proof, Rendering Collective Adjudication Individualized and Unmanageable .........................................................................................21

  C.    The Court Should Not Notify Anyone Who Agreed Not to Join a Collective Action ..............................................................................................24

IV.    CONCLUSION ............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andel v. Patterson-UTI Drilling Co., LLC*,
280 F.R.D. 287 (S.D. Tex. 2012) ...........................................................................15

*Archer v. Freedmont Mortg. Corp.*,
2013 WL 93320 (D. Md. Jan. 7, 2013) ............................................................. 12, 22

*Bamgbose v. Delta-T Group, Inc.*,
684 F. Supp. 2d 660 (E.D. Pa. 2010)...........................................................12, 15, 17

*Blaney v. Charlotte-Mecklenberg Hosp. Auth.*,
2011 WL 4351631 (W.D.N.C. Sept. 16, 2011) .....................................................11

*Brown v. White's Ferry, Inc.*,
2011 WL 5151394 (D. Md. Oct. 27, 2011) ............................................................22

*Camara v. Mastro's Rests. LLC*,
2018 WL 5281906 (D.D.C. Oct. 24, 2018) ............................................................25

*Clay v. Huntington Ingalls Inc.*,
2011 WL 13205917 (E.D. La. Sept. 29, 2011) ......................................... 10, 11, 14

*Colson v. Avnet, Inc.*,
687 F. Supp. 2d 914 (D. Ariz. 2010)................................................................. 15, 16

*Czopek v. TBC Retail Grp., Inc.*,
2015 WL 4716230 (M.D. Fla. Aug. 7, 2015) ........................................................25

*De Luna-Guerrero v. N.C. Grower's Assoc., Inc.*,
338 F. Supp. 2d 649 (E.D.N.C. 2004) ....................................................................12

*Dearman v. Collegiate Housing Servs., Inc.*,
2018 WL 1566333 (W.D.N.C. Mar. 30, 2018)......................................................15

*Demauro v. Limo, Inc.*,
2011 WL 9191 (M.D. Fla. Jan. 3, 2011) ...............................................................15

*Drew v. Shoe Show, Inc.*,
2011 WL 4387096 (S.D. Ill. Sept. 19, 2011).........................................................17

*In re Family Dollar FLSA Litig.*,
2014 WL 1091356 (W.D.N.C. Mar. 18, 2014).................................... 10, 11, 12, 15

Case 3:18-cv-00150-KDB-DSC   Document 136   Filed 11/05/18   Page 4 of 33

*Feamster v. Compucom Sys., Inc.*,
  2016 WL 722190 (W.D. Va. Feb. 19, 2016) .......................................................................25

*Fischer v. Kmart Corp.*,
  2014 WL 3817368 (D.N.J. Aug. 4, 2014) ...........................................................................25

*Grace v. Family Dollar Stores, Inc.*,
  2007 WL 2669699 (W.D.N.C. Sept. 6, 2007) ........................................................... 9, 10, 12

*Herman v. Mid-Atl. Install. Servs., Inc.*,
  164 F. Supp. 2d 667 (D. Md. 2000) ....................................................................................20

*Hodzic v. FedEx Pkg. Sys., Inc.*,
  2016 WL 6248078 (W.D. Pa. Oct. 26, 2016) ......................................................................17

*Hoffmann-LaRoche, Inc. v. Sperling*,
  493 U.S. 165 (1989) ...........................................................................................................10

*Houston v. URS Corp.*,
  591 F. Supp. 2d 827 (E.D. Va. 2008) .................................................................................11

*Lewis-Gursky v. Citigroup, Inc.*,
  2017 WL 892604 (M.D. Fla. Mar. 6, 2017) ........................................................................24

*Long v. CPI Security Systems, Inc.*,
  292 F.R.D. 296 (W.D.N.C. 2013)) ......................................................................................14

*MacGregor v. Farmers Ins. Exch.*,
  2011 WL 2981466 (D.S.C. July 22, 2011) ..........................................................................12

*McCurley v. Flowers Foods, Inc.*,
  2016 WL 6155740 (D.S.C. Oct. 24, 2016) ..........................................................................25

*McFeeley v. Jackson Street Entm't, LLC*,
  825 F.3d 235 (4th Cir. 2016) ................................................................................. 14, 16, 20

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010) ...............................................................................................11

*Purdham v. Fairfax Cty. Public Sch.*,
  629 F. Supp. 2d 544 (E.D. Va. 2009) ...........................................................................11, 14

*Reich v. Homier Distrib. Co.*,
  362 F. Supp. 2d 1009 (N.D. Ind. 2005) ..............................................................................24

*Rutherford Food Corp. v. McComb*,
  331 U.S. 722 (1947) ...........................................................................................................14

-iv-

*Safarian v. Am. DG Energy, Inc.*,
    622 F. App'x 149 (3d Cir. 2015) ......................................................................21

*Schultz v. Capital Int'l Sec., Inc.*,
    466 F.3d 298 (4th Cir. 2006) ..........................................................................15

*Sloane v. Gulf Interstate Field Servs., Inc.*,
    2017 WL 1105236 (M.D. Pa. Mar. 24, 2017) ..................................................13

*Soares v. Flowers Foods, Inc.*,
    320 F.R.D. 464 (N.D. Cal. 2017) ....................................................................22

*Stone v. SRA Int'l, Inc.*,
    2014 WL 5410628 (E.D. Va. Oct. 22, 2014) ..................................................10

*Symczyk v. Genesis Health Care Corp.*,
    656 F.3d 189 (3d Cir. 2011), *rev'd on other grounds* 569 U.S. 66 (2013) ...........11

*Syrja v. Westat, Inc.*,
    756 F. Supp. 2d 682 (D. Md. 2010) ................................................................10

*Tahir v. Avis Budget Grp., Inc.*,
    2011 WL 1327861 (D.N.J. Apr. 6, 2011) ........................................................24

*Tavares v. S-L Distribution Co.*,
    2016 WL 1743268 (M.D. Pa. May 2, 2016) ....................................................17

*Weckesser v. Knight Enters. Se., LLC*,
    2018 WL 4087931 (D.S.C. Aug. 27, 2018) ....................................................25

*Woods v. Vector Mktg. Corp.*,
    2015 WL 1198593 (N.D. Cal. Mar. 16, 2015) ................................................25

*Yerger v. Liberty Mut. Group, Inc.*,
    2011 WL 5593151 (E.D.N.C. Nov. 15, 2011) ................................................11

**Statutes**

29 U.S.C. § 13(b)(1)............................................................................................24

29 U.S.C. § 216(b) ................................................................................................9

29 U.S.C. § 251(a) ..............................................................................................10

Case 3:18-cv-00150-KDB-DSC   Document 136   Filed 11/05/18   Page 6 of 33

# I.   INTRODUCTION

Plaintiffs ask the Court to grant "conditional" certification and permit formal notice of this lawsuit to roughly 3,000 business owners across the country.  Under the FLSA collective action Plaintiffs propose, the fact-finder would have to determine, in a single proceeding, whether *each member* of this omnibus group did business with S-L Distribution Company, LLC as an independent contractor or whether in reality each acted as an employee.[1]  As Plaintiffs themselves concede, this requires an individualized, fact-specific inquiry assessing the "economic realities" for each member of the collective.  And even if one or more were found to be employees, the question then would turn to figuring out whether and to what extent each person is entitled to minimum wage or overtime pay, another layer of individual adjudication complicated by, among other things, the fact that many members of the proposed collective were passive owners of independent entities and did not *perform* any work for which they now seek compensation.  Simply put, there is no way Plaintiffs could prove each collective member's individual FLSA claim using common evidence, such that a single, unified, and nationwide proceeding would be possible—much less manageable, efficient, or fair.

Nothing in the FLSA or elsewhere requires the Court to turn a blind eye to this reality, even at the conditional certification stage.  And here, the circumstances warrant a more searching inquiry, as the rationale for the "lenient" standard upon which Plaintiffs so heavily rely—the typical *absence* of discovery—does not apply.  To the contrary, not only did Plaintiffs seek to leverage the fruits of discovery from prior cases to sustain their Motion, but the Court also allowed discovery of opt-ins who submitted declarations here.  Dkt. 123.  It is revealing that three of the ten declarants S-L served with discovery dismissed their claims *with prejudice*

---

[1] Plaintiffs named as defendants S-L Distribution Company, LLC, S-L Distribution Company, Inc., and S-L Routes, LLC, referred to collectively as "S-L."  S-L also is a Counterclaim Plaintiff and Third-Party Plaintiff.  S-L Routes, LLC merged into S-L Distribution Company, Inc. in late 2013, and S-L Distribution Company, Inc. later converted to an LLC in late 2016.  The only named defendant that still exists is S-L Distribution Company, LLC.

rather than respond and testify under oath. And the testimony of the nine opt-ins who were deposed (and others deposed in a prior case) shows precisely why this case should *not* be "conditionally" certified. Indeed, the testimony of just this fraction of the putative collective proves they are not "similarly situated" even to one another, much less a broader class of nearly 3,000 geographically dispersed business owners and others who may have worked for them.

Plaintiffs' Motion fails under any standard. They rely on three grounds: (1) all "independent business owners" ("IBOs") do business with S-L as independent contractors; (2) each IBO operates pursuant to a Distributor Agreement with S-L; and (3) virtually identical, conclusory assertions in template declarations from 22 opt-ins, along with 10 who settled their claims in a prior lawsuit and are not even part of the proposed collective. But these grounds only beg the key questions and are legally insufficient to warrant conditional certification.

*First*, shared status as an independent contractor alone cannot be the tie that binds a proper FLSA collective action. If this were enough, nationwide conditional certification would be automatic, a proposition numerous courts have expressly rejected.

*Second*, far from rendering Plaintiffs "similarly situated," the Distributor Agreement (or "Agreement") vests each IBO with broad discretion to operate independently. Even Plaintiffs concede the Agreements—containing an express understanding that they act as independent contractors—*do not* control, but rather contain mere "labels" that are "of little consequence," meaning the Court must look past each Agreement to conduct a fact-specific, "multi-factor 'economic realities'" test for each individual. Dkt. 110, Pls.' Mot. for Cond. Cert. ("Mot."), at 2-3. Indeed, named plaintiff Jared Mode and several opt-ins testified that they believe S-L *breached* the Agreement in their specific instances by allegedly exercising control over their businesses in violation of specific terms to the contrary. Moreover, several opt-ins—again including Mode—are not even signatories to *any* relevant version of an Agreement. And, different IBOs were (and still are) subject to different versions of the Agreement, with

materially different terms—not the least of which is the presence in many Agreements of a binding collective action waiver that Plaintiffs' counsel has *conceded* is enforceable and will exclude many within the proposed collective here, including at least one declarant who chose to dismiss his claims *with prejudice* and more than a dozen of the other opt-ins.

*Third*, Plaintiffs' template declarations rest on unsupported observations about other unidentified people and alleged similarities untethered to the legal questions here. Removing all doubt, the opt-ins' deposition testimony undermined these declarations and revealed material *dissimilarities*, underscoring why resolving each claim in a single proceeding is untenable.

Given their disparate circumstances, adjudicating the employment status of each of the thousands of individuals who perform services for IBOs across the country will devolve into a series of individualized determinations, requiring evidence specific to each putative member. These claims do not lend themselves to collective adjudication. The Court does not have to ignore this reality now, only to kick-the-can down the road to some later date. Allowing notice is discretionary, and S-L respectfully submits this Court should decline Plaintiffs' request here because notice offers no promise of the efficiency for which § 216(b) of the FLSA is designed.

## II.    BACKGROUND[2]

### A.    <u>S-L Contracts with Independent Businesses to Distribute Products.</u>

Snyder's-Lance, Inc., through its affiliates, manufactures and markets leading brands of snack foods. Snyder's-Lance, Inc. contracts with an operating subsidiary, S-L Distribution Company, LLC, to distribute certain products to retailers around the country. In addition to Snyder's-Lance products, S-L Distribution provides distribution services to various third-party companies, including many whose products compete with Snyder's-Lance products ("partner brands"). S-L Distribution uses a national "direct-store delivery" distribution network, which

---

[2] Plaintiffs' "Preliminary Points" and "Facts" sections rely extensively on Snyder's-Lance, Inc.'s 2017 Form 10-K. Mot. at 3-6. S-L will not respond to all of Plaintiffs' misstatements, misquotations, and misrepresentations, except to say the document speaks for itself and does not support the Plaintiffs' misleading excerpts and argument.

includes more than 3,200 distinct geographic territories. Mot. at 4-5. This network, however, is not the exclusive means by which Snyder's-Lance distributes products to retailers.

Most territories are owned and operated by an Independent Business Owner, or "IBO." Mot. at 5. Most IBOs are independent entities that purchase the route and thereby obtain certain exclusive rights to distribute Snyder's-Lance products to retail customers in its territory. *See, e.g.*, Dkt. 25-1, J&M Mode Distr. Agmt ("J&M Agmt."). Some IBOs purchase routes from S-L, while some buy from other IBOs, who often reap a sizeable gain on their investment.[3] And still other IBOs enter separate agreements with S-L to service a territory independently, but with no ownership interest—and many IBOs had *both* relationships with S-L at different times.[4]

### B. The Distributor Agreements, the Form of Which Has Varied Materially, Vest IBOs with Significant Control Over Their Businesses' Dealings with S-L.

S-L typically contracts with IBOs through an Agreement, though different versions have been used, with materially different terms governing each IBO. *Infra* at 15-16. At the most general level, however, the Agreement grants IBOs certain exclusive rights to sell and distribute certain products within the IBO's territory, in exchange for the IBO's agreement to maximize sales and meet its territory's customers' expectations. *See, e.g.*, J&M Agmt. at 2.

Under the Agreement, an IBO purchases Snyder's-Lance and/or partner brand products (from S-L directly or third parties), and in turn sells, promotes, and distributes those products to stores or other customers in the IBO's territory, which may range from large chain stores (*e.g.*, Walmart or Kroger) to convenience stores, mini-marts, or mom-and-pop businesses.[5] *See* J&M

---

[3] *See, e.g.*, Ex. 1, Bushnell Dep. 112:22-118:23 (profited by selling part of his territory, and set price based on his perception of "market value"); Ex. 2, Akelman Dep. 107:17-110:5 (he and his "investor" knew "what we want for the route," noting "[e]verything is for sale for the right price"). S-L attaches as Exhibits 1 to 13 a true and correct copy of the pertinent portions of deposition transcripts, each referred to herein as "Ex. __, [Last Name] Dep."

[4] *See* Ex. 3, R. Sturino Dep. 87:2-90:5 (after selling his territory, his prior Distributor Agreement ceased, and his IBO entered a new "service" Distributor Agreement; "I mean, I'm sure it's different than the other ones.").

[5] In this regard, different IBOs have different types of territories. For instance, some have "grocery" territories, which focus on one or more large grocery chain stores, while others have "mass/c-store" territories, which focus on mass stores (like Walmart or Target) and/or smaller convenience stores (like Circle K or 7-11), while still others have "traditional" territories, which might include a combination of the other two. *See infra* at 6-9.

4

Agmt. Art. 3. Some stores are "cash accounts," which pay the IBO directly, while other stores request central billing through S-L, which then credits the IBO for its sales. *Id.* Art. 10. The IBO retains the revenue generated from this business, which includes (but is not limited to) the difference between the price an IBO pays for products and the price at which it sells them to customers in its territory. *Id.* Arts. 4, 10; *see* Dkt. 122, MTD Order, at 2 (Sept. 5, 2018).

The Agreement expressly states the parties' intent to "create an independent contractor relationship." J&M Agmt. Art. 2B. Each IBO further agrees that neither it nor its owners or employees will "be treated as an employee, franchisee, partner, venture or agent of [S-L]" for any purpose, and neither it nor its owners will receive benefits typically provided to employees, including "wages" and "overtime payments," among others. *Id.* Arts. 2E, 2G, 25B.

The Agreement makes clear that S-L is "interested only in the results obtained under this Agreement"—namely, that products are sold and distributed in the IBO's territory pursuant to each store's demands—but the "manner, means and methods by which [the IBO] achieves these results" are left to each IBO, "based upon [its] independent discretion and judgment." *See* J&M Agmt. Art. 2B. Such means include "the IBO's schedule, hours worked, sequence of performing work, when breaks are taken, vehicles and equipment utilized, and other details of performance." *Id.* The IBO has authority to determine which products to purchase, and in what amount, to meet the needs of each store, and may negotiate the price it charges certain accounts. *Id.* Arts. 4, 5. And each IBO is free to try to grow sales by seeking new stores, fostering existing relationships, promoting products, or working to get more sales space. *Id.* Arts. 5, 8.

Moreover, an IBO may hire employees or helpers to assist in providing services under the Agreement, without even notifying S-L. *See id.* Art. 5E. Indeed, S-L agrees it "will have no authority to control or direct the performance of any [IBO] employees," *id.* Art. 2B, while the IBO agrees to comply with federal, state, and local employment laws, *id.* Art. 5E-F. Likewise, the IBO agrees to be solely responsible for all costs of operating its business, and for

5

providing and maintaining "all personnel, supervision, facilities, equipment . . . and materials as may be needed for the efficient and proper distribution and sale of the Products" in its territory. *Id.* Art. 5B. And nothing precludes an IBO or its employee(s) from engaging in other work while contracting with S-L, including distributing products for competitors. *Id.* Art. 2F.

In short, each Agreement grants each IBO significant latitude to operate the business, so long as it achieves the result for which S-L engaged it: maximizing the sale and distribution of Snyder's-Lance and partner-brand products in its territory.

### C.    Testimony Confirms that IBOs Operate Their Companies in Different Ways.

Different IBOs achieve their business objectives in materially different ways. Plaintiffs submitted 22 boilerplate declarations, along with ten declarations their counsel obtained in a prior case against S-L. Mot. at 9; Dkt. 109-3 (declarations from *Roxberry v. S-L Distr. Co., Inc.*, No. 1:16-cv-02009 (M.D. Pa.)). The Court allowed S-L to depose up to ten declarants in this case. Dkt. 123. That testimony, bolstered by testimony from the *Roxberry* declarants— which Plaintiffs conspicuously fail to mention—not only reveals that each IBO or its employees operate differently, and with varying degrees of involvement by S-L, but also confirms they have no foundation for assertions about how other IBOs choose to run their businesses.[6]

For instance, some IBOs hired employees or helpers. These ranged from isolated instances,[7] to regular part-time help,[8] to full-time employees handling an entire route.[9] In fact,

---

[6] As noted, S-L initially identified ten deponents, but three chose to dismiss their claims rather than respond to discovery and testify. Dkt. 134 (granting dismissal of two opt-ins); Dkt. 135 (Joint Mot. to Dismiss Opt-in Anthony Sarti). Plaintiffs agreed to produce only two declarants in their stead, leaving S-L with just nine depositions of opt-in plaintiffs.

[7] *See, e.g.*, Ex. 4, Mode Dep. 89:11-90:4, 173:25-175:9 (Mode's father and another employee drove after Mode received a DUI); Ex. 5, Fritts Dep. 74:20-24, 91:3-93:5 (uses a helper a couple of times per year); Ex. 1, Bushnell Dep. 65:8-23 (hires someone for vacation days or as needed); Ex. 6, Eardley Dep. 54:4-56:18, 119:7-126:5 (same).

[8] *See, e.g.*, Ex. 7, Garguilo Dep. 28:1-31:25, 131:22-132:9 (hired part-time help up to three days per week and paid $100/day in cash); *see also* Ex. 8, *Roxberry*, Grutsch Dep. 230:14-238:24 (hired someone to help on Sundays, every other month, paying $599 per year), 242:19-244:5 (knew group of IBOs who arranged, collectively, to hire three employees to rotate as part-time help to cover routes or other tasks should the need arise).

[9] *See, e.g.*, Ex. 1, Bushnell Dep. 63:9-64:13 (he understands some IBOs use full-time employees to handle entire route); Ex. 10, M. Sturino Dep. 42:16-43:3 (knew IBO whose son handled entire route when he got sick); *see also* Ex. 11, *Roxberry*, Snyder Dep. 17:25-19:10, 48:19-50:23, 215:19-216:4 (her IBO hired a full time employee for a

6

named plaintiff Mode's mother, *not* Mode, owns the entity for which he worked during the proposed collective period, which paid him a weekly sum to run the entire route. Ex. 4, Mode Dep. 109:19-114:4; J&M Agmt. at 26 (signed by Mitzi Mode). Likewise, opt-in Michael Sturino *did not* own MBS Distribution, LLC; rather, his stepmother did, financed and purchased the route, and paid Sturino—as an employee, with tax withholdings—a wage based on what Sturino "determined that [he] could live on." Ex. 10, M. Sturino Dep. 20:11-21:2, 26:13-28:24; 30:1-31:11; Dkt. 25-4, MBS Distrib. Agmt. at 26. And, despite having a full-time job and not doing any work for MBS, Sturino's step-mother *also* opted-in here, stating she "worked for" S-L. Ex. 10, M. Sturino Dep. 20:11-21:1; Dkt. 4-1 at 5.

Some IBO owners perform other jobs. For example, opt-in Jonathan Garguilo owned a distributorship for S-L competitor Bimbo Bakeries during the same period he claims to have been "employed" by S-L.[10] Similarly, two *Roxberry* declarants distributed products for S-L and Snyder's-Lance competitor UTZ Quality Foods, even while on the *same route* as delivering for S-L.[11] And deponents who did not perform such work agreed they could if they wanted.[12]

Some IBOs took more control over sales and profits than others. For example, several added new stores to their routes, increasing the "cash accounts" that paid the owners directly.[13] Others chose not to add stores (or removed them), independently calculating they would not be profitable.[14] Some IBOs own a "grocery" route, servicing only large stores with no convenient

---

period so she could "stay home with [her] daughter," and she knew an IBO who owned two routes, with the owner operating one and hiring employee to handle second entirely); Ex. 8, *Roxberry*, Grutsch Dep. 215:10-13; 229:2-230:13 (hired assistant for four weeks, including for *entire* route for half that time, after injuring knee).

[10] *See, e.g.*, Ex. 7, Garguilo Dep. 8:2-12:2, 220:18-221:12.

[11] *See* Ex. 9, *Roxberry*, Smawley Dep. 106:5-07-108:25, 116:3-16, 137:3-139:9; Ex. 8, *Roxberry*, Grutsch Dep. 143:10-22, 159:2-7; 226:23-227:4, 265:11-276:8 (he spends roughly 2 hours per day on an Utz route).

[12] *See, e.g.*, Ex. 5, Fritts Dep. 52:6-53:9; Ex. 2, Akelman Dep. 87:2-18; Ex. 10, M. Sturino Dep. 53:16-57:5 (worked other part-time, non-distributor jobs at the same time he handled the route for MBS Distribution, LLC).

[13] *See, e.g.*, Ex. 10, M. Sturino Dep. 45:12-47:1; Ex. 2, Akelman Dep. 97:23-98:25 ("If I see a potential customer that I want to go get, I go get it."); *see also, e.g.*, Ex. 11, *Roxberry*, Snyder Dep. 36:5-18, 56:14-24: (her cash accounts yielded $600/week, paid directly to her, not S-L).

[14] *See, e.g.*, Ex. 10, M. Sturino Dep. 47:3-49:1 (removed stores, including ones S-L personnel suggested he try to keep); Ex. 12, *Roxberry*, Manning Dep. 200:16-201:4 (stopped servicing cash account because he was not making

stores or cash accounts at all.[15]  Some IBOs or their workers tried to boost sales at existing

stores, by fostering relationships with store managers and/or requesting more space in the store,

including adding displays or "end caps," actively suggesting products that may sell better, or

welcoming Snyder's-Lance promotions.[16]  Other IBOs claim not to have done so.

The deponents testified to varying levels of interaction with S-L personnel.  Some had

fairly regular contact, while others rarely communicated with anyone from S-L.[17]  Some IBOs

purchase products from a warehouse, while others order once per week and have them delivered

to a "bin" near their territory, impacting how often they see S-L personnel and their access to

product.[18]  Several deponents said they often decline recommendations by S-L personnel

without repercussion.[19]  Some IBOs received a "breach letter" for failing to perform their

obligations under the Agreement; other IBOs *never* received such a letter, do not know what

might prompt one, and know no other IBO whose route was terminated as a result of one.[20]

Each IBO (whether by the owner or an employee) manages the operating schedule and

route, subject only to the needs, service expectations, and receiving procedures of the IBO's

---

money); Ex. 11, *Roxberry*, Snyder Dep. 37:10-39:15.  The deponents identified no repercussion for these decisions.

[15] *See, e.g.*, Ex. 1, Bushnell Dep. 35:13-37:15 (he did not believe he even *could* add "cash accounts").

[16] *See, e.g.*, Ex. 4, Mode Dep. 59:15-60:6 (good relationships with stores could increase sales and profitability), 60:24-61:13 (increased profitability by identifying products that sold well and choosing placement); Ex. 5, Fritts Dep. 42:4-23 (independently seeks opportunities for end caps); Ex. 7, Garguilo Dep. 129:2-4, 150:14-151:5 (he obtained end-cap and display space in certain stores); Ex. 2, Akelman Dep. 94:23-98:25 (same); Ex. 13, Seibert Dep. 80:5-17 (discussing end-caps, stating "every store is different, and I'm sure every manager is different").

[17] *See, e.g.*, Ex. 5, Fritts Dep. 103:3-21 ("On a normal week I usually receive a couple texts, a couple e-mails. I do not always talk to [the district manager] on a weekly basis, and I don't always see him on a weekly basis."); Ex. 13, Seibert Dep. 14:5-15:10, 129:24-130:14 (works from a "bin," thus sees district manager less than those operating from Richmond warehouse; manager now handles an entire route, and Seibert sees him even less); Ex. 7, Garguilo Dep. 158:14-23 (would not surprise him if some view S-L personnel as *supporting*, not "oversee[ing]" them); Ex. 4, Mode Dep. 155:8-156:18 (to his knowledge, each S-L district manager was "a little different").

[18] *See, e.g.*, Ex. 13, Seibert Dep. 14:5-18:7, 88:1-94:7, 99:21-102:6, 129:24-130:14; Ex. 7, Garguilo Dep. 22:11-24:24 (worked from *both* a warehouse and a "bin" during his distributorship).

[19] *See, e.g.*, Ex. 1, Bushnell Dep. 71:2-72:24, 85:12-18, 86:16-88:9 (received "no specific consequence" for declining to go to stores a certain number of times, to add specific quantity of product, and to add Snyder's-Lance promotions); Ex. 5, Fritts Dep. 68:23-70:6 (did not always put manufacturer-suggested amount for promotions); Ex. 4, Mode Dep. 58:12-59:3 (chose to follow "planograms" less often to increase sales), 108:16-109:18 (set shelves how he saw fit to increase sales), 208:1-8 (never had a "breach letter" for not following guidelines).

[20] *See, e.g.*, Ex. 5, Fritts Dep. 70:18-71:12 (never received a breach letter and doesn't "have any understanding at all" about what they are "because [he's] never seen one"); Ex. 1, Bushnell Dep. 92:16-94:4.

customers. Each IBO's representatives determine what hours to work, which days to take off, which stores to service, and in what order.[21] They choose the vehicle(s) to use, with some using box trucks, others pulling trailers, and some using personal vehicles.[22] An IBO receiving product at a "bin" may need to go to a warehouse—often at some distance—to replenish products mid-week, while someone who purchases directly at the warehouse may find it easy to go there multiple times per week.[23] However, some "bin"-based IBOs have their own key and 24/7 access, while a warehouse—like any independent business—has operating hours.[24]

This sampling of ways in which IBOs and those who provide services for IBOs maintain individual control and are differently situated—readily apparent from this handful of deponents alone—would only multiply through full discovery in this case.

## III.    ARGUMENT

### A.    The "Conditional" Certification Standard Does Not Require that the Court Ignore Existing Evidence and the Individualized Nature of Plaintiffs' Claims.

#### 1.    "Conditional" Certification Is a Discretionary Case-Management Device that Should Facilitate Judicial Efficiency.

The FLSA allows a plaintiff to bring a collective action on behalf of himself and others who are "similarly situated." 29 U.S.C. § 216(b). The statute does not define that phrase, nor has the Fourth Circuit addressed how courts should manage FLSA collective actions. *See, e.g.*, *Grace v. Family Dollar Stores, Inc.*, 2007 WL 2669699, at *22 (W.D.N.C. Sept. 6, 2007).

---

[21] *See, e.g.*, Ex. 4, Mode Dep. 145:10-148:4 (agreeing delivery schedules, hours worked, and sequence of stores varies from IBO to IBO, depending on make-up of territory and stores' receiving hours); Ex. 5, Fritts Dep. 73:13-20, 86:18-87:6 (can go to warehouse any time it is open, and he controls his schedule generally); Ex. 1, Bushnell Dep. 60:16-19, 68:7-25 (chooses to structure schedule to take Thursdays off); Ex. 13, Seibert Dep. 94:24-96:23, 98:21-99:9 (structures schedule for a "light day" on Tuesday, and to work 4-5 hours on Wednesday and Thursday).

[22] *See, e.g.*, Ex. 1, Bushnell Dep. 77:5-14 (uses box truck and personal vehicle); Ex. 5, Fritts Dep. 77:1-79:14 (same, S-L does not dictate); Ex. 6, Eardley Dep. 66:17-69:13 (pulls trailer with vehicles also used personally).

[23] *Compare, e.g.*, Ex. 13, Seibert Dep. 99:21-102:6 (loads from bin on Mondays, but often travels 45 minutes to Richmond warehouse on Fridays to replenish products, while other IBOs near him go less), *with* Ex. 5, Fritts Dep. 72:7-73:20 (can go to warehouse 15 miles from home any time it is open), *and* Ex. 1, Bushnell Dep. 74:12-75:16, 133:13-134:11 (controls when and how often to go to nearby warehouse, during open hours).

[24] *Compare, e.g.*, Ex. 13, Seibert Dep. 90:15-92:15 (had own key and 24/7 access to his bin), *and* Ex. 7, Garguilo Dep. 21:23-23:22 (could go to bin "anytime"), *with* Ex. 5, Fritts Dep. 73:10-17, 143:10-145:14 (can go to warehouse whenever open, but would prefer longer open hours), *and* Ex. 10, M. Sturino Dep. 84:3-94:19 (same).

9

Relying on the Supreme Court's ruling in *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165 (1989)—which holds merely that a court may facilitate notice to potential plaintiffs "in appropriate cases"—many courts have used a two-stage analysis. *See, e.g.*, *In re Family Dollar FLSA Litig.*, 2014 WL 1091356, at *1-2 (W.D.N.C. Mar. 18, 2014). The first stage, known as "conditional certification," determines whether a court should help a named plaintiff in sending notice of the lawsuit to other potential opt-ins. *Id.* The second stage, often triggered by a "decertification" motion, resolves whether the case will in fact be tried on a collective basis. *Id.*

The origin of this two-stage approach is central to understanding why the Court should not authorize notice here. In response to a flood of "representative" litigation, in 1947 Congress amended § 216(b) to *limit* employees' ability to proceed collectively. Notably, Congress barred representative actions and, unlike Rule 23 class actions, expressly restricted suits under § 216(b) to include only those "similarly situated" individuals who file a consent to join the litigation.[25]

Addressing § 216(b)'s opt-in requirement, *Hoffman-LaRoche* held only that a court may, in appropriate cases, authorize notice of a lawsuit to "similarly situated" individuals. 493 U.S. at 169-70. Because such notice often comes at the outset, a plaintiff typically has limited or no discovery, leading many courts to describe the burden for obtaining "conditional" certification as "lenient" or "modest." *See, e.g.*, *Family Dollar*, 2014 WL 1091356, at *2; *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 686 (D. Md. 2010). Nevertheless, facilitating notice resides squarely within the Court's discretion, *Grace*, 2007 WL 2669699, at *2, and the touchstone for "conditional" certification remains judicial efficiency, *Hoffman-LaRoche*, 493 U.S. at 170.[26]

No efficiency is gained, however, by accepting Plaintiffs' invitation to rubber-stamp a

---

[25] Indeed, Congress even codified its findings that the FLSA, as it previously existed, "creat[ed] wholly unexpected liabilities" and that, absent appropriate limitations, "the courts of the country would be burdened with excessive and needless litigation[.]" 29 U.S.C. § 251(a).

[26] *See also Stone v. SRA Int'l, Inc.*, 2014 WL 5410628, at *8 (E.D. Va. Oct. 22, 2014) ("[T]he Court's role at this stage requires screening unmanageable or judicially inefficient classes."); *Clay v. Huntington Ingalls Inc.*, 2011 WL 13205917, at *5 (E.D. La. Sept. 29, 2011) ("The collective action mechanism of the FLSA serves no utility if thousands of plaintiffs join together in one lawsuit only to then try their claims individually.").

*nationwide* collective action without getting "bogged down in too many particulars." Mot. at 13. To the contrary, a meaningful review at the notice stage is important, as it would waste the Court's and the parties' time and money to notify an expansive, diverse class only to determine later what was obvious at the outset: that class members cannot establish their claims collectively and using common proof. *See, e.g., Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, 2011 WL 4351631, at *10 (W.D.N.C. Sept. 16, 2011) ("[T]he Court need not certify the action and facilitate notice where . . . it would inevitably decertify the action in a month's time.").[27]

### 2. Plaintiffs Must Identify a Common, Unlawful Policy or Practice Causing a Violation of the FLSA for All Putative Collective Members.

The typical burden for conditional certification, though described as "lenient," is "not invisible." *Blaney*, 2011 WL 4351631, at *3; *Purdham v. Fairfax Cty. Public Sch.*, 629 F. Supp. 2d 544, 548 (E.D. Va. 2009). Rather, Plaintiffs must provide a "reasonable basis" to find they are "similarly situated" to the thousands who would receive notice, and "some factual evidence is necessary." *Yerger v. Liberty Mut. Group, Inc.*, 2011 WL 5593151, at *4 (E.D.N.C. Nov. 15, 2011); *see Purdham*, 629 F. Supp. 2d at 548. And not any similarity will do. Plaintiffs must show they are similarly situated in ways that *matter* to proving their claims.

*First*, Plaintiffs must demonstrate that they and others were, collectively, victims of a common policy, scheme, or plan resulting in the legal violation they actually assert. *See* Mot. at 11; *Family Dollar*, 2014 WL 1091356, at *2; *Houston v. URS Corp.*, 591 F. Supp. 2d 827, 832 (E.D. Va. 2008) (common issues must be "central to the disposition of the FLSA claims" and resolvable without "facts unique or particularized as to each class member").[28] Absent some

---

[27] Courts also recognize what FLSA practitioners know well: regardless of the merits of a plaintiff's claims, obtaining early "conditional" certification "signals the potential expansion of the case and the need for significant and expensive class-wide discovery." *Clay*, 2011 WL 13205917, at *4.

[28] *See Symczyk v. Genesis Health Care Corp.*, 656 F.3d 189, 192-93 (3d Cir. 2011), *rev'd on other grounds* 569 U.S. 66 (2013) (plaintiff must show "a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other[s]"); *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (must show "potential opt-in plaintiffs together were victims of a common policy or plan that violated the law").

common *unlawful* policy or practice to bind the claims of putative class members, the rationale for proceeding collectively evaporates. Superficial similarities having nothing to do with the question of liability are of little relevance. *See, e.g.*, *MacGregor v. Farmers Ins. Exch.*, 2011 WL 2981466, at *2 (D.S.C. July 22, 2011); *Family Dollar*, 2014 WL 1091356, at *2.

*Second*, notice is inappropriate where collective adjudication requires "an unmanageable assortment of individualized factual inquires." *Archer v. Freedmont Mortg. Corp.*, 2013 WL 93320, at *4 (D. Md. Jan. 7, 2013); *see Family Dollar*, 2014 WL 1091356, at *1 (if collective action "would not serve the interests of judicial economy, plaintiffs should not be permitted to request court-supervised notice as a tool for drumming-up business") (citations omitted). Rather, Plaintiffs are "similarly situated" only if their claims arise "from at least a manageably similar factual setting." *De Luna-Guerrero v. N.C. Grower's Assoc., Inc.*, 338 F. Supp. 2d 649, 654 (E.D.N.C. 2004) (quotations omitted). Thus, it is not only relevant, but necessary, to consider whether the fact-finder must engage in individualized inquiries to resolve each claim.

*Third*, while this is not the time to resolve merits issues, Mot. at 2, this does not mean the Court must ignore the elements of Plaintiffs' claims or the evidence needed to prove them. Rather, it is only by reference to these facts that the Court can determine what *meaningful*, common nexus must connect the proposed class before justifying collective adjudication and achieving the efficiency intended by § 216(b). *See, e.g.*, *Bamgbose v. Delta-T Group, Inc.*, 684 F. Supp. 2d 660, 668-69 (E.D. Pa. 2010) (courts "must analyze whether [class members] are similarly situated with respect to the analysis it would engage in to determine whether the workers are employees or independent contractors"); *Family Dollar*, 2014 WL 1091346, at *2.

### 3. The Court May Consider the Record in Deciding Whether to Authorize Nationwide Notice to Several Thousand IBOs and Their Employees.

This case is different than many proposed FLSA collective actions, as the parties already have "extensive" discovery related to their claims. The Court allowed S-L to seek documents

and deposition testimony from a sampling of opt-in declarants here, Dkt. 123, which has revealed significant divergences among even those nine individuals. Moreover, Plaintiffs' attorneys acknowledge representing other IBOs in three prior lawsuits against S-L, each raising claims similar to those asserted here. Mot. at 4, 9. Indeed, in *Roxberry*, plaintiffs also sought conditional certification of a *nationwide* class mirroring the proposed class here. Ex. 14, *Roxberry*, Dkt. 71. The parties settled before the court ruled—but not before S-L produced significant discovery. As Plaintiffs' counsel described it when seeking settlement approval: "**Discovery has been extensive.** S-L produced approximately 141,000 pages of documents and voluminous electronic compensation data and responded to written interrogatories. Plaintiffs, meanwhile, produced over 3,500 pages of documents and responded to nine sets of interrogatories. Eight depositions have been completed, and class counsel have interviewed well over 50 IBOs." Ex. 15, *Roxberry*, Dkt. 163, at 3-4 (emphasis added). And Plaintiffs not only *have* extensive discovery from S-L, but they rely on some of it to support their Motion.[29]

There is no reason for the Court to ignore this evidentiary record in resolving Plaintiffs' Motion, particularly when Plaintiffs have cherry-picked discovery from prior cases, while ignoring other evidence in the same record that shows why conditional certification is inappropriate.[30] Indeed, courts have applied a more searching standard when the rationale for the "lenient" first-stage standard—the typical lack of discovery early in a case—does not exist, including where plaintiffs' attorney obtained discovery in prior cases.[31]

---

[29] For example, they cite "documents gathered in other cases" and attach a 70-page collection of "breach letters," *every one of which* pre-dates their proposed collective period and pertains to IBOs in Massachusetts only, many of which are expressly *excluded* from the proposed collective in this case. Mot. at 9; Dkt. 109-5. They also attach a document titled "Suggested Operating Guidelines" signed in December 2011, long before any date relevant here, by an opt-in plaintiff in another case who also is excluded from their proposed class. Dkt. 109-6. And Plaintiffs attach ten *Roxberry* declarations, omitting that these individuals offered deposition testimony at odds with their declarations *and* revealing key differences among them, and they, too, are excluded from the putative class here.

[30] The extensive record here differentiates this case from those Plaintiffs cite (at 13) to justify their request that the Court ignore "detailed evidence" now and the "particulars"—no matter how obvious from the existing record—to a later date, after thousands of others may have opted-in. That this case cannot be fairly and efficiently adjudicated collectively is clear now, and nothing precludes the Court from acknowledging that reality at this stage.

[31] *See, e.g.*, *Sloane v. Gulf Interstate Field Servs., Inc.*, 2017 WL 1105236, at *8 (M.D. Pa. Mar. 24, 2017)

**B.** **The Court Should Deny Conditional Certification Because Plaintiffs Have Not Shown They Are "Similarly Situated" to Mode or Others Across the Country.**

The crux of Plaintiffs' FLSA claims is that they are entitled to overtime and minimum wage compensation because they should have been classified as "employees," not independent contractors. *See* Dkt. 1, Compl. ¶¶ 29, 35. As Plaintiffs acknowledge (*id.* ¶ 13), courts generally employ a six-factor "economic realities" test to determine whether an individual acted as an independent contractor or an employee under the FLSA: (1) the degree of control over the manner of work; (2) the opportunity for profit/loss depending on managerial skill; (3) the investment in equipment or materials, or the employment of helpers; (4) whether the service requires a special skill; (5) the degree of permanence of the relationship; and (6) whether the service is an integral part of the alleged employer's business. *See McFeeley v. Jackson Street Entm't, LLC*, 825 F.3d 235 (4th Cir. 2016). No single factor is determinative; rather, the analysis turns "upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). As even reciting the factors makes clear, the test is highly fact-specific, "allow[ing] for flexible application to the myriad different working relationships that exist" in the marketplace. *McFeeley*, 825 F.3d at 241. After all, the "employee/independent contractor distinction is not a bright line but a spectrum, and . . . courts must struggle with matters of degree rather than issue categorical pronouncements." *Id.*[32]

---

(applying higher standard "where nearly the same exact counsel and parties have already exchanged discovery in two strikingly similar actions"); *Purdham*, 629 F. Supp. 2d at 547 ("When sufficient evidence in the record at the initial 'notice' stage makes it clear that notice is not appropriate, however, a court can collapse the two stages of the analysis and deny certification outright."); *Clay*, 2011 WL 13205917, at \*5 (courts need not "blithely certify the action with a blind eye toward deficiencies that discovery has already revealed").

[32] For these reasons, Plaintiffs' heavy reliance upon this Court's ruling in *Long v. CPI Security Systems, Inc.*— including a two-page block quotation—is misplaced. Mot. at 10-12 (quoting 292 F.R.D. 296, 298-99 (W.D.N.C. 2013)). In *Long*, there was no dispute over employment status, but rather a claim that the employer misclassified employees as exempt from the FLSA to deny them overtime pay. *See* 292 F.R.D. at 301-02. Thus, the nature of the claim in *Long* was different, and it was enough for the putative collective to share a job title, responsibilities, payment method, schedule, and other commonalities. *Id.* Here, as Plaintiffs *concede*, the Court must go beyond these types of facts—which are *not* common among Plaintiffs—to examine the "economic realities" of each IBO, its owners, and any employees. This inquiry will uncover myriad differences, just as the discovery to date has *already* confirmed. Moreover, the factual record here is far more developed than in *Long*, particularly when taking into account the "extensive discovery" Plaintiffs' counsel obtained in *Roxberry* and other prior cases.

14

### 1. Plaintiffs Have Not Shown Any Common Unlawful Policy or Practice.

Plaintiffs rest their Motion on three alleged commonalities: (1) each IBO is classified as an independent contractor; (2) each IBO signed a Distributor Agreement; and (3) each IBO (or the person performing services for the IBO) supposedly has a similar working relationship with S-L, based on boilerplate declarations, many from IBOs expressly excluded from the proposed collective. Mot. at 14-15. None of these grounds justify conditional certification.

#### a. Plaintiffs' Status as Independent Contractors Is Not Enough.

The simple fact that IBOs did business with S-L as independent contractors is not sufficient to justify nationwide notice.[33] If this were all it took, "conditional" certification in cases like this would be automatic. In fact, Plaintiffs themselves ask the Court to look *beyond* the parties' "independent contractor label," to the fact-intensive "economic realities" test. Mot. at 2-3 (quoting *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006)); Compl. ¶ 13. For good reason, then, a common classification, alone, is not enough to bind a collective. *See Dearman v. Collegiate Housing Servs., Inc.*, 2018 WL 1566333, at *3 (W.D.N.C. Mar. 30, 2018) (Conrad, J.) ("[I]t is not enough to merely point to common job titles and a uniform classification to properly support a showing that potential plaintiffs are all similarly situated").[34]

#### b. The Distributor Agreements Only Beg the Key Questions and Do Not Suggest a Common Unlawful Policy or Practice.

Likewise, the fact that each IBO entered into an Agreement cannot be the tie that binds a FLSA collective. For one, nearly every "independent contractor" relationship will, as the name suggests, involve a "contract." Thus, the mere existence of a supposedly "standard" Agreement (Mot. at 6) no more demonstrates that each putative opt-in across the country is "similarly

---

[33] In fact, the putative collective here is not even similarly situated in this most basic characteristic. As noted, neither named plaintiff Mode nor opt-in Michael Sturino was an "independent contractor" or owner of the IBO that contracted with S-L during the relevant period, but rather were *employees* or workers for those entities. *Supra* at 7.

[34] *Accord Family Dollar*, 2014 WL 1091356, at *2; *Andel v. Patterson-UTI Drilling Co., LLC*, 280 F.R.D. 287, 290 (S.D. Tex. 2012); *Demauro v. Limo, Inc.*, 2011 WL 9191, at *3 (M.D. Fla. Jan. 3, 2011); *Bamgbose*, 684 F. Supp. 2d at 668-69; *Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 927 (D. Ariz. 2010).

15

situated" than does their classification as an "independent contractor."

Regardless, Plaintiffs incorrectly assert that all putative opt-ins were "required to enter into standard" Agreements. Mot. at 14. Rather, different IBOs were (and still are) subject to different versions of the Agreement, with different terms.[35] Most notably, many in the proposed class already agreed *not* to resolve their claims collectively.[36] In fact, one opt-in, Anthony Sarti, is subject to such an agreement, which his counsel *conceded* is enforceable. Ex. 16, which is a true and correct copy of an October 9, 2018 email from Pls.' Counsel. It would make little sense—and would thwart § 216(b)'s goal of efficiency—to invite litigants to this case who even Plaintiffs *agree* cannot pursue claims in court.

Plaintiffs also incorrectly assert that all putative opt-ins were "required" to sign an Agreement. Mot. at 14. Putting aside the individualized circumstances under which a given IBO contracted with S-L, some putative members—including Mode and Michael Sturino—*did not* sign the Agreement under which they operated during the proposed class period at all.

In any event, even if each IBO's Agreement was "standard," this only begs more questions than it answers. The Agreement vests each IBO with freedom to operate the business as its owners see fit, *supra* at 4-6, and it is the *operation* of those businesses —whether by the IBO or an employee or helper—that will decide each FLSA claim.[37] Again, Plaintiffs concede this by asking the Court to go *beyond* each Agreement and disregard the IBO's promises to act

---

[35] In fact, each IBO represented it "agrees, understands and acknowledges that other distributors of S-L may be granted distributor agreements at different times and in different situations and that provisions of such agreements may vary substantially from those contained in this Agreement. Distributor's obligations hereunder *may differ substantially* from those of other distributors." *See, e.g.*, J&M Agmt. Art. 25D (emphasis added).

[36] *See, e.g.*, Dkt. 25-3, Siempre Avanti LLC Agmt. Art. 24, at 23-29; Dkt. 25-6, Auch Distributions, Inc. Agmt. Art. 24, at 23-29; Dkt. 25-13, BK3 Distributors, LLC Agmt., Art. 24, at 23-29. Rather, they agreed to arbitrate their claims with S-L on an individual basis. *See id.*

[37] For example, the relevant question under the FLSA is not the alleged employer's *right* to control the work of a contractor, but rather the extent to which it actually *exercised* such control in reality. *See, e.g.*, *McFeeley*, 825 F.3d at 241-43 (evaluating "the degree of control the [defendant] exercised"). As such, even if the Agreement did grant S-L substantial control over an IBO's business—and it does not—this argument would still be immaterial, because *each* putative plaintiff would have to show the extent to which S-L actually exercised those rights.

16

as an "independent contractor," which they say represents mere "labels" that are "of little consequence." Mot. at 3; Compl. ¶ 13. Plaintiffs cannot have it both ways. If they do not believe the many provisions allowing them to act independently are meaningful to this analysis, then neither are any purported contractual indicia of S-L's "control" over their work.

If anything, Plaintiffs' position boils down to a contention that S-L *breached* the Agreement by exercising more control over the work performed on behalf of each IBO than S-L said it would.[38] This type of claim even more clearly cannot be resolved with common proof, because that proof would have to establish S-L committed the same breach in the same way for every IBO. This would simply return the Court to the same questions raised by the "economic realities" test, including the day-to-day operations of each IBO, its owners, or its employees.[39]

In short, the existence of a common agreement cannot constitute the common policy or practice necessary to justify conditional certification, because Plaintiffs concede that application of the Agreement's terms impacted different Plaintiffs in different ways.[40]

### c. Plaintiffs' Conclusory, Template Declarations Do Not State Any Common Unlawful Policy or Practice—and Actually Underscore Precisely Why Nationwide Notice Is Inappropriate Here.

Unable to rely solely on a common status or agreement, Plaintiffs offer self-described "standard" declarations from 22 opt-ins here and ten *Roxberry* opt-ins who are not part of the

---

[38] Indeed, several opt-in Plaintiffs said so expressly. *See, e.g.*, Ex. 7, Garguilo Dep. 49:23-50:15, 64:14-66:8; Ex. 5, Fritts Dep. 35:11-37:12; Ex. 1, Bushnell Dep. 42:20-44:14; Ex. 2, Akelman Dep. 40:5-41:3, 75:18-76:9.

[39] *See, e.g.*, *Hodzic v. FedEx Pkg. Sys., Inc.*, 2016 WL 6248078, at *4 (W.D. Pa. Oct. 26, 2016) (denying, in large part, conditional certification where class used standard agreement); *Drew v. Shoe Show, Inc.*, 2011 WL 4387096, at *1 (S.D. Ill. Sept. 19, 2011) (denying conditional certification, despite "uniform employment contracts"); *Bamgbose*, 684 F. Supp. 2d at 668-69 (denying conditional certification, where plaintiffs signed same agreement).

[40] Plaintiffs incorrectly suggest certification of a settlement class in *Tavares v. S-L Distribution Co.* supports their position that the Distributor Agreement, alone, is sufficient. Mot. at 15. To start, *Tavares* alleged violations of the Massachusetts Wage Act, and whether such claims were preempted by federal law was the "common argument" that "predominates over all of Plaintiffs' claims," and resolving *that* issue—not the rights and obligations under the Agreement—"will be the same in each case, and will impact the rights of every class member in the same way." 2016 WL 1743268, at *4-5 (M.D. Pa. May 2, 2016). Moreover, the court applied Rule 23 and emphasized that courts are "more inclined to find the predominance test met in the settlement context." *Id.* (quotations omitted). Finally, the *Tavares* settlement agreement reserved S-L's position that, absent the settlement, "the Action is not suitable for class treatment," and the settlement shall not be used as an admission or evidence of the allegations there. *Tavares*, Dkt. 120-1, Mot. for Prelim. Approval ¶¶ 20-21, No. 1:13-cv-1313 (M.D. Pa. Dec. 23, 2015).

proposed class. Mot. at 8; Dkts. 109-2, 109-3. These rote statements do not justify nationwide notice. To the contrary, when juxtaposed against testimony of just a sampling of these people, the declarations illustrate why generic assertions cannot substantiate a common unlawful policy.

### (1) Plaintiffs' Declarations Lack Foundation and Reliability.

To start, the Court should approach Plaintiffs' self-serving declarations with a healthy dose of skepticism. They are identical, aside from each declarant's vehicle, claimed number of hours worked, and a few other minor facts. And they clearly were drafted by counsel, as they repeat the same carefully-worded assertions tailored for this Motion—and even have identical grammatical errors. *See* Dkt. 109-2 ¶ 5 ("I was able to learn the all job requirements quickly.").

More importantly, the deposition testimony undermines not only the stock assertions in these individuals' own declarations, but also the reliability of *all* identical statements Plaintiffs submit. Each makes broad statements about "other distributors," without offering any basis for these assertions. *See, e.g.*, Dkt. 109-2 ¶¶ 11, 13. And yet deponents conceded they have no basis for stating how other IBOs operate their businesses or manage their routes, how many hours they work, whether they use helpers or employees, how they interact with S-L personnel, whether they added cash accounts or negotiated at stores, and no basis to testify about *any other* relevant part of other IBOs' operations. As just one example, each declarant states that, based on "*personal observations*, [he] understand[s] that other distributors assigned to [his] warehouse also worked over 40 hours per week." Dkt. 109-2 ¶ 13 (emphasis added). Yet not one declaration explains how these "observations" were made—did they follow IBOs or employees around with a time sheet? Or, more likely, is this assertion baseless? The Court now has the answer for at least nine opt-ins: they *do not* know how many hours other IBOs work or whether a helper might have worked some or all of those hours for them.[41] For instance, Fritts said he

---

[41] *See, e.g.* Ex. 4, Mode Dep. 193:17-193:21 (does not know how many hours others work); Ex. 1, Bushnell Dep. 75:20-76:25 (does not know others' schedules or hours worked, apart from "hearsay of what other IBOs say"); Ex. 3, R. Sturino Dep. 110:3-8 (does not know others' hours, as it "just was never part of our conversation").

has "no idea" what schedule other IBOs keep or how many hours they work. Ex. 5, Fritts Dep. at 75:7-76:22, 90:17-91:2. Further examples abound.[42]

The deponents further muddied their template declarations in several material ways. Exhibit 17 outlines more of this testimony, but to take a few examples: despite declaring S-L controlled their work, many deponents acknowledged their ability to decide when and in what order to visit stores (subject to *the stores'* receiving hours); they did not know if perceived restrictions derived from the needs of their *customer* stores (and not S-L), such as required products and "planograms"; and they declined S-L suggestions without any real consequence. *Supra* at 6-9; Ex. 17. Despite declaring they were forced to deliver specific products to specific stores and never "played any role" in the amount of shelf space, many testified to taking independent efforts to add (or remove) stores on their route, adding end caps or displays, declining to deliver certain products to certain stores, and/or using other means to increase sales. *Id.* Despite declaring they were required to go to their warehouse on specific days, many confirmed they could go any time the warehouse was open, and those receiving product at "bins" had even more access. *Id.* Despite declaring S-L personnel "oversees" and "monitors" their work, many testified to limited interaction with S-L personnel and conceded they have no basis for asserting how or to what extent S-L personnel "monitors" their whereabouts. *Id.* Simply put, the testimony confirms why Plaintiffs' declarations cannot obviate the need to analyze each claim individually.

### (2) Plaintiffs' Declarations Identify No Common Policy or Practice Resulting in a Violation of the FLSA.

Even without questioning the reliability of the declarations, the purportedly "common characteristics with respect to [Plaintiffs'] job duties and their work relationship with S-L" they

---

[42] For the Court's convenience, S-L attaches hereto as Exhibit 17 a chart summarizing several instances in which a deponent's testimony contradicted or called into question a statement made in his declaration. Exhibit 17 is intended to be a representative sample, but not an exhaustive list, of such testimony.

19

identified do not suggest any unlawful S-L policy.  Mot. at 15.  Most notably, Plaintiffs offer a red-herring in their mantra-like recital of ways S-L supposedly controls their day-to-day operations, including "suggested operating guidelines" or the threat of "breach letters."

*"Suggested Operating Guidelines."*  Despite identifying 55 opt-ins, 22 of whom submitted sworn declarations, Plaintiffs do not attach a *single* copy of any "Suggested Operating Guidelines" from a member of their proposed collective.  Rather, they cite only one document with that title, dated December 2011—long before the proposed class period—and signed by someone who settled his claims and is thus excluded from this lawsuit.  Dkt. 109-6. As such, this document is not probative of anything with respect to the time period or putative collective here.  In fact, Plaintiffs concede S-L can amend these "Guidelines" over time, and such "variations may lead to different costs and obligations among distributors."  Mot. at 7.

Regardless, as the name reflects, the "Suggested Operating Guidelines" are exactly that: "suggested guidance which can be used by Distributor, at its discretion, in operating its Territory," to offer certain methods an IBO might "consider" to maximize its sales potential and avoid stale products.  Dkt. 109-6 at 1.  It is neither unusual nor unexpected for a business using contractors to establish guidance to achieve the ultimate goal of the relationship; to the contrary, "[i]t is rather hard to imagine a party contracting for needed services with an insouciant 'Do whatever you want, wherever you want, and however you please.'"  *McFeeley*, 825 F.3d at 242-43; *see Herman v. Mid-Atl. Install. Servs., Inc.*, 164 F. Supp. 2d 667, 672-73 (D. Md. 2000). Here again, these "guidelines" bring the Court back to the core inquiry:  what are the "economic realities" of each IBO's business?  As discussed, this is not suitable for collective adjudication.

And if that were not enough, the deponents made clear that they were free to deviate from or disregard the Guidelines without consequence.  As noted, numerous deponents testified to declining to follow the Guidelines' suggested number of visits to certain stores, but not one received meaningful repercussions or discipline as a result.  *Supra* at 7-8.

***"Breach Letters."*** First, Plaintiffs' compilation of "breach letters" does not even relate to a *single* member of their proposed collective. Rather, every letter pre-dates the proposed period and (presumably) was received by individuals excluded here. Dkt. 109-5. Plaintiffs cannot show they are "similarly situated" to their proposed collective by pointing to others not even in it.

Regardless, a "breach letter" reflects only that S-L expected each IBO to perform the services it agreed to perform. Just as a homeowner might stop working with a builder who fails to complete a renovation, any contracting party typically may stop or threaten to stop doing business if a contractor provides substandard services. These "breach letters" do not show any *common* practice pertaining to Plaintiffs' claims. Indeed, many opt-ins *never* received one, do not know what circumstances result in getting one, do not know the consequences if one is sent, and—because some opt-ins do not even own the IBO entities—may *never* get one. *Supra* at 8.

Despite attaching voluminous materials, Plaintiffs do not demonstrate any common unlawful policy, such that the Court can adjudicate each Plaintiff's status collectively.

### 2. Plaintiffs Cannot Establish Their Claims Through Common Proof, Rendering Collective Adjudication Individualized and Unmanageable.

The current record also is more than sufficient to conclude that, if this case proceeds as proposed, any attempt to resolve Plaintiffs' claims inevitably will devolve into individualized, fact-specific inquiries. This would not be an efficient and fair way to manage this litigation, or to resolve each Plaintiff's individual claims. The potential for idiosyncratic issues runs rampant in the factors the Court must consider to evaluate each putative collective member's claim, which rests on "the economic realities, *not the structure*, of the relationship" with S-L. *Safarian v. Am. DG Energy, Inc.*, 622 F. App'x 149, 152 (3d Cir. 2015) (emphasis added). And that is before considering whether, if a given Plaintiff establishes employee status, he or she should be entitled to compensation. The deposition testimony here removes any doubt about this.

- ***Membership in Plaintiffs' Collective***.  Plaintiffs ask the Court to issue notice to *everyone* since March 2015 who "*worked pursuant* to a Distributor Agreement" with S-L.  Mot. at 1 (emphasis added); Compl. ¶ 23.[43]  But the actual signatories to most Agreements are independently owned entities, not individuals.  *Supra* at 4-6.  Some entities have multiple members, owners, or shareholders; indeed, Mode and Michael Sturino *are not* signatories to the operative Agreements, while Beth Sturino is an IBO who opted-in to this case but has *never* herself provided services for S-L.  *Id.* at 7.

More importantly, whether and to what extent anyone "worked pursuant to a Distributor Agreement"—and thus is even in the collective—*itself* requires individualized attention.  Each IBO was free to hire employees, without notifying S-L.  Many did exactly that, and the extent of this practice ranged dramatically, including the delegation of entire routes.  Did IBOs who delegated entire routes—like Mitzi Mode or Beth Sturino—perform any "work[] pursuant to a Distributor Agreement"?  Ms. Sturino apparently thinks so, as she already has opted-in.  Are non-owner IBO employees or helpers also part of the collective, whether part-time or full-time?  Plaintiffs Mode and Sturino apparently think so.  And if they are, how much time did *those* employees or helpers work?  Minimum wage and overtime pay, if owed at all, would be due to those who actually worked the hours for which they seek compensation.  But it is not possible for the Court even to ascertain who *is in the collective* without inquiry into how each IBO operated.[44]

- ***Other Employment or Work for Competitors.***  As noted, IBO owners could and

---

[43] In fact, Plaintiffs modified their proposed collective from their Complaint, which purports to bring suit on behalf of "all individuals who, during any time within the past three years, *worked for* [S-L] *as an IBO*," Compl. ¶ 23, suggesting they may be attempting to broaden the proposed collective through the new definition in their Motion.

[44] *See, e.g.*, *Archer*, 2013 WL 93320, at *4 (denying conditional certification of facially "homogeneous class," where liability and "calculation" of hours worked "would require a complex reconstruction"); *Brown v. White's Ferry, Inc.*, 2011 WL 5151394, at *3 (D. Md. Oct. 27, 2011) (same, finding need for "speculative reconstruction"); *cf. Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 483 (N.D. Cal. 2017) (denying Rule 23 certification of distributors, because "differences in their operations, such as whether they hired sub-drivers" required individual inquiry, and whether and when they "'personally serviced' their routes . . . cannot be answered in one fell swoop").

did engage in other work, including distribution with competitors and/or of products other than Snyder's-Lance. *Supra* at 7. S-L should not have to pay for time devoted to delivering another company's products. Individualized analysis would be required both to resolve the merits *and* to decipher whether any time "worked" is compensable.

- ***Exercise of Control Over Profits and Costs.*** As outlined above, the extent to which each IBO controlled its own sales and profit cannot be adjudicated collectively. Each IBO had myriad ways to grow sales and/or reduce expenses, and each IBO took (or did not take), those opportunities in unique and individualized ways. Different IBOs also owned various types of routes in different parts of the country. Some had many "cash accounts"; others serviced solely large chain stores. Some purchase S-L products from a warehouse throughout the week; others order just once each week and receive them at a "bin." And while Plaintiffs declare *they* had no control over prices, stores, sales, or costs—contrary to the express terms of the Distributor Agreement—the record confirms that *others* in the putative class had such control.

- ***Interactions with S-L Personnel.*** Several deponents here and in *Roxberry* explained key differences in their interactions with S-L personnel, a critical inquiry in the "economic realities" analysis. Different types of routes had different levels of interaction with S-L personnel, and different S-L personnel interacted with different IBOs in different ways—including instances of a single IBO having different interactions with different S-L personnel over time. *Supra* at 8-9. The extent, if any, to which a given IBO was subject to "oversight" is unknowable without a fact-specific inquiry—particularly given S-L's promise in the Distributor Agreement *not* to exert control over the means or mode of the IBO's performance. *Id.* at 4-6.

- ***Release of Claims.*** Many IBOs in the putative collective sold all or part of their territory during the proposed collective period, often at a sizeable profit. *Supra* at 4. Not only does this raise questions about the sales' impact on their individual claims, but many—including several opt-ins—agreed to *release* claims against S-L in the agreement effectuating these

23

transactions.[45]  Unless Plaintiffs' counsel is willing to carve out all released claims, whether and to what extent any particular IBO released its claims requires individualized inquiry.

- ***FLSA Exemptions.***  Some putative collective members may be exempt from the FLSA.  For example, any individual who used a vehicle weighing more than 10,000 pounds and operated in interstate commerce may meet the motor-carrier exemption.  29 U.S.C. § 13(b)(1); DOL Wage & Hour FAB 2010-2.  Opt-in Akelman testified that his truck weighs more than 10,000 pounds, while Eardley delivers across state lines in both North and South Carolina (and already is overseen by the U.S. Department of Transportation).[46]  The Court cannot resolve whether this or other exemptions apply without the facts of each IBO's operations.[47]

Plaintiffs almost certainly will shrug off these and other differences among IBOs or employees as "merits" issues.  But that argument misses the point:  S-L is not asking the Court to resolve whether these particular Plaintiffs were, in fact, independent contractors.  Rather, the critical points proven by their testimony are that: (1) significant variability exists—even among the handful of opt-ins willing to submit identical declarations—as to how IBOs operate; and (2) the Court thus has every reason to believe similar differences exist—and will expand—for the thousands of proposed collective members to whom Plaintiffs want to send notice.

### C.  The Court Should Not Notify Anyone Who Agreed *Not* to Join a Collective Action.

Finally, even if the Court were to find that some contingent of the putative collective should receive Court-approved notice, it should exclude those who have already waived participation in this or any collective action.  Many proposed collective members have opted to resolve the claims asserted here through individual arbitration, *not* in a collective action.  *Supra*

---

[45] *See, e.g.*, Ex. 5, Fritts Dep. 116:16-118:17 and Ex. 18, Fritts Agmt. of Sale Art. 2.1; Ex. 1, Bushnell Dep. 119:8-120:3 and Ex. 19, Bushnell Agmt. of Sale Art. 2.1.

[46] *See* Ex. 2, Akelman Dep. 68:12-20; Ex. 6, Eardley Dep. 12:15-13:1, 154:12-155:14.

[47] *See, e.g.*, *Lewis-Gursky v. Citigroup, Inc.*, 2017 WL 892604, at *6 (M.D. Fla. Mar. 6, 2017); *Tahir v. Avis Budget Grp., Inc.*, 2011 WL 1327861, at *4 (D.N.J. Apr. 6, 2011); *Reich v. Homier Distrib. Co.*, 362 F. Supp. 2d 1009, 1014 (N.D. Ind. 2005).

at 16. It makes little sense to invite these individuals to opt into a lawsuit from which they have already opted out.[48] Although some courts have authorized notice to individuals who may be subject to collective waivers, those cases involved factual disputes over whether the agreements were enforceable[49] or where no named or opt-in plaintiff actually was subject to one,[50] meaning it was premature for those courts to evaluate the issue. Here, however, Plaintiffs' counsel *concedes* the Agreement entered into by Siempre Avanti LLC (owned by opt-in Sarti) contains a collective action waiver—like clauses in Agreements signed by many other putative collective members, *including* several who already opted-in—that is enforceable and encompasses Sarti's claims. *See* Ex. 16.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion and decline to authorize nationwide notice to the thousands of members in Plaintiffs' proposed collective.

---

[48] *See, e.g.*, *Feamster v. Compucom Sys., Inc.*, 2016 WL 722190, at *4-5 (W.D. Va. Feb. 19, 2016) (declining to issue notice to those subject to collective action waiver); *McCurley v. Flowers Foods, Inc.*, 2016 WL 6155740, at *5 (D.S.C. Oct. 24, 2016) (carving out those subject to arbitration agreement); *Woods v. Vector Mktg. Corp.*, 2015 WL 1198593 (N.D. Cal. Mar. 16, 2015) (same); *Czopek v. TBC Retail Grp., Inc.*, 2015 WL 4716230, at *7 (M.D. Fla. Aug. 7, 2015) (same); *Fischer v. Kmart Corp.*, 2014 WL 3817368, at *6, 8 (D.N.J. Aug. 4, 2014) (same).

[49] *See, e.g.*, *Camara v. Mastro's Rests. LLC*, 2018 WL 5281906, at *9 (D.D.C. Oct. 24, 2018).

[50] *See, e.g.*, *Weckesser v. Knight Enters. Se., LLC*, 2018 WL 4087931, at *3 (D.S.C. Aug. 27, 2018).

Dated: November 5, 2018

Respectfully submitted,

**BRADLEY ARANT BOULT CUMMINGS, LLP**

*/s/ Robert R. Marcus*                   

Robert R. Marcus
N.C. State Bar No. 20041
Bridget V. Warren
N.C. State Bar No. 48142
214 North Tryon Street
Suite 3700
Charlotte, NC 28202
Telephone:  704-338-6000
Facsimile:  704-338-8858
Email:  rmarcus@bradley.com
        bwarren@bradley.com

**MORGAN, LEWIS & BOCKIUS LLP**

Sari M. Alamuddin (*pro hac vice*)
77 West Wacker Drive
Chicago, IL  60601-5094
Telephone:  312-324-1158
Facsimile:  312-324-1001
Email:  sari.alamuddin@morganlewis.com

Paul C. Evans (*pro hac vice*)
Benjamin K. Jacobs (*pro hac vice*)
1701 Market St.
Philadelphia, PA 19103
Telephone:  215-963-5000
Facsimile:  215-963-5001
Email:  paul.evans@morganlewis.com
        benjamin.jacobs@morganlewis.com

*Attorneys for S-L Distribution Company, LLC; S-L Distribution Company, Inc.; and S-L Routes, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2018, a copy of the foregoing Defendants'

Opposition to Plaintiffs' Motion for Conditional Certification was filed electronically.  Notice

of this filing will be sent by operation of the Court's electronic filing system to all parties

indicated on the electronic filing receipt.  Parties may access this filing through the Court's

electronic filing system.


*/s/ Robert R. Marcus*