**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:18-CV-00150-KDB-DSC**

| | |
|---|---|
| **JARED MODE, on behalf of himself and all others similarly situated,** | |
| **Plaintiffs,** | |
| **v.** | **ORDER** |
| **S-L DISTRIBUTION COMPANY, LLC, S-L DISTRIBUTION COMPANY, INC., and S-L ROUTES, LLC,** | |
| **Defendants.** | |

**THIS MATTER** is before the Court on S-L Distribution Company, LLC, S-L Distribution Company, Inc., and S-L Routes, LLC's (collectively, "S-L" or "Defendants") Motion to Decertify the Collective, (Doc. No. 617); S-L's Motion to Dismiss Certain Opt-In Plaintiffs or to Deem Certain Third-Party Defendants Served, (Doc. No. 627); S-L's Motions for Summary Judgment as to Opt-In Plaintiffs Anthony Eardley and Michael Sturino, (Doc. Nos. 641 and 644); J&M Mode Distribution, LLC's ("J&M") Motion for Summary Judgment, (Doc. No. 647); and Jared Mode's Motion for Summary Judgment, (Doc. No. 648). Having carefully considered the parties' briefs and exhibits filed in support and in opposition to these motions and oral arguments made on May 20, 2021 on the Motion to Decertify, as well as the record and applicable law, the Court will deny S-L's Motion to Decertify the Collective, deny S-L's Motion to Dismiss, deny S-L's Motion for Summary Judgment as to Anthony Eardley, deny S-L's Motion for Summary Judgment as to Michael Sturino, grant J&M's Motion for Summary Judgment, and deny Mode's Motion for Summary Judgment for the reasons and to the extent set forth below.

1

## MOTION TO DECERTIFY

## I.    PROCEDURAL BACKGROUND

Plaintiffs, a group of snack food distributors for S-L, filed suit on March 22, 2018, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, and the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. §§ 95-25.1, *et seq.*[1] Plaintiffs allege they were misclassified by S-L as independent contractors, rather than employees, and are therefore entitled to certain benefits under the FLSA, specifically, minimum wage and overtime pay for hours worked in excess of forty per week. In response, S-L filed counterclaims for unjust enrichment against Plaintiffs and third party claims for indemnification and unjust enrichment against the distribution companies that Plaintiffs formed to enter into Distributor Agreements with S-L.

Plaintiff Jared Mode moved for conditional certification of his FLSA claims as a collective action under 29 U.S.C. § 216(b) on behalf of himself and other "Independent Business Operators" ("IBOs") that distributed snack food products on behalf of S-L. The Court granted conditional certification on March 19, 2019 for the following class:

> All individuals who, during any time within the past three years, worked pursuant to a Distributor Agreement with S-L Distribution Company, Inc. or any related company other than individuals covered by: (i) the class/collective action settlement in *Tavares v. S-L Distribution Co., Inc.*, No. 1:13-cv-01313-JEJ (M.D. Pa.); (ii) the class/collective action settlement in *Roxberry v. S-L Distribution Company, Inc.*, 1:16-cv-02009-JEJ (M.D. Pa.); or (iii) the class action settlement in *Bankalter v. S-L Distribution Company, Inc.*, 2017-SU-000549 (Pa. Common Pleas, York County).

(Doc. No. 143, at 10). In doing so, the Court found that Plaintiffs presented sufficient evidence to overcome the fairly lenient standard to establish that they were similarly situated under 29 U.S.C.

---

[1] Plaintiffs' NCWHA claim was dismissed on March 6, 2019. (Doc. No. 141). Only Plaintiffs' FLSA claims remain.

2

§ 216(b). *Id.* at 8. Since the entry of that order, the parties have conducted discovery on a group of sample opt-in Plaintiffs, agreed to dismiss numerous claims, and 225 Plaintiffs were compelled to arbitration. Now before the Court is S-L's Motion to Decertify the Collective. (Doc. No. 617).

## II.    RELEVANT FACTUAL BACKGROUND

S-L is a snack food company that manufactures, distributes, markets, and sells various snack foods to retail stores in North Carolina and other states. The company uses "IBOs"[2] to distribute its snacks to stores, in total covering over 3,200 distribution routes. Plaintiff Jared Mode is a member of J&M, a North Carolina limited liability company, and worked as a Distributor for S-L. Like Mode, the conditional collective class is made up of principals, officers, and/or employees of these IBOs.

The current iteration of S-L is the result of a 2011 merger between Snyder's of Hanover, Inc. and Lance, Inc. "Prior to the merger, Lance's sale route force had been employees of the company . . . but the newly formed S-L adopted Snyder's IBO business model, which utilized independent contractors to perform this function." (Doc. No. 633, at 4) (citing S-L's brief in *Broach v. SL*, No. 3:15-cv-000339 (M.D. Fla.)). The conversion to the IBO business model resulted in over a thousand employees losing their jobs, however, many of the employees who were already familiar operating a route territory purchased routes from S-L and became Distributors.

S-L uniformly deems all Distributors to be independent contractors and enters into standardized Distributor Agreements with each IBO. Pursuant to these Distributor Agreements, S-L grants the IBOs rights to distribute and/or sell its snack food products. IBOs purchase products

---

[2] S-L now calls IBOs "Independent Direct-Store-Delivery Partner entities" or "IDPs." (Doc. No. 618, at 10). The Court will refer to Plaintiffs and their entities collectively as "IBOs" or "Distributors" as there appears to be no material change in who is encompassed in this role even after the name change.

3

at wholesale from S-L and then sell the products to various stores at higher prices. S-L claims that IBOs are responsible for ordering, selling, distributing, and merchandising S-L's products to customers in their respective geographical territories. Still, S-L retains sole discretion to determine the price IBOs pay for products and IBOs are allowed to set the prices that Authorized Outlets pay for products only if the price has not already been negotiated between S-L and the Outlet. (Distributor Agreement, Art. 4). IBOs agreed to be financially responsible for certain aspects of the distributorship pursuant to the Agreements, including the costs associated with stale products, product delivery, vehicles and vehicle maintenance. The Distributor Agreements provide that IBOs can control the schedule, hours, and operations of their businesses, and are allowed to distribute other products in addition to S-L's snack foods. The Agreements also expressly state that the IBOs are independent contractors and that, in the event a court finds the parties did not have an independent contractor relationship, either party would be entitled to declare the Distributor Agreements null and void.

According to S-L, discovery of 31 Opt-In Plaintiffs have revealed "wide differences in experiences relevant to FLSA classification—including Opt-Ins' various levels of control over their businesses, managerial skills affecting profits, independent investments, and types of relationships with S-L." (Doc. No. 618, at 11). Plaintiffs, on the other hand, argue that a trial on common issues will avoid the inefficiencies of briefing the same pretrial motions, presenting common evidence, and making identical legal arguments in approximately 332 individual trials to different triers of fact. Also, Plaintiffs say that proceeding as a collective will eliminate the risk of conflicting decisions with respect to the legal status of the Distributors. Plaintiffs further argue that S-L's uniform classification of its Distributors as independent contractors, and evidence that S-L subjected Distributors to the same type of policies and control (as described below) show that the

4

Plaintiffs are similarly situated. Accordingly, Plaintiffs ask the Court to deny S-L's Motion to Decertify.

### III.    LEGAL STANDARD

The FLSA "embodies a federal legislative scheme to protect covered employees from prohibited employer conduct." *Houston v. URS Corp.*, 591 F. Supp. 2d 827, 831 (E.D. Va. 2008). A plaintiff alleging an FLSA violation may bring suit on his or her own behalf or on behalf of other employees who are similarly situated. 29 U.S.C. § 216(b). Section 216(b) explains the process for this type of collective action:

> An action to recover the liability prescribed [under the FLSA] may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

"Thus, there are two requirements for the certification of a FLSA collective action: (1) the members of the proposed class must be 'similarly situated,' and (2) the class members must 'opt-in' by filing their consent to suit." *Dearman v. Collegiate Housing Services, Inc.*, No. 5:17-cv-57, 2018 WL 1566333 (W.D.N.C. Mar. 30, 2018); *see also Long v. CPI Sec. Sys., Inc.*, 292 F.R.D. 296, 298 (W.D.N.C. 2013)*; Romero v. Mountaire Farms, Inc.,* 796 F. Supp. 2d 700, 705 (E.D.N.C. 2011).

"Similarly situated" is not defined in the FLSA and the Fourth Circuit has not provided guidance on how it should be applied. *Long*, 292 F.R.D. at 298. "However, federal district courts in the Fourth Circuit typically follow a two-step approach when deciding whether the named plaintiffs are similarly situated to potential plaintiffs for the purposes of certifying the collective action." *Id.*; *see also Holland v. Fulenwider Enterprises, Inc.*, No. 1:17-cv-48, 2018 WL 700801 (W.D.N.C. Feb. 2, 2018).

At the first stage, "the court makes a preliminary determination whether to conditionally certify the class based upon the limited record before the court." *Long*, 292 F.R.D. at 298. At this stage, the plaintiff bears a "fairly lenient" burden, needing only to show "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Holland*, 2018 WL 700801 at *2; *see also In re Family Dollar FLSA Litigation*, No. 3:12-cv-1951, 2014 WL 1091356 (W.D.N.C. Mar. 18, 2014).

Stage two arises if and when the defendant files a motion for decertification, which generally occurs after discovery is complete. *Long*, 292 F.R.D. at 299. At this more advanced stage of the litigation, the Court will conduct the same "similarly situated" analysis but will apply a heightened fact-specific standard. *Id.* Plaintiffs bear the burden of establishing that they are similarly situated. *LaFleur v. Dollar Tree Stores, Inc.*, 30 F. Supp. 3d 463, 468 (E.D. Va. Mar. 7, 2014); *see also Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 537 (3d Cir. 2012). Courts within the Fourth Circuit often consider three factors at stage two: (1) the factual and employment settings of individual plaintiffs; (2) whether defendants have presented individualized defenses; and (3) fairness and procedural considerations. *See, e.g.*, *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, No. 3:12-cv-00596-MOC-DSC, 2015 WL 1346125, at *15 (W.D.N.C. Mar. 23, 2015); *Sharer v. Tanberg, Inc.*, No. 06-626, 2007 WL 676220, at *2 (E.D. Va. Feb. 27, 2007).

"If the court determines under this heightened standard that the plaintiffs are 'similarly situated,' the collective action proceeds to trial. If, however, the court determines that the plaintiffs are not 'similarly situated,' the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the original plaintiffs may proceed with their individual claims." *Rehberg*, 2015 WL 1346125 at *40-41 (citing *Romero*, 796 F. Supp. 2d at 705-706, and *Long*, 292 F.R.D. at 299).

6

# IV. DISCUSSION

S-L argues that each of the three factors the Court is to consider at stage two weigh in favor of decertification. Plaintiffs argue that all of the factors favor continued certification. The Court will address each factor in turn.

## A. Factual and Employment Settings of Individual Plaintiffs

Assessing the first factor of decertification—the factual and employment settings of individual plaintiffs—requires consideration of whether Plaintiffs have "provided evidence of a company-wide policy which may violate the FLSA, as well as an assessment of Plaintiffs' job duties, geographic location, supervision, and salary." *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007). S-L asserts that the Opt-Ins' employment settings are so disparate that a collective action would simply "'devolve into a cacophony of individual actions.'" (Doc. No. 618, at 15) (quoting *Swales v. KLLM Transp. Servs., LLC*, 985 F.3d 430, 442 (5th Cir. 2021).

As this Court recognized in *Rehberg*, S-L's uniform classification of IBOs as independent contractors, while not dispositive, is telling. Most, if not all, Distributors (through corporate entities that they were required to establish) entered into essentially the same agreement classifying them as independent contractors.[3] They have substantially similar job duties, as described in the Distributor Agreements, and were not given overtime pay because of their classification as independent contractors. *See Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1020 (D. Minn.

---

[3] While there may be slight differences in the Distributor Agreements, S-L's counsel stated at the hearing that any such differences would not be "the path for the Court" to grant decertification. (Transcript Doc. No. 656, at 28:11-18) ("THE COURT: Are the distributor agreements materially the same among all the opt-ins? MR. PUMA: I think—I mean, with—with having not studied, Your Honor, every provision of all the different forms of agreement, I can't say there are not some differences, but I would not stand up here and say, that's – that's the path for the Court to deny— to grant decertification rather.")

2007) (holding that evidence of a common policy of uniformly classifying employees as exempt and declining to pay overtime compensation where plaintiffs indicated they worked in excess of 40 hours per week "supports a finding of sufficient commonality between and among the plaintiffs to support collective adjudication of their misclassification claims.").

S-L's main argument for decertification is that there is not enough common evidence to allow the Court to assess whether all Plaintiffs are employees or independent contractors because the evidence as to each Plaintiff is too widely varying and would require individualized inquiries for each Plaintiff. To determine whether a worker is an employee or an independent contractor under the FLSA, "a court considers the 'economic realities' of the relationship between the worker and the putative employer." *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006). The "economic realities" test is a six-factor test that examines:

> (1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Id.* at 304-305. No single factor is dispositive. *Id.* at 305. Rather, "[t]he focal point is whether the worker 'is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself.'" *Id.* at 304. At this stage in the litigation, Plaintiffs must show that the Court may rely on common proof to decide the economic-realities test on a collective basis. *Rehberg*, 2015 WL 1346125, at *45.

S-L asserts that decertification is appropriate because significant material differences exist among Plaintiffs on virtually all of the factors under the economic realities test; differences that require individualized inquiries. Specifically, S-L argues that the record shows material differences among Plaintiffs as to: (1) the degree of control S-L has over the manner in which Opt-Ins perform

8

distribution services; (2) the opportunity for profit or loss based on a certain level of managerial skill; (3) the level of each Opt-In's investment in his or her respective business; and (4) the permanence (or non-permanence) of the relationship between each Opt-In and S-L.

### 1. Degree of Control

S-L points to a number of disparities with respect to the "control" factor that allegedly establish that Plaintiffs are not similarly situated. First, S-L claims that Plaintiffs testified that they experienced "widely disparate levels of interactions with S-L personnel," including how often Plaintiffs communicated with their District Sales Managers ("DSMs") and S-L's supervision over compliance with its "planograms."[4] Second, S-L asserts that Plaintiffs testified to disparities in their ability to set their schedules, such as how many hours they worked a week and what order they visited their stores to maximize efficiency. Third, Opt-Ins testified to disparities in their ability to work for other companies while performing work for S-L. Fourth, training and mandatory meetings varied across Opt-Ins. Lastly, S-L contends that Opt-Ins testified to disparities in the discipline and performance management to which they were subjected.

While there may be some factual differences in the Opt-In Plaintiffs' testimony, the Court finds that these differences are exaggerated by S-L or are immaterial to the decertification issue at hand.[5] As shown by Plaintiffs' attached Exhibit A, which summarizes the deposition testimony of

---

[4] "Planograms" are diagrams or models that indicate the placement of retail products on shelves as part of the effort to maximize sales. Distributors have very little, if any, control over the planograms for non-cash accounts and chain stores (which allegedly make up a significant majority of Plaintiffs' business). Planograms are generally negotiated between S-L and the customer, and Distributors' compliance with the planograms is allegedly mandatory. *See* (Doc. No. 633-1, at 20).

[5] The Court has carefully reviewed the deposition testimony cited by both Parties and finds that Opt-In Plaintiffs overwhelming testified to similar circumstances in their positions as Distributors for S-L. Much of the testimony cited by S-L to support decertification exaggerate, and at times come close to mischaracterizing, the deposition testimony. The Court will reference a few of these situations throughout its discussion below.

the Opt-Ins selected for discovery, the vast majority of deposed Opt-In Plaintiffs experienced a similar degree of control. (Doc. No. 633-1). For example, all Distributors (through corporate entities) entered into standardized Distributor Agreements outlining their job duties and controlling what products Distributors could sell, to whom they could sell the products, and the price and terms under which the products could be sold. Also, Plaintiffs generally testified that they had little control over the price of the products they purchased from S-L, the price at which they sold products to their accounts,[6] determining what products to sell to each account, product promotions, and the planograms S-L directed them to follow. Opt-In Plaintiffs also commonly testified that they were subject to one or more of S-L's "Suggested Operating Guidelines," which detailed specific work rules and expectations that they were expected to follow. *Id.* at 8. S-L also contracted directly with its retail chain customers regarding the pricing, placement, and promotion of its products, as well as the frequency that the Distributors serviced these retail chain customers. *Id.* at 10-11. Such common evidence regarding S-L's management of its chain customers will inform the inquiry of whether S-L exercises a high degree of control over the manner in which Opt-In Plaintiffs are to perform their work.

Plaintiffs also testified to frequent supervision by their DSMs assigned to each Distributor. *Id.* at 12-14 (describing in-person meetings, text messages, emails, and calls from DSMs directing

---

[6] The Parties note the difference between "cash" and "chain" accounts. While S-L negotiates prices for chain accounts, Distributors apparently can determine the prices for cash accounts. As noted throughout this Order, the question before the Court is not whether Distributors actually had the ability to set prices for cash accounts and whether this weighs in favor of employee status. Rather, the question at the decertification stage is whether there is common evidence from which the question of whether the Opt-Ins are employees or independent contractors can be decided. The Opt-In Plaintiffs testified to similar levels of control with their chain and cash accounts. For instance, while they may have agreed that they technically could set the price for their cash accounts, Opt-In Plaintiffs commonly testified that they did not change the prices (which were allegedly pre-programmed in their hand-held device).

Plaintiffs to do certain tasks).[7] The DSMs allegedly implemented company-wide policies and procedures, including closely monitoring the Distributors' daily activities through handheld devices and tracking procedures to ensure compliance with its standards and issuing standardized disciplinary letters if such standards were not met.[8] The record also reflects that S-L and the DSMs solicited feedback directly from customers regarding the Distributors. S-L would then negotiate any "requirements" from the customers and distribute these requirements to Opt-In Plaintiffs. And, while some Distributors hired help,[9] Plaintiffs who hired helpers to perform day-to-day operations may still be employees if S-L exercises functional control over the conditions of a Distributor's

---

[7] S-L argues that Opt-In Plaintiffs "experience[d] widely disparate levels of interaction with S-L personnel"—varying from "constant[]" communication to "only cursory contact" with their DSMs. (Doc. No. 618, at 19). However, upon review of the record such communications were not as varied as S-L suggests. S-L cites to Eardley and Hyde as outliers who had only "limited" interactions with S-L employees. Yet, both Eardley and Hyde testified that their interaction with their DSMs varied depending on the week. Eardley testified that he typically saw his DSM twice in a typical week and that the majority of the discussions were "productive discussions about [Eardley's] business." (Eardley Tr. 23-29). He also testified that "they supervise us on a daily basis to make sure that we service the stores effectively, adequately, keep the planogram." (Eardley Tr. 73-74). Hyde testified that he would talk to his DSM "at least once a week." (Hyde Tr. 243:1-2). On the other hand, S-L cites to McCabe as an Opt-In Plaintiff who "constantly communicated" with his DSM, but similar to Eardley and Hyde, McCabe testified that interaction with his DSM varied each week (McCabe Tr. 209:6-7) ("Sometimes weekly, sometimes multiple times a week."). When pressed to estimate how many times he would typically talk to his DSM per week by "phone, text, or in person," McCabe estimated that it was "four, five, maybe six times." *Id.* at 209:16.

[8] Plaintiffs have proffered evidence of standardized "breach letters" and "termination letters" that were issued to Distributors that failed to meet S-L's requirements and directives. S-L argues that testimony varies on when such letters were issued. As noted at oral argument, some of these differences in when such letters were issued are likely attributed to the different managing styles of the DSMs. Different management styles are present at any job—even when there is no question that workers are employees—and the Court does not find the presence of any such variances in the issuance of breach or termination letters enough to override the significant common evidence that exhibits substantial control (or a lack thereof) by S-L. The evidence among Opt-Ins need not be identical, but merely common enough to determine this prong of the economic realities test on a collective basis. The Court is satisfied that there is such common evidence.

[9] As touched upon below, no Opt-In Plaintiff testified that he or she hired other employees. A handful testified that they did hire "helpers" occasionally.

work. *Neff v. Flowers Foods, Inc.*, 2019 WL 10750005, at *6 (D. Vt. May 19, 2019); *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 70 (2d Cir. 2003); *Noll v. Flowers Foods, Inc.*, 2019 WL 206084 at *4 n.3 (E.D. Pa. May 7, 2019) ("A distributor could hire 'helpers' and still be an employee.").

As in *Rehberg*, "Defendants exaggerate isolated differences among the distributors and ignore the larger picture of the issue at hand – that all distributors are subject to Defendants' uniform policies." *Rehberg*, 2015 WL at *17 (citations omitted); *see also Scovil v. FedEx Ground Package Sys., Inc.*, 886 F. Supp. 2d 45, 54 (D. Me. 2012) ("[W]hile there may be a *lot* of evidence present to show variety [among workers' behavior], that is not the same as showing that common evidence does not predominate."). Therefore, despite S-L's contentions, there is common evidence in the record that, if believed, establishes S-L's substantial control over how Plaintiffs were required to perform their jobs in accordance with the standards defined in detail by S-L.[10]

### 2. *Opportunity for Profit or Loss & Managerial Skill*

With respect to the factor "opportunity for profit or loss," S-L argues that Plaintiffs used varying degrees of "managerial skills" that would affect a Plaintiff's opportunity for profit or loss. S-L notes that some Opt-Ins testified to carefully managing their inventory levels and even hiring and managing their own employees, while others testified that they did neither. Some Opt-Ins also testified that their cash accounts provided them with more flexibility than their chain store accounts.

However, the record again reflects much common evidence that, if believed, shows that the Opt-In Plaintiffs' opportunities for profit or loss may have been similarly limited by S-L's

---

[10] As described below in connection with the Court's discussion of the motions for summary judgment, there are disputed factual issues that need to be decided by the trier of fact in connection with the ultimate determination of whether Plaintiffs are employees or independent contractors.

control. As described above, Opt-In Plaintiffs allege that S-L controlled numerous day-to-day aspects of their jobs, including control of most product pricing and promotions. S-L claims that common proof is not possible on this factor and cites to Mode's LinkedIn page, where Mode allegedly described in detail the way he exercised his managerial skill. Specifically, his LinkedIn page stated that he "collaborated with" store managers, "managed conflicts, and built strong relationships," and that he "created and executed marketing promotions" with "company executives." However, when asked more specifically about whether his LinkedIn page accurately described his duties, Mode responded: "I don't know how to answer that question, because this is a LinkedIn page of me trying to get people to look at me; not try to make everything worded right, make it sound good and all this. So this isn't like factual information testimony I would say." (Mode Tr. 67:21-25).[11] Despite Mode's explanation, S-L asked other Opt-In Plaintiffs' how their experience compared to that described in Mode's LinkedIn description. S-L claims that these Opt-In Plaintiffs "disavowed" Mode's "testimony" (which is actually more accurately characterized as Mode's LinkedIn page, rather than his deposition testimony). So, taken together, this is another example of S-L exaggerating the differences between Opt-In Plaintiffs.

S-L also claims that Opt-In Plaintiffs' testimony differed on whether they exercised the "key managerial skill of hiring and managing their own employees, deciding how much to pay them and how to use them." (Doc. No. 618, at 24) (emphasis removed). Notably, all of the Opt-In Plaintiffs denied hiring other "employees"; rather, some testified that they hired "helpers." These "helpers" *occasionally* assisted Opt-In Plaintiffs in their day-to-day activities and/or helped while

---

[11] Notably, and further belying his LinkedIn page description, Mode also testified that anytime he attempted to increase his sales by placing products in his accounts that he knew would sell instead of following the planograms, his DSM would go in behind him and change the display back to comply with the planograms. (Mode Tr. 49-52).

an Opt-In Plaintiff was on a vacation. For instance, Opt-In Plaintiff Hyde occasionally paid helpers to assist him from time to time on his route, Eardley obtained help from his daughter's boyfriend about one day a week for a year (sometimes paying him and other times not), Mode paid a man to drive him around for 30 days after he received a DUI, and Eardley, Fulmer, and Baluha testified to paying another to run their route while they were on vacation. The vast majority (if not all) of these Opt-Ins paid these helpers in cash, and others testified that their family members assisted them from time to time and they did not pay them for their help. Others testified that they could not afford help. Thus, while there are inevitably some differences in Opt-In Plaintiffs' testimony regarding who hired help and to what extent, these differences are not so great as to destroy commonality.

S-L also asserts that the mix of types of stores in an Opt-In's route—such as larger chain stores, like Walmart, and smaller cash account stores—could affect an Opt-In's ability to increase profits. S-L claims that "store composition varied route-to-route;" therefore, there is not common evidence as to an Opt-In Plaintiff's opportunity for profit and loss. However, as already described above, there is common evidence that, if believed, shows that S-L limited Opt-In Plaintiffs' opportunity to profit from cash accounts. Additionally, S-L argues that some Opt-Ins exercised managerial skill by "changing the territory in their routes to attain a more profitable mix of stores." (Doc. No. 618, at 25). For instance, S-L claims that Eardley, Tubertini and Mazurkiewicz sold portions of their routes. However, the Distributor Agreements required approval from S-L for the sale of any portion of their distribution route, and both Tubertini and Mazurkiewicz testified that S-L was heavily involved in the sale. (Tubertini Tr. 87-88) (S-L was involved in determining the price at which to sell his route); (Mazurkiewicz Tr. 135-137) (needed to obtain S-L's permission to split the route and S-L did all the paperwork and determined the value of the stores). Eardley

14

testified that he felt forced to sell part of his route by S-L and ended up selling a portion of his route to his son. (Eardley Tr. 105-113).

S-L also claims that some Opt-Ins simply made a "flat salary" from the corporate entity that contracted with S-L, and their managerial skill did not affect that salary. (Doc. No. 618, at 25) (citing to M. Sturino's deposition and Mode's deposition). However, Michael Sturino testified that he received a "base" weekly salary of $522 from MBS Distribution, LLC, but that any remaining profits went to his stepmother in an effort to repay her for purchasing the route. (M. Sturino Tr. 26-28). Thus, to state that Sturino only received a flat rate salary does not accurately characterize his testimony. Similarly, Mode only testified that he received a weekly sum, but does not testify as to what that sum was or whether it fluctuated from week to week. (Mode Tr. 110-113).

Again, while S-L does indeed cite to differences among some Opt-In Plaintiffs, "such differences will always exist between people due to variations in personal style and circumstance." *Rehberg*, 2015 WL 1346125 at *16. Regardless, there is substantial common evidence that Opt-In Plaintiffs were similarly situated in their ability to increase their opportunity for profit using their own managerial skill.

### 3. Special Skill

Moreover, the record shows that there are significant similarities in the skill required to operate the delivery routes. (Doc. No. 633-1, at 6-7). In a factually similar case from the District of Vermont, the Court stated:

> The evidence before the court makes it clear that there are far more similarities in the operation of delivery routes than there are differences. The skills include driving a commercial vehicle, organizing and delivering the right mix of product to the right stores, removing the old product and straightening up the display, and doing all of this fast enough to complete the entire route in a reasonable period of time. It is not an easy job, but it is one which requires skills many people are able to develop. Individual distributors may be better or worse at these skills,

15

but there is little difference in the type of skills which each brings to the delivery work.

     Whether distributors' work required independent initiative may also be determined using common evidence. While Defendants contend that some distributors display more sales initiative and entrepreneurship than others, these "different tactics and attitudes" suggest variations in individual distributors' personal style, not their job requirements. All distributors were instructed to carry out their jobs according to the Distributor Agreement. These requirements do not vary between individual Plaintiffs.

*Neff v. Flowers Foods, Inc.*, 2019 WL 10750005, at *6 (D. Vt. May 19, 2019); *see also Rehberg*, 2015 WL 1346125 at *7 ("In terms of skill required for the job, distributors are subject to common standards—they are not required to have any advanced knowledge, skill, educational background, or job experience . . . .").

    *4. Level of Investment*

    S-L also argues that Plaintiffs vary in the level of investment in their representative businesses, namely investments each Opt-In made to purchase their route, vehicle purchases, other business expenses, and hiring other employees. S-L notes that some Opt-Ins finance their route purchases while others paid all cash and some made money from their investments by selling a portion of their routes. Opt-Ins were able to choose how, where, and what sort of vehicle to obtain, including whether to purchase or lease their vehicles. Other business expenses, such as insurance and deductions on taxes varied. As noted above, some Opt-Ins chose to hire helpers.

    However, while specific expenses may vary, the differences do not necessarily reflect the absence of common evidence. Each Opt-in Plaintiff made investments in their business by having to purchase their routes and in buying or leasing a vehicle. Indeed, S-L uniformly requires its Distributors to be responsible for bearing all costs and expenses for "vehicles, depreciation, maintenance, fuel, oil, tires, taxes, insurance coverage, licenses, vehicle registration and renewal fees and tolls" pursuant to its standardized Distributor Agreements. *See also Rehberg*, 2015 WL

at *7 (finding that all distributors were expected to make a similar level of investment in purchasing their vehicles); *Carr*, 2019 WL 2027299, at *14 (same).

### 5. *Permanence of Relationship*

Finally, S-L argues that because Plaintiffs worked for varying amounts of time and were permitted to work for multiple employers at the same time, there is no common evidence as to the duration of Plaintiffs' relationship with S-L. Under the terms of the Distributor Agreements, all Distributors are to serve indefinitely, subject to termination by either the Distributor or S-L pursuant to certain conditions. Thus, these agreements appear to be generally intended as long-term relationships, especially considering that Plaintiffs are required to sign binding agreements with no set duration while being required to make substantial monetary investments in purchasing their routes and vehicles (sometimes by taking out loans). *Rehberg*, 2015 WL at *20-21 (finding that distributors' execution of distributor agreements and significant monetary investments in distributorship evidences that distributor relationships are clearly intended to be long term). The fact that a few Opt-Ins may have also worked for another employer does not outweigh the common evidence on this prong of the economic realities test.

### 6. *Integral Part of S-L's Business*

Finally, there is common evidence to establish that the Opt-In Plaintiffs' work is an integral part of S-L's business. It is undisputed that S-L relies almost exclusively on Distributors to deliver their products to retailers, which is a fundamental and necessary part of their sales process. Thus, whether Plaintiffs' work is an integral part of S-L's business can be adjudicated through representative proof applicable to all members of the collective action. *See, e.g.*, *Rehberg*, 2015 WL 1346125 at *5 (finding that common evidence shows that the degree to which the distributors are considered an integral part of the employer's business is uniform across the board); *Carr*, 2019

WL 2027299 at *6 (because the distributors were all employed in the same capacity, the question of whether they are an integral part of the defendant's business will be resolved through common evidence); *Neff*, 2019 WL 10750005 at *7 (the evidence concerning the importance of the distributors' work to the defendants will be the same for each distributor). Notably, S-L does not dispute that this factor can be determined from common evidence.

In sum, the Court finds that significant common evidence exists to determine, on a collective basis, whether all Plaintiffs are employees or independent contractors under the economic realities test. Though S-L identifies some factual differences among Plaintiffs, the similarities between Plaintiffs' claims outweigh their differences. *See Butler v. DirectSAT USA, LLC*, No. DKC 10-2747, 47 F. Supp. 3d 300, 311 (D. Md. 2014) ("A collective action does not necessitate that there be no differences among class members, nor does it prohibit individualized inquiry in connection with fashioning the specific relief or damages to be awarded to each class member.") (internal quotations and citations omitted). As did the defendants in *Rehberg*, S-L "exaggerate[s] isolated differences among the distributors and ignore[s] the larger picture of the issue at hand—that all distributors are subject to [S-L's] uniform policies." *Rehberg*, 2015 WL 1346125, at *46. Plaintiffs persuasively write in their brief:

> In reality, all the Plaintiffs are snack food delivery drivers who perform the same core functions relevant to their economic reality; they pick up SL's products from a warehouse or bin owned or maintained by SL, deliver SL's products to SL's customers on routes created by SL, stock store shelves with SL's products, remove stale product, and restock the shelves with SL's products. All of the Plaintiffs work under similar non-negotiable Distributor Agreements, are paid under a common pay policy which fails to pay them any overtime compensation, are subject to the same corporate policies, practices and mandates, face the same limitations and control by SL, and are subject to termination and discipline for failing to comply with SL's company-wide rules and expectations.

(Doc. No. 633, at 2-3). Accordingly, common evidence of Plaintiffs' factual and employment settings weighs in favor of a finding that all Plaintiffs are "similarly situated" for the purpose of the FLSA.

B. S-L's Defenses

"The individualized defenses factor assesses whether potential defenses pertain to the plaintiff class or whether the potential defenses require proof of individualized facts at trial." *Rawls*, 244 F.R.D. at 300. As this Court recognized in *Rehberg*, "[j]ust because the inquiry [under the asserted defense] is fact-intensive does not preclude a collective action where plaintiffs share common job traits." 2015 WL at *47 (quoting *Morgan v. Family Dollar Store, Inc.*, 551 F.3d 1233, 1263 (11th Cir. 2008)).

S-L first contends that the "wide disparity in the relevant factual circumstances of employment" support decertification, as S-L has no other way to prove that each Opt-In is an independent contractor other than "going into the day-to-day job duties of each of the plaintiffs to prove that each one is properly classified." (Doc. No. 618, at 29-30) (internal quotations and citations omitted). As discussed above, the Court is satisfied that there is common evidence that will resolve whether Plaintiffs are employees or independent contractors.

Second, S-L intends to assert that certain Plaintiffs (even if found to be employees) are exempt from the FLSA under the Motor-Carrier (MCA) exemption. Under the MCA exemption, the FLSA's overtime requirements do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49." 29 U.S.C. § 213(b)(1). Under Section 31502, the Secretary has power over any employee who (1) is employed by a "motor private

19

carrier"[12] or "motor carrier,"[13] as defined by 49 U.S.C. § 13102; and (2) performs work as a driver whose duties affect the safety of operation of commercial motor vehicles while transporting products in interstate commerce. 49 U.S.C. § 31502(b); 29 C.F.R. § 782.2(a). Thus, for S-L "to establish the applicability of the MCA exemption . . . [the alleged employer] must show that it is a motor carrier under the MCA and that plaintiff's employment duties involved the safety of operation of motor vehicles weighing at least 10,001 pounds in interstate commerce." *Buckner v. United Parcel Serv., Inc.,* No. 5:09-CV-411-BR, 2012 WL 1596726, at *4 (E.D.N.C. May 7, 2012) *aff'd*, 489 F. App'x 709 (4th Cir. 2012). S-L contends that the collective should not be certified because there is allegedly a wide variance among Plaintiffs as to whether they transported goods over state lines and used vehicles weighing more than 10,001 pounds.

However, assuming that the MCA exemption applies to Distributors,[14] there is a relevant exception to the MCA exemption. The Technical Corrections Act ("TCA") (often referred to as the "small vehicle exception"), SAFETEA—LU Technical Corrections Act of 2008, PL 110-244, June 6, 2008, 122 Stat. 1572, mandates that overtime compensation is available to employees covered by the TCA despite the MCA exemption. As explained in *Rehberg*, 162 F. Supp. 3d at 509, a "covered employee" under the TCA is an individual: (1) who is employed by a motor carrier or motor private carrier; (2) whose work, in whole or in part, is defined as that of a driver; and as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation

---

[12] A "motor private carrier" is an entity that transports property by motor vehicle when: (A) the transportation is across state lines; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

[13] A "motor carrier" is "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).

[14] The Court notes that none of the parties have offered evidence of whether former Lance employees who handled similar distribution duties were paid overtime or were considered exempt under the MCA exemption.

20

on public highways in interstate or foreign commerce; and (3) who performs duties on motor vehicles weighing 10,000 pounds or less. *Id.* Thus, even though a driver is subject to DOT's general maximum-hour regulations, the FLSA's overtime-wage provisions apply to that driver if he spends all or part of his time driving a small vehicle. *Id*. at 510-12 ("Principles of statutory construction indicate that Congress intended to carve out an exception for certain employees of motor carriers— i.e. those who, at least "in part," drive vehicles weighing 10,000 pounds or less.").

Here, while the specific details of how each Plaintiff used a small vehicle in its delivery business may differ, the Court finds that there is arguably sufficient "common" evidence from which the jury will be able to determine, on a collective basis, if the Distributors are covered employees under the TCA such that decertification is not warranted. Plaintiffs have presented evidence, which S-L does not dispute, that a significant, ongoing part of the Distributors' weekly duties includes removing stale products from their customers' shelves and transporting that product away from the retailer. In *Noll v. Flowers Foods Inc*., 478 F. Supp. 3d 59, 63 (D. Me. 2020), the court found that "pulling stales" from the shelves and transporting them to another location in a small vehicle is "an activity that affects 'the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways *in interstate . . . commerce.*'" (emphasis in original). The same reasoning is applicable here where, to the extent that a Distributor is a driver subject to the interstate MCA exemption, the "pulling" of stale product and taking it away from the store is a key step in the interstate transportation of those products from the warehouse to their final disposal and is subject to the TCA exception if the Distributor used a "small vehicle."

Accordingly, if Plaintiffs can establish that it is "typical of the members of the collective to perform this work in small vehicles," *id*., then the jury can resolve the issue of whether the TCA

exception applies collectively.[15] For example, Opt-In Plaintiff Eardley testified that he used a personal car to "pull my stores on . . . Saturday or Sunday evening or morning." Doc. No. 643-1 at 66. Opt-In Plaintiff Arrendondo used her Nissan Pathfinder to do "pull-ups when needed," (Arredondo Tr. 176:15-177:4), and Opt-In Plaintiff Hanna would use her personal vehicle to deliver to cash stores and when taking stales from one of her stores, (Hanna Tr. 121:2-17). *See also* (Doc. No. 633-1, at 28-29) (Plaintiffs' exhibit citing to deposition testimony from over 30 Opt-Ins about the use of their personal vehicles). Further, given the nature and frequency of the Distributors' required task of "pulling" stores it seems reasonable that Distributors would often perform this duty in a smaller vehicle. Therefore, the Court finds that S-L will be able to assert its MCA exemption defense – together with adjudication of the related TCA exception – collectively so the class should not be decertified on that basis.

S-L similarly argues that individualized inquiries are needed to determine whether a second FLSA exemption applies, the Outside Sales Exemption. *See* 29 U.S.C. § 213(a)(1). The FLSA's minimum wage and overtime provisions do not apply to "outside sales [people]." *Id.* The applicable regulation defines an outside salesperson as an employee whose "primary duty" is

---

[15] In *Noll*, the court ultimately concluded that there was insufficient evidence to permit the case to be tried collectively, *id*. at 66. While the Court finds in this case that the Plaintiffs should have an opportunity to present evidence at trial from which the jury can find that it is "typical" for Distributors to use their small vehicles when "pulling" their stores, if they fail to do so the Court can decline to submit that issue to the jury and, if necessary following a jury determination that the Distributors are employees, devise, with the input of the Parties, an appropriate process that permits S-L to assert its MCA defense individually. *See Rehberg*, 2015 WL 1346125, at *18. (finding that "Motor Carrier Act Exemption" and the "Outside Sales Exemption" "if applicable to any distributors, do not overwhelm the 'similarly situated' analysis . . . . [T]he primary inquiry for the court at this point is to determine whether or not all distributors were misclassified as independent contractors and whether they are truly employees within the meaning of the FLSA. The issue of whether the distributors are entitled to overtime pay, all exemptions considered, can be dealt with after the court makes its initial decision as to whether they are "employees" within the meaning of the FLSA.").

"making sales . . . or obtaining orders or contracts for services for the use of facilities for which a consideration will be paid by the client or customer; and who is customarily and regularly engaged away from the employer's place of business in performing such primary duty." 29 C.F.R. § 541.500(a). S-L asserts that some Plaintiffs testified that their job did not involve sales, while others agreed that sales was their principal business. [16] (Doc. No. 618, at 31). Whether Plaintiffs' primary duty is making sales is readily resolved through common evidence. Distributors' duties are set forth in nearly identical Distributor Agreements and testimony about their day-to-day duties overlap significantly. Thus, this defense can be resolved through common evidence about the terms of the Distributor Agreements and the nature of the work. *See Neff*, 2019 WL 10750005 at *10.

The Court is similarly unpersuaded that the asserted "individualized" issues of damages support decertification. Numerous courts have found that individualized inquiries into damages do not warrant decertification. *See Neff*, 2019 WL 10750005 at *10 (citing *McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 369 (S.D.N.Y. 2014)); *Epps v. Scaffolding Solutions, LLC*, 2019 WL 3363790, at *4 (E.D. Va. Apr. 2, 2019) (stating collective actions do not "'prohibit individualized inquiry in connection with fashioning specific relief or damages to be awarded to each class member'") (quoting *LaFleur v. Dollar Tree Stores, Inc.*, 30 F. Supp. 3d 463, 474 (E.D. Va. 2014)); *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 381 (W.D. Pa. 2011) ("It is well-established that the fact that individualized findings regarding damages may be necessary does not require decertification."); *see also Carr*, 2019 WL 2027299 at *15 (finding an individualized inquiry into damages does not "undermine the case for certification" under Rule 23). Furthermore,

---

[16] S-L cites to two Opt-In Plaintiffs that characterized their work as "sales." However, the cited testimony falls short of showing that those Plaintiffs are *primarily* engaged in sales work or that their primary job duties differ from that of the other Opt-In Plaintiffs to such an extent that this defense could not be determined on a collective basis.

23

"[i]f such inquiries were an obstacle to collective resolution in FLSA overtime cases, few cases could ever be decided on a collective basis." *Neff*, 2019 WL 10750005 at *10. Thus, the fact that damages may need to be individualized is not a reason to decertify the collective.[17]

The Court finds S-L's remaining "defenses"—credibility issues, absentee owners, and Opt-In Plaintiffs that did not sign an agreement with S-L—do not support decertification. Credibility issues are present in nearly all cases, and those pointed out by S-L here do not warrant decertification. *See Crawford v. Lexington-Fayette Urban County Government*, 2008 WL 28885230, at *10 (E.D. Ky. July 22, 2008) ("[C]ontradictions in testimony among the plaintiffs 'are matters of credibility for the factfinder, not individualized defenses.'") (quoting *Pendlebury v. Starbucks Coffee Co.,* 518 F. Supp. 2d 1345, 1362 (S.D. Fla. 2007)). As for absentee owners, Plaintiffs have represented that they have culled through the remaining Opt-In Plaintiffs and do not have any evidence that any of the remaining Opt-Ins do not run their own routes. So, neither S-L nor Plaintiffs can point to any evidence showing that any of the remaining 332 Opt-Ins are absentee owners.[18] As for the two Opt-Ins that S-L claims did not sign an agreement with S-L (M. Sturino and Mode (for second territory)), such evidence does not overcome the common evidence that weighs in favor of a common issues trial, especially when there is evidence that S-L required Plaintiffs to incorporate to buy a route and both Sturino and Mode had their mother/step-mother

---

[17] In the event of a determination that the Opt-In Plaintiffs are employees (and in the absence of settlement between the Parties on damages), it will be necessary to develop a method of determining damages. Plaintiffs claim this can be done on a representative basis, which appears to be supported by some caselaw. *See, e.g.*, *Monroe v. FTS USA, LLC*, 860 F.3d 389 (6th Cir. 2017). Regardless, the Court can, with the input of the Parties, devise an appropriate process to determine damages at a later time. For purposes of S-L's motion to decertify the collective, individualized damages do not warrant decertification of the collective.

[18] It seems the Parties could, if necessary, easily confirm that there are no remaining absentee owners in the collective through a simple interrogatory or affidavit and subsequently agree on their dismissal.

24

sign for them because they did not have the credit to sign themselves. (M. Struino Tr. 19; Mode Tr. 113).

C. <u>Fairness and Procedural Considerations</u>

As for fairness and procedural considerations, the parties vehemently disagree as to whether this prong favors decertification. Once again, S-L asserts that Plaintiffs have failed to carry their burden to show that their claims and S-L's defenses are subject to common proof, and that proceeding as a collective would prejudice the S-L's ability to present defenses and/or would require mini-trials for each of the opt-in plaintiffs. Beyond these arguments, which the Court has already addressed above, S-L argues that there are three additional fairness and procedural concerns that independently warrant decertification. First, S-L claims it would have no way of challenging whether any non-sample Opt-Ins are properly in the collective. Second, S-L contends that discovery deficiencies extend even to sample Opt-ins who were supposed to turn over all documents related to their work. These documents, S-L reports, include tax records and relevant emails. Third, S-L argues that these concerns (discovery deficiencies and inability to probe non-sample Opt-Ins) are especially unfair in light of the fact that sample Opt-Ins are continuing to opt out of the case, rather than be deposed or turn over their documents.

In turn, Plaintiffs contend that the fairness and procedural considerations in this case are identical to those in *Rehberg* and strongly favor a common issues trial. A collective action may be the only avenue of relief for many Plaintiffs and decertification may risk denying them their day in court. Even if Plaintiffs each had the resources to sue individually, a common issues trial would avoid the inefficiency of relitigation of the same issue in numerous cases and potentially conflicting judgments on Plaintiffs' legal status.

Under the fairness and procedural considerations factor, the court considers:

the primary objectives of allowance of a collective action under § 216(b), namely (1) to lower costs to the plaintiffs through pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity. The Court also must determine whether it can coherently manage the class in a manner that will not prejudice any party.

*Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 302 (D. Md. 2007) (internal quotations and citations omitted).

In considering fairness and procedural concerns, the Court bears in mind that the FLSA is a remedial statute that should be liberally construed. *See, e.g.*, *Schilling v. Schmidt Baking Co., Inc.*, 876 F.3d 596, 602 (4th Cir. 2017); *Morgan*, 551 F.3d 1233, 1265 (11th Cir. 2008). As numerous courts have pointed out, Congress intended to give "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989); *see, e.g., Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 541 (S.D. Tex. 2008). Without the option of a collective action, many Plaintiffs may not pursue their claims due to the lack of resources required to do so. Plaintiffs can "hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action." *Bradford v. Bed Bath and Beyond*, 184 F. Supp. 2d 1342, 1352 (N.D. Ga. 2002). "Although the remedial nature of the FLSA standing alone, does not justify allowing a case to proceed collectively, it does at least suggest that a close call as to whether Plaintiffs are similarly situated should be resolved in favor of certification." *Falcon*, 580 F. Supp. at 541.

Moreover, the mere size of an FLSA action does not, on its own, compel the conclusion that a decision to collectively litigate is inherently unfair. *Morgan*, 551 F.3d at 1265. After all, the purpose of a collection action is to efficiently resolve a large number of plaintiffs' claims. Given the substantial similarity in the Opt-Ins' circumstances, it would not serve the interest of judicial

economy to require these similarly-situated overtime-pay claims to be adjudicated in hundreds of individual trials.

As for S-L's argument that the inability to probe non-sample Opt-Ins would make proceeding as a collective unfair to S-L, this argument could be raised in almost all collective actions with a substantial number of opt-in plaintiffs. Yet, courts have long permitted the use of representative evidence to establish or defend against liability in class and collective actions. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016) (discussing the appropriate use for representative evidence and rejecting the argument that the use of such evidence in a class action is unfair). As for S-L's argument that there are numerous discovery deficiencies with regards to the Opt-Ins, S-L could have used ordinary motions practice to obtain any documents it thought relevant to the matter at hand. S-L's final fairness and procedural concern addresses the small number of Opt-Ins chosen to represent the collective action and alleges that sample Opt-Ins continue to opt out of the case rather than be deposed or turn over their documents. While S-L cites to a declaration by one of its attorneys, the citation does not support the contention that Opt-Ins are opting out *rather than* be deposed or turn over documents. The declaration is merely a statement that a number of other Opt-Ins have dropped out of the case.

Indeed, if these concerns were enough to prevent collective action, there would likely be few, if any, collective actions under the FLSA. Such a result does not square with the plain language of the FLSA and Congress's intent in enacting the statute. In sum, the interests of judicial and procedural economy, fairness, and the primary objectives of collective FLSA actions support moving forward with this action collectively. The Court also believes that, at this time, it can ably manage this class without prejudice to either party.

In light of the above, the Court finds that the members of the collective are "similarly situated" for the purposes of collectively adjudicating their FLSA claims and will deny S-L's Motion to Decertify.

## MOTIONS FOR SUMMARY JUDGMENT

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal citations and quotations omitted). "It is axiomatic that in deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568); *see Smith v. Collins*, 964 F.3d 266, 274 (4th Cir. 2020). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs*, 780 F.3d at 568-69 (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). "The court therefore cannot weigh the evidence or make credibility determinations." *Id*. at 569. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).

## I.    S-L's Motions Against Opt-In Plaintiffs Eardley and Sturino

S-L seeks summary judgment against two of the more than 300 Opt-In Plaintiffs.[19] In these motions, S-L contends that applying the six-factor "economic realities" test discussed above to the relevant facts shows there can be no dispute that both Anthony Eardley and Michael Sturino are independent contractors rather than employees. Eardley and Sturino disagree and argue there are disputed issues of fact (or the facts clearly support their positions) on each of the factors. The Court agrees with Eardley and Sturino that the claims are materially disputed and will deny the motions for summary judgment as to the status of their relationship with S-L.

Eardley is a former Lance employee who lost his distribution job with Lance in 2011 and then, in 2012, through a corporate entity "A&V Snacks" (which he alleges that he was required to form by S-L), purchased back a S-L sales and distribution territory that included parts of North Carolina and South Carolina. S-L alleges that "Eardley—not S-L—(1) controlled A&V Snacks' day-to-day operations, without input (or consequence) from S-L, (2) could profit (or suffer losses) as a result of his managerial skill and business acumen, (3) made significant, independent investments in A&V Snacks' business, (4) exercised a significant degree of skill in operating his business, and

---

[19] At the outset of their responses, Eardley and Sturino argue that the Court should deny the motions because filing individual summary judgment motions against individual opt-ins contradicts the policy underlying FLSA collective litigation. *See Pendlebury v. Starbucks Coffee Co.*, 2008 WL 113667 (S.D. Fla. Jan. 8, 2020) ("allowing Defendant to move for summary judgment against particular individuals who are indistinguishable from other members of the class defeats the entire purpose of a collective action"). The Court shares some of this concern about multiple summary judgment motions and notes that S-L appears to be relatively open about their strategic choice to cherry-pick for summary judgment motions Opt-Ins Plaintiffs who they see as a potential linchpin to obtain decertification of the collective action. *See, e.g.*, Doc. No. 667 at 1, 3, 12.  However, because the Court can quickly decide that there are genuine issues of material fact that preclude summary judgment as to these motions, the Court need not and does not decide whether a defendant should generally be prohibited from filing separate summary judgment motions against members of a FLSA collective action.

(5) controlled the permanence of A&V Snacks' relationship with S-L." Doc. 642 at 1. Eardley counters with evidence from his deposition and other parts of the record which he says demonstrates material disputes as to the relevant facts and factors. *See* Doc. No. 662 at 15-23; Doc. No. 662-1.

Similarly, Sturino worked for S-L as a Distributor from approximately October 2013 to March 2017. Sturino's territory was purchased through a corporate entity, MBS Distribution, LLC ("MBS"), which was formed and owned by his stepmother (who performed no work for S-L) because Sturino's credit was not good enough to purchase the S-L route by himself. As with Eardley, the Parties strongly disagree on the extent to which Sturino or S-L controlled his activities as a S-L Distributor and the other relevant factors. *Compare* Doc. No. 645, at 11-20 *with* Doc. No. 661, at 15-24.

In sum, with respect to both Eardley and Sturino, numerous material facts are disputed[20] and summary judgment cannot be entered on the question of whether or not Eardley and/or Sturino were employees rather than independent contractors. Indeed, the nature and substance of the work of "employees" or "independent contractors" who perform the same tasks for a company often overlap. Both groups are engaged in a portion of the company's business and have (or don't have) significant support from the company to do their jobs, both have (or don't have) skills and use judgment that make them a good (or not as good) employee or contractor. In other words, rarely in those circumstances that evolve into legal disputes is the relationship entirely independent or dependent. Rather, the finder of fact – here the jury – must, considering the relevant factors, weigh

---

[20] In addition to arguing that Eardley is not an employee subject to FLSA overtime rules, S-L contends that he is exempt from the FLSA under the MCA exemption. However, as discussed above, the Court finds that there are disputed issues of fact concerning whether Eardley used his personal vehicle to "pull" his stores that preclude summary judgment on the MCA exemption.

the evidence and determine where the balance lies. Therefore, the Court will deny S-L's motions for summary judgment and Eardley's and Sturino's FLSA "employment" status will be decided by the jury as part of the collective trial ordered above.[21]

Finally, in S-L's motion against Sturino, S-L also contends that the record establishes that there is no genuine dispute that Sturino received compensation from his distribution work in excess of the minimum wage rate each week. S-L bases its argument on Sturino's undisputed testimony that he worked on average for 50 hours per week, Doc. No. No. 109-2, at 57 ¶ 13, and received fixed "base" compensation from MBS (which is the entity that S-L paid) of approximately $522 every week, Doc. No. 646-1 at 27:1-6, 28:21-24, which is more than the minimum wage requirement of $7.25 per hour. However, for purposes of Sturino's FLSA minimum wage claim the specific question is not how much he agreed with his Mother that he would receive each week from MBS[22] but rather how much S-L paid MBS each week for his services. With respect to that amount, Sturino testified that there were weeks where S-L paid MBS less than $522. Doc. No. 646-1 at 72:15-23. Accordingly, the Court will – generously considering the evidence in the light most favorable to Sturino along with reasonable inferences – find that there is a factual dispute as to whether S-L paid less than minimum wage for Sturino's services in any particular week.

---

[21] To be clear, the Court does not intend to suggest how the jury will answer this question given the totality of the evidence, which as noted in part favors Plaintiffs and in part S-L.

[22] As discussed below, the question of how much must be offset from Plaintiffs' income during the relevant period against Plaintiffs' FLSA damages or deducted in equity against those damages will be addressed, if necessary, in the damages phase of the trial. So, even though the Court will allow Sturino's minimum wage claim to proceed based on the disputed fact of whether S-L paid more than minimum wages each week, the allegation that he actually received more than minimum wages each week may be considered in reaching the ultimate result as to his claims.

## II.    J&M Mode Distribution's Motion

S-L filed a Third Party Complaint in this action against "all entities owned, controlled, related to, and/or managed by any Opt-In Plaintiff," (i.e. the corporate entities which are the counter-parties to the Distributor Agreements related to the Opt-In Plaintiffs), asserting two claims. *See* Doc. No. 539. First, S-L alleges that it is entitled to be "indemnified" by the Third Party Defendants ("TPDs") under the indemnification provision of the Distributor Agreements for all or part of any judgment or settlement in this action as well as its attorneys' fees and costs. Second, S-L asserts "in the alternative" a claim for unjust enrichment alleging that if the Court finds that the TPDs were employees of S-L rather than independent contractors then they have been unjustly "enriched as a result of their status as independent contractors." *Id.* at ¶¶ 26-36. On behalf of all the TPDs, J&M seeks summary judgment on both of S-L's third party claims. For the reasons discussed below, the Court will grant J&M's motion.

### A. Indemnification

The basis of S-L's indemnification claim is Article 19 of each respective Distributor Agreement, which states:

> Distributor agrees to and shall[] protect, defend, indemnify, and hold harmless [S-L] from and against any and all fines, rights, claims, costs, expenses (including reasonable attorneys' fees and court costs), demands, damages, punitive damages, actions, causes of action, interest, penalties and other liabilities of every kind and nature, whether known or unknown, whether in contract, tort, equity or otherwise, whether statutory or common law, arising or resulting, directly or indirectly, from: Distributor's actions, omissions or negligence; the performance of this Agreement by Distributor; any breach of this Agreement by Distributor; the operation of Distributor's business; or the use or operation of Distributor's vehicles. Distributor shall notify [S-L], in writing, of any such matters or actions as soon as Distributor becomes aware thereof. Unless otherwise required by any applicable insurance policy, [S-L] shall have the exclusive right to control and direct the legal activities associated with any such action against it through counsel retained by it, but at Distributor's cost and expense.

Doc. No. 539 at ¶ 15. The TPDs challenge S-L's indemnification claim on numerous grounds, including that S-L is not entitled to indemnify itself contractually against its own FLSA violations, the Plaintiffs' FLSA claims are outside the scope of the indemnification provision, the "notice" provision is inapplicable or was fulfilled, Pennsylvania law (which S-L contends governs the Distributor Agreements) enforces similarly worded indemnification provisions only in the context of "third-party claims," and allowing indemnification here would be inconsistent with the public policy protecting the rights of workers to pursue federal statutory wage claims.

S-L's first response to the TPDs' arguments is that the Court should not consider the merits of the TPDs' motion because the "law of the case" bars their motion; that is, S-L contends that the Court has already definitively decided (in its Order on the TPDs' 12(b)(6) motion to dismiss) that S-L's indemnification claim can proceed to trial. The Court disagrees. The "law of the case" doctrine recognizes that "when a court decides upon a rule of law that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983); *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019); *Fairchild v. Kubota Tractor Corp.*, No. 18-69, 2020 WL 739353, at *2 (W.D.N.C. Feb. 13, 2020). However, "the law-of-the-case doctrine 'poses no bar to the assessment of past holdings based on a different procedural posture when, as is the case in the progression from review of a motion to dismiss to a motion for summary judgment, that later review expands the court's inquiry based on development of actual facts underlying a plaintiff's claims.'" *Fairchild*, 2020 WL 739353, at *2 (quoting *Graves*, 930 F.3d at 318). In addition, exceptions to the law-of-the-case doctrine exist, including where: (1) a subsequent trial produces substantially different evidence … or (3) the prior decision was clearly erroneous and would work manifest injustice." *Id.*

Here, in its earlier Order on the Plaintiffs' and TPDs' motions to dismiss, the Court specifically noted it was ruling on the motions "under Rule 12(b)(6)'s standard" and that it was

33

declining to dismiss S-L's claims "at this stage," as merely "plausible" and "at this procedural posture of the case." *See, e.g.,* Doc. No. 141 at 15, 16, 19. Also, contrary to S-L's suggestion, there has been the expected "further development of the factual record," Doc. No. 141 at 19, as to relevant issues. Moreover, even if the Court were to conclude that its earlier order intended to decide the issues of indemnification and unjust enrichment to preclude a later motion for summary judgment (which the Court does not conclude) then Rule 54(b) provides, in pertinent part, that Courts may revise interlocutory orders "at any time before the entry of a judgment." Fed. R. Civ. P. 54(b); *see also Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 12, (1983) (noting that "every order short of a final decree is subject to reopening at the discretion of the district judge"). Indeed, even the law of the case doctrine cannot prohibit a district court from reconsidering an interlocutory order in light of federal courts' "ultimate responsibility . . . to reach the correct judgment under law." *Am. Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 514–15 (4th Cir. 2003). Finally, for the reasons stated below, and in light of a fuller review of the record now before the Court, if it was necessary to do so (which it is not) the Court would conclude that any earlier ruling that S-L's third party claims can proceed to trial would be clearly erroneous and a manifest injustice.

As to the merits of S-L's indemnification claim, it is clear (as the Court has previously stated) that the Fourth Circuit has held that "the FLSA simply will not allow" an employer-defendant to plead a counterclaim or third-party complaint against its employee that essentially seeks to indemnify itself against its employee for its own violation of the FLSA. Doc. No. 141 at 18 (*citing Lyle v. Food Lion, Inc.*, 954 F.2d 984, 987 (4th Cir. 1992)). Nevertheless, S-L argues that it is still entitled to maintain a claim for indemnification in the event that the jury finds that the Plaintiffs are independent contractors. In other words, S-L seeks indemnification against the

TPDs (which would necessarily be only the recovery of its attorneys' fees and costs in the event the Plaintiffs' FLSA claim is unsuccessful) based on Plaintiffs' filing of an FLSA claim. Allowing S-L to recover its attorneys' fees under an indemnification provision simply as a result of Plaintiffs participating in an unsuccessful FLSA action would, however, be wrong for several reasons.

First, allowing the recovery of attorneys' fees in this way would be inconsistent with the limited attorneys' fees provisions in the FLSA. Section 216(b) of the FLSA provides, in pertinent part, that: "The court in [a collective] action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). There is no comparable statutory authority for the award of attorneys' fees to a prevailing defendant. *See E.E.O.C. v. Clay Printing Co.,* 13 F.3d 813, 817 (4th Cir. 1994); *Colbert v. Yadkin Valley Tel. Membership Corp*., 960 F. Supp. 84, 85–87 (M.D.N.C. 1997). While courts have awarded fees against plaintiffs in FLSA actions, such awards are limited to the rare circumstances, plainly not found here, where "the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *See Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1437 (11th Cir. 1998); *Colbert*, 960 F. Supp. 85-86 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59 (1975)). Thus, permitting S-L to recover fees under a contractual indemnification provision only on the grounds that an FLSA Plaintiff was unsuccessful would be an improper end-run around the FLSA's statutory scheme.

Similarly, allowing S-L's indemnification claim to proceed would inevitably chill the right of a putative FLSA plaintiff in these circumstances to pursue a FLSA claim. *See Herman v. RSR Security Services LTD*, 172 F.3d 132, 143-44 (2d Cir. 1999) *Martin v. Gingerbread House, Inc.*, 977 F.2d 1405, 1407-08 (10th Cir. 1992); *Lyle*, 954 F.2d at 987; *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1264-65 (5th Cir. 1986). This concern is particularly applicable here where

35

S-L indisputably required the Plaintiffs to form corporate entities and execute Distributor Agreements which included a provision that – according to S-L – requires the corporate entity to "indemnify" S-L in the event that the business arrangements devised by S-L are challenged by the Plaintiffs. If enforced, this scheme would plainly discourage the workers who were required to form the corporate entities from asserting their rights under the FLSA, which clearly violates public policy. *See Abdul-Rasheed v. KableLink Communications, LLC*, 2013 WL 6182321, *14-15, 2013 U.S. Dist. LEXIS 167159, *13 (M.D. Fla. Nov. 25, 2013) ("If courts imposed an attorneys' fees award against unsuccessful independent contractors that have indemnity agreements, it would incentivize employers to mis-classify employees as independent contractors in an independent contractor agreement that contains an indemnity provision based on the hope that the possibility of an attorneys' fee award would dissuade litigation on the issue"); *Houston*, 591 F. Supp. 2d at 831 (The FLSA "embodies a federal legislative scheme to protect covered employees from prohibited employer conduct.").[23]

Moreover, even if S-L's indemnification claim was not inconsistent with the FLSA, the basis for the asserted indemnification - that a "Member" of the TPD asserted an unsuccessful FLSA claim – is not encompassed by the indemnification provision. A claim that S-L, rather than the TPDs, violated the FLSA by not paying overtime or minimum wages to Plaintiffs does not arise

---

[23] The Court also notes in this regard that the indemnification provision is one-sided (it does not for example provide indemnification in the event of the breach of the Distributor Agreement by S-L) and might violate Pennsylvania law under the doctrine of unconscionability. *See Salley v. Option One Mortg. Corp.*, 592 Pa. 323, 331–32, 925 A.2d 115, 119–20 (2007) (a contract or term is unconscionable, and therefore avoidable, where there was a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it); *Graystone Bank v. Grove Ests., LP*., 2012 PA Super 274, 58 A.3d 1277, 1284 (2012), *aff'd sub nom. Graystone Bank v. Grove Ests*., *L.P.*, 623 Pa. 107, 81 A.3d 880 (2013) (holding that "it is beyond dispute that an unconscionable fee-shifting provision, or a provision yielding unconscionable results, should not be enforced according to its terms").

out of or result from "Distributor[s'] actions, omissions or negligence; the performance of [the Distributor] Agreement by [a] Distributor; any breach of [the Distributor] Agreement by [a] Distributor; the operation of [a] Distributor's business; or the use or operation of [a] Distributor's vehicles." Doc. No. 539 at ¶ 15. Instead, Plaintiffs' claim arises out of S-L's actions and the operation of S-L's business.[24]

Finally,[25] the "notice" requirement in the indemnification provision which S-L claims was breached[26] is either inapplicable or was fulfilled. Again, the requirement that an indemnification provision be narrowly construed is instructive. Fairly read, a "claim," "demand" or "action" does not become such until it is *asserted* (by a third party) against the party seeking to be indemnified. Thus, *unasserted* or *potential* claims that may or are even likely to be brought but have not yet been made are not encompassed by the indemnification. In other words, even if as alleged by S-L, the TPDs knew that the Plaintiffs could (or believed they intended to) make claims in the future, the indemnification provision did not require notice be given until the claim or demand was

_____

[24] While a Plaintiff's FLSA claim undoubtedly "relates" to Distributors' business in that it generally involves the distribution of S-L's products by a "Member" of the corporate entity, the indemnification provision, which must be read narrowly, is more limited, specifically requiring that the claim "arise[]" or "result[]" from the Distributor's action or business, which it does not. *See Equitrans Servs., LLC v. Precision Pipeline, LLC*, 154 F. Supp. 3d 189, 204 (W.D. Pa. 2015) (Pennsylvania law requires that indemnity clauses be construed narrowly against the party seeking indemnification).

[25] Plaintiffs also assert that Pennsylvania law (which S-L contends governs the Distributor Agreements) enforces similarly worded indemnification provisions only in the context of "third-party claims." While this appears to be an accurate statement of the law, *see Equitrans*, 154 F. Supp. 3d at 203-04, it is also true that the FLSA claims made by individuals rather than the corporate TPDs are arguably "third party" rather than "intraparty" claims. So, in light of the foregoing determination that the indemnification claim cannot proceed, the Court need not and does not reach this issue.

[26] It is unclear to the Court what damages S-L contends that it suffered in connection with the allegedly "late" notice of the Plaintiffs' claims as it does not allege (nor could it) that it has not had a full and fair opportunity to defend itself against Plaintiffs' claims or that it would have taken some action (which could not have been taken later) in the event it had received notice of Mode or the other Plaintiffs' claims before they were filed.

37

actually made. And, there is no dispute that once claims were made against S-L then S-L had notice of the claims.[27] Therefore, the Court finds that S-L's notice argument is unpersuasive.[28]

In sum, for all the reasons discussed above, the TPDs are entitled to summary judgment on S-L's indemnification claim.

### B. Unjust Enrichment

S-L's second claim against the TPDs is a claim for unjust enrichment. In that claim, S-L alleges that if the Court finds that the TPDs are employees rather than independent contractors then the TPDs were unjustly "enriched as a result of their status as independent contractors." Doc. No. 539 at ¶ 32. However, S-L's unjust enrichment claim against the TPDs elides the critical distinctions between the TPDs and the individual Plaintiffs which establish that S-L's claim cannot proceed. First, and most fundamentally, there is no claim in this case that the TPDs – the *corporate entities* that S-L insisted be formed and act as counterparties to the Distributor Agreements – are employees entitled to damages under the FLSA. Instead, that claim is only made on behalf of the *individual* Plaintiffs.[29] Therefore, the Court will never find that any of the TPDs are employees so the underlying premise of S-L's unjust enrichment claim necessarily fails.

---

[27] To be clear, a "claim," etc. can be asserted prior to litigation being filed as is the case when a company receives a demand from an injured customer regarding alleged negligent conduct or an allegedly defective product. Here, however, the claim or demand (as opposed to an unasserted potential claim) was only made when it was asserted against S-L, which gave S-L notice of the claim.

[28] Also, the Court notes that it finds S-L's citation of and quotation from *Gerber v. First Horizon Home Loans Corp.*, No. C05-1554P, 2006 WL 581082, at *2 (W.D. Wash. Mar. 8, 2006) as purported authority for its position on notice misleading. In *Gerber*, the "notice" provision at issue was not an indemnification provision but instead a contract term that required a party to give notice of a contractual complaint prior to filing a legal action. Accordingly, the court's resolution of that dispute is inapplicable here.

[29] S-L has asserted a separate counterclaim for unjust enrichment against the individual Plaintiffs which the Court will allow to proceed to trial as discussed below.

38

Further, even if the TPDs could be considered FLSA employees, S-L's unjust enrichment claim fails because there is an ongoing contractual relationship between the TPDs and S-L that governs their rights and obligations. As the Court has previously held, "[w]hen a valid contract or agreement exists between the parties, a party cannot also recover on an unjust enrichment claim. *Watson Elec. Const. Co. v. Summit Companies, LLC*, 587 S.E.2d 87, 92 (N.C. Ct. App. 2003)." Doc. No. 141 at 14.[30] Therefore, the unjust enrichment claims may move forward only if the Court determines that a valid agreement (i.e., the Distributor Agreements) does not govern the parties' relationship. However, parties may plead causes of action in the alternative. *FMW/MJH at 2604 Hillsborough LLC v. WSA Constr., LLC*, No. 3:13-CV-703, 2014 WL 6476187, at *2 (W.D.N.C. Nov. 19, 2014). Thus, even though "a quantum meruit claim can only prevail 'in the absence of an enforceable, express contract,' *TSC Research, LLC v.. Bayer Chemicals Corp*., 552 F. Supp.2d 534, 540 (M.D.N.C.2008), dismissal is improper when the existence of such a contract has not been proven by evidence before the court." *FMW/MJH*, 2014 WL 6476187, at *2.

S-L contends that they have alleged their unjust enrichment claim "in the alternative" so the claim may proceed despite the existence of the Distributor Agreements. Again, S-L bases its position on a faulty premise. In support of its argument, S-L asserts that if the jury finds that Plaintiffs are employees rather than independent contractors then the Distributor Agreements will be "void" and there will be no contractual relationship with the TPDs so the unjust enrichment claim will be viable. However, this is an inaccurate reading of the Distributor Agreements. Those agreements state that "[a]ny [finding that there is not an independent contractor relationship

---

[30] In its response to J&M's motion, S-L argues that North Carolina law may not apply to all its unjust enrichment claims, suggesting that the Court might need to apply the law of each TPD's home state. However, the Court need not decide this choice of law issue because there is no assertion that this fundamental principle of common law regarding when quasi-contractual claims are available does not apply in all states.

39

between them] by any board, court of competent jurisdiction or agency shall entitle either party to immediately declare this Agreement null and void." Doc. No. 636-7 at Article 2 (A). So, rather than allegedly being "void" in the event of an adverse finding at trial, the Distributor Agreements are merely "voidable."

This distinction is significant and determinative. Even if a Court determines that Plaintiffs are employees rather than independent contractors that finding alone does not disturb either the existence or validity of the Distributor Agreement. Rather, each of the parties to the agreements has a contractual right, but not an obligation, to then declare the contract to be void, only at that point triggering whatever rights and obligations are attendant to their voided contract.[31] Indeed, because it would be S-L's contractual *choice* to declare the contract void, even the voiding of the contract would be an act entirely subject to and deriving from the parties' rights under the contract. Accordingly, S-L could not, based on its own elections under the Distributor Agreements, create an opportunity to recover against the TPDs under a quasi-contractual claim. In sum, all of the parties' rights and obligations flow from their express contractual relationship, which precludes any claim of unjust enrichment between them and entitles J&M and the other TPDs to summary judgment on that claim.

### III.     Plaintiff Mode's Motion

The final summary judgment motion before the Court is Plaintiff Mode's motion on behalf of the collective class of Opt-In Plaintiffs seeking summary judgment on S-L's counterclaim for

---

[31] The Court of course need not decide in this action how the Distributor Agreements should properly be unwound if one party elects to declare the agreement void, but presumably S-L would be required, at a minimum, to return the consideration paid for the distribution territory like the agreement provides in the event S-L elects to terminate the agreement (in other words, the Distributor ought not be worse off in the event that a court finds that S-L violated the FLSA than if S-L terminated the agreement without any finding of fault). *See* Doc. No. 636-7 at Article 15 (C).

unjust enrichment. While S-L's counterclaims against Plaintiffs are similar, if not mostly identical to S-L's third party claims, *see, e.g.*, Doc. No. 25 at ¶¶ 69-73; Doc. No. 539 at ¶¶ 32-36, S-L stands in a different posture with respect to the Plaintiffs who, unlike the TPDs, are not the named counterparties to the Distributor Agreements. Accordingly, the Court reaches a different conclusion, only for purposes of this summary judgment motion, as to the viability of S-L's counterclaim.

Like the TPDs, Plaintiffs argue that S-L cannot maintain its unjust enrichment claim because it is "grounded in contract." *See* Doc. No. 651 at 7; *TSC Research,* 552 F. Supp.2d at 540 (an unjust enrichment claim "can only exist in the absence of an enforceable, express contract."). And, S-L's counterclaim offers substantial support for Plaintiff's contention, repeatedly tying the relationship between S-L and the Plaintiffs to the Distributor Agreements. *See, e.g.,* Doc. No. 538 at Counterclaim ¶¶ 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 23, 26, 27, 28, 29. However, notwithstanding S-L's pleading, the substance of Plaintiffs' FLSA claims is that the economic reality of their relationship did *not* match the contract. Instead, they argue that the independent contractor relationship purportedly envisioned by the Distributor Agreements was in practice and fact an employee/employer relationship subject to the FLSA. Thus, if Plaintiffs are correct and the jury finds they were employees rather than independent contractors then their relationship with S-L, with whom the individual Plaintiffs were never contractual counterparties, is outside of and not governed by any express contract.[32] So, in the absence of a controlling contract, S-L can maintain a claim for unjust enrichment, if it is otherwise viable.

---

[32] This stands in contrast to the TPDs, with whom S-L would have and could continue to have an express contract even if there is a finding that Plaintiffs were S-L employees under the FLSA, as discussed above.

41

Broadly stated, the essence of a claim for unjust enrichment in these circumstances[33] is that even if a party has been the victim of unlawful conduct, if it has nevertheless received benefits related to the wrongdoing that in equity should be offset against its damages then it should be required to offset those benefits.[34] Under Restatement (Third) of Restitution and Unjust Enrichment (Am. L. Inst. 2011)[35]:

> § 1: "A person who is unjustly enriched at the expense of another is subject to liability in restitution" . . . .
>
> § 32 : "A person who renders performance under an agreement that is illegal or otherwise unenforceable for reasons of public policy may obtain restitution from the recipient in accordance with the following rules: (1) Restitution will be allowed, whether or not necessary to prevent unjust enrichment, if restitution is required by the policy of the underlying prohibition; (2) Restitution will also be allowed, as necessary to prevent unjust enrichment, if the allowance of restitution will not defeat or frustrate the policy of the underlying prohibition. There is no unjust enrichment if the claimant receives the counterperformance specified by the parties' unenforceable agreement; (2) Restitution will be denied, notwithstanding the enrichment of the defendant at the claimant's expense, if the claim under subsection (2) is foreclosed by the claimant's inequitable conduct (§ 63)."

S-L alleges that Plaintiffs received numerous benefits in connection with their distribution work, including, (1) revenue that they generated through the sale of the products that they

---

[33] In other circumstances, a party who has no contractual right to be paid for goods or services which were provided with an expectation of payment may assert a claim for unjust enrichment against the party who received the benefit of "non-contractual" performance.

[34] Indeed, S-L's claim for "unjust enrichment" may be more accurately seen as a request that the Plaintiffs' FLSA overtime damages be reduced by the money that Plaintiffs made as distributors. S-L obviously cannot "recover" / "offset" any of the money Plaintiffs made as Distributors more than once (i.e., a deduction cannot be made both in determining damages and as part of an unjust enrichment claim) so S-L's unjust enrichment claim may effectively become moot in light of the calculation of Plaintiffs' FLSA damages (if liability is found).

[35] S-L contends that the Court's earlier discussion of the elements for unjust enrichment under North Carolina law, Doc. No. 141 at 16, is not applicable to all Plaintiffs. The Court need not at this time undertake a conflict of laws analysis to determine which, if any, particular state's law is applicable and if there are *material* differences in the laws of the various states on this issue. The general principles of the Restatement are thus used here only for the purpose of a general discussion of the law in the context of this Order.

purchased from Snyder's-Lance; (2) revenue that they generated through the sale of all or parts of their distribution rights; (3) compensation that they received for serving as owners, officers, executives, members, agents, and/or employees of their respective entities; and (4) compensation that they received as a result of other work they performed while they were Distributors. *See* Doc. No. 538 at ¶ 73. While the Court need not and does not determine here whether all of these alleged benefits may be recovered under S-L's unjust enrichment claim, the Court finds that there are disputed material facts as to whether and to what extent such benefits were in fact received and whether it would be "unjust" for Plaintiffs to retain those benefits. To be clear, by this ruling the Court does not yet find that this issue will be presented to the jury. Indeed, the Court could find, depending on the evidence at trial, that in balancing the numerous benefits that S-L received in connection with treating Plaintiffs as independent contractors (for example, lower social security and unemployment taxes, reduced vehicle and operating costs, gains on the sale of distribution territories, etc.) that a reasonable jury cannot find that it would be "unjust" for Plaintiffs to retain certain "benefits" that accrued to them as Distributors.[36, 37]

Accordingly, Mode's motion for summary judgment will be denied, with one caveat. The Court agrees with Plaintiffs that to the extent S-L seeks attorneys' fees as part of its claim for unjust enrichment, S-L is not entitled to recover attorneys' fees for the same reasons discussed above in connection with J&M's motion.

---

[36] Again, whether or not S-L may recover on its claim for unjust enrichment, some of the offsets urged by S-L may still be considered as part of the determination of FLSA damages (if damages are recoverable).

[37] Said more generally, S-L presumably adopted the "independent contractor" business model because it would benefit the company financially.

**MOTION TO DISMISS**

S-L moved to dismiss Opt-in Plaintiffs Barbara Meeker, Nelson Guevara, Timothy Barnes, Joseph Covganka, Jose Duarte, John Stosick III, Philip Hines, Harold Leslie, Jr., Norma Arriaga, Brian O'Neal, Lazaro Erillo, Barry Sommers, Thomas Orasco, James Weniger. Alternatively, S-L moved the Court for an order deeming the following Third-Party Defendants served pursuant to Rule 4 of the Federal Rules of Civil Procedure: Barbara Meeker LLC, Bataan Snacks LLC, Cicero Snacks LLC, Covganka & Sons, Inc., Duarte Delivery, Inc., Excellence Distributing LLC, Go Hard Retail, Leslie Snacks LLC, Norma L. Arriaga Distribution Company Inc., O-World LLC, Pam's Marketing LLC, Southernmost Distributors LLC, Thomas Orasco Distributing LLC, and Tri-City Snacks LLC (collectively, the "Relevant Third-Party Defendants") served. S-L argues that "[t]he Relevant Third-Party Defendants (each of which has a principal, officer member, and/or employee who opted into this lawsuit as an Opt-in Plaintiff) clearly have actual knowledge of the Third-Party Complaints filed against them but have sought to evade service, while the Opt-In Plaintiffs associated with these Third-Party Defendants—who are all allegedly 'really one in the same'—continue to seek affirmative relief against S-L. In order to stop this type of gamesmanship by the Relevant Opt-In Plaintiffs and the Third-Party Defendants they control, the Court should either (1) dismiss the Opt-in Plaintiffs associated with the Third-Party Defendants, or alternatively, (2) deem the Third-Party Defendants served under Federal Rule of Civil Procedure 4(h)." (Doc. No. 627, at 2).

Because the Court is dismissing S-L's claims against the Third-Party Defendants for indemnification and unjust enrichment, it need not dismiss Opt-In Plaintiffs who have allegedly evaded service on behalf of their Distribution Companies or deem their relevant Distribution Companies served. Thus, the Court will deny S-L's Motion to Dismiss as moot.

44

**ORDER**

**IT IS THEREFORE ORDERED** that:

(1) S-L's Motion to Decertify, (Doc. No. 617), is **DENIED**. The case shall proceed as a collective action under 29 U.S.C. § 216(b). The Court will continue to monitor and assess the feasibility of doing so and will act accordingly if it determines that collective resolution, for any reason, proves to be improper;

(2) S-L's Motions for Summary Judgment as to Opt-In Plaintiffs Anthony Eardley and Michael Sturino, (Doc. Nos. 641 and 644) are **DENIED;**

(3) J&M Mode Distribution, LLC's Motion for Summary Judgment, (Doc. No. 647), is **GRANTED;**

(4) Mode's Motion for Summary Judgment, (Doc. No. 648), is **DENIED** with the caveat described above with respect to attorneys' fees**;**

(5) S-L's Motion to Dismiss, (Doc. No. 627), is **DENIED AS MOOT** in light of this Court's ruling on J&M's Motion for Summary Judgment; and

(6) Trial of this matter will be set for the Court's November 8, 2021 Charlotte civil term.

**SO ORDERED**.

Signed: August 31, 2021

Kenneth D. Bell
United States District Judge

45