IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| JARED MODE, *et al.*,<br>Plaintiffs/Counterclaim Defendants, | 3:18-cv-00150-KDB-DSC |
| v. | |
| S-L DISTRIBUTION COMPANY, LLC, *et al.*,<br>Defendants/Counterclaim and<br>Third-Party Plaintiffs, | **MEMORANDUM OF LAW IN<br>SUPPORT OF PLAINTIFFS'<br>UNOPPOSED MOTION FOR<br>APPROVAL OF THE<br>SETTLEMENT** |
| v. | |
| J&M MODE DISTRIBUTION, LLC, *et al.*,<br>Third-Party Defendants. | |

After years of hard-fought litigation, Originating Plaintiff Jared Mode ("Mode") and the 330 other IBOs covered by this lawsuit (together "Plaintiffs") and Defendants S-L Distribution Company, LLC, S-L Distribution Company, Inc., and S-L Routes, LLC (together ("S-L") have settled this Fair Labor Standards Act ("FLSA") lawsuit per the accompanying Settlement Agreement and Release ("Agreement"). The settlement requires S-L to make a total, non-reversionary payment of $6,000,000 that, subject to this Court's approval, will be distributed as follows: (i) $3,797,544 will be distributed to Plaintiffs based on each individual Plaintiff's proportional share of workweeks during the relevant time period; (ii) a $15,000 service award will be paid to Mode; (iii) $2,500 service awards will be paid to each of the 30 Plaintiffs (other than Mode) who sat for depositions; (iv) $2,000,000 in attorney's fees will be paid to Winebrake & Santillo, LLC ("W&S") and Woolf, McClane, Bright, Allen & Carpenter, PLLC ("Woolf McClane") (together "Plaintiffs' Counsel"); (v) $86,956 in litigation expenses will be paid to Plaintiffs' Counsel; (vii) $10,500 will be paid to Settlement Services, Inc. ("SSI") to cover

settlement administration expenses; and (vii) $15,000 will be placed in a "reserve fund" to be utilized to resolve any disputes by Plaintiffs who disagree with the number of workweeks utilized to determine their individual allocations.

Although the Fourth Circuit has not specifically addressed the issue, this Court regularly holds that FLSA collective settlements must be judicially reviewed for fairness. *See* pp. 8-9 *infra*. As discussed in this brief, judicial approval is warranted:

## A. BACKGROUND

### 1. Procedural History.

This Court has written several extensive opinions summarizing the facts and the parties' competing legal claims. *See*, *e.g.*, ECF Nos. 97, 122, 141, 143, 532, 673. As the Court most recently summarized:

> Plaintiffs, a group of snack food distributors for S-L, filed suit on March 22, 2018, alleging violations of the [FLSA] and the North Carolina Wage and Hour Act ("NCWHA") . . . . Plaintiffs allege they were misclassified by S-L as independent contractors, rather than employees, and are therefore entitled to certain benefits under the FLSA, specifically, minimum wage and overtime pay for hours worked in excess of forty per week. In response, S-L filed counterclaims for unjust enrichment against Plaintiffs and third party claims for indemnification and unjust enrichment against the distribution companies that Plaintiffs formed to enter into Distributor Agreements with S-L.

ECF No. 673 at 2.

Litigation has been extensive. At the outset, S-L successfully moved to dismiss the NCWHA claim, while Plaintiffs failed to dismiss the counterclaims and third-party complaints. *See* ECF No. 97, 141. Next, Plaintiffs' succeeded in "conditionally certifying" the FLSA collective. *See* ECF No. 145. Notice ensued, *see* ECF Nos. 150, 152, and hundreds of IBOs

joined the lawsuit. *See* ECF Nos. 147, 153-155, 158-185.[1]  Thereafter, approximately 311 of

these IBOs would be compelled to private arbitration. *See* ECF Nos. 532, 536, 590.  Others

withdrew, were dismissed for failing to participate in discovery, or were dismissed because they

did not individually work their distribution routes. *See* ECF Nos. 132-133, 135, 518, 521, 533,

540, 555, 564, 574, 577, 584, 598, 606, 624, 670.  In the wake of all these dismissals and

withdrawals, we currently are left with 331 Plaintiffs (including Mode).  Nearly all of these

Plaintiffs faced S-L's counterclaims and third-party complaints. *See* ECF Nos. 25, 26-47, 52-56,

188-218, 221-419, 429-433, 439-508, 538-539.

Discovery proceeded based upon a "representative sample" of the entire collective. *See*

ECF No. 517.  The discovery was extensive.  Plaintiffs answered approximately 40 sets of

written interrogatories and document requests, produced over 12,000 pages of documents,

deposed approximately 10 of S-L's' employees, and retained an expert to analyze pertinent

compensation data.  Meanwhile, S-L answered approximately 2 sets of written interrogatories

and document requests, produced over 2 million pages of documents, deposed approximately 30

Plaintiffs, and retained its own expert.  Throughout discovery, the Court was called upon to

resolve various disputes. *See*, *e.g.*, ECF Nos. 97, 122, 141, 143, 532, 577, 623, 626, 655, 673.

At the close of discovery, the parties engaged in extensive motion practice.  S-L moved

to "decertify" the collective and for summary judgment against two Plaintiffs (Anthony Eardley

and Michael Sturino). *See* ECF Nos. 617, 641, 644.  Plaintiffs, meanwhile, moved for summary

judgment against S-L's counterclaims and third-party claims. *See* ECF Nos. 647-648.  On

September 1, 2021, the Court entered a 45-page order, denying S-L's motions, granting

---

[1]  While most Plaintiffs joined the lawsuit after the FLSA collective was conditionally certified,
some of them joined in advance of conditional certification. *See* ECF Nos. 4, 8-9, 21, 24, 48, 78,
87, 91, 95, 98, 105-106, 119, 124, 128.

Plaintiffs' motion for summary judgment against S-L's third-party claims, and denying

Plaintiffs' motion for summary judgment against S-L's counterclaims (except to the extent such

counterclaims sought "indemnification"). *See* ECF No. 673.

S-L strongly denies any liability and/or damages in this case (including that any alleged

violation was willful), and disputes whether this case ultimately could be maintained as a

collective action once the evidence is presented and/or on appeal. Nonetheless, faced with the

significant expense and uncertainty of trial, the parties engaged in mediation proceedings

overseen by Michael Dickstein, a mediator with vast experience mediating class and collective

actions arising under the FLSA and other state wage laws.[2] Mediation resulted in settlement.[3]

### 2. The Settlement Terms.

The settlement requires S-L to make a total, non-reversionary payment of $6,000,000

that, subject to this Court's approval, will be distributed as follows: (i) $3,797,544 will be

distributed to Plaintiffs based on each individual Plaintiff's proportional share of workweeks

during the relevant time period; (ii) a $15,000 service award will be paid to Mode; (iii) $2,500

service awards will be paid to each of the 30 Plaintiffs (other than Mode) who sat for

depositions; (iv) $2,000,000 in attorney's fees will be paid to Plaintiffs' Counsel; (v) $86,956 in

litigation expenses will be paid to Plaintiffs' Counsel; (vii) $10,500 will be paid to SSI to cover

---

[2] *See* www.dicksteindisputeresolution.com. Previously, on April 28, 2020, Mr. Dickstein presided over an all-day mediation that did not result in settlement.
[3] As previously reported to the Court, the recent mediation proceedings also addressed potential resolution of various litigation *in addition* to the instant FLSA collective action. Such litigation includes over a hundred individual arbitration proceedings, and four separate lawsuits in the United States District Court for the Middle District of Pennsylvania asserting claims under Connecticut, New Hampshire, New Jersey and Massachusetts wage laws. W&S has been involved in some (but not all) of this ancillary litigation. However, in reporting its time and expenses to this Court, W&S has limited its report to time and expenses connected to the instant FLSA action. *See* Declaration of Peter Winebrake ("Winebrake Dcl.") at ¶ 27 n. 4.

settlement administration expenses;[4] and (vii) $15,000 will be placed in a "reserve fund" to be utilized to resolve any disputes by Plaintiffs who disagree with the number of workweeks utilized to determine their individual allocations.[5] If the Court disapproves of the requested service awards, attorney's fees, litigation expenses, or settlement administration expenses, the disapproved monies will enhance the payments to Plaintiffs. *See* Agreement at § 1.16 (defining "Net Settlement Fund").

In exchange for the settlement payments, Originating Plaintiff Mode, who is receiving a $15,000 service award, will execute a general release of all claims he has or may have had against S-L. *See* Agreement at § 3.6(a). The remaining Plaintiffs are bound by the following, more limited release:

> Release of Claims by All Other FLSA Collective Members. Upon the entry of the Order Granting Approval, each FLSA Collective Member, on his or her behalf, and on behalf of any owners, employees, helpers, representatives, agents, and spouses or family members engaged in their business or contracting with S-L, and their businesses . . . , shall fully release and discharge S-L Releasees from all claims that were or could have been raised in the Action, including but not limited to all wage and hour and wage payment claims, including claims under the Fair Labor Standards Act, and all other federal, state (including, but not limited to, claims under the Massachusetts Wage Act), or local wage and hour laws and wage payment laws (including but not limited to laws or regulations related to alleged misclassification as independent contractors, overtime, straight time wages, meal and rest breaks, wage statements, wage notice, minimum wage, expense reimbursement, and allegedly unlawful deductions), and related common law theories including all liquidated damages, civil penalties, equitable relief, fees, costs, or other damages/relief . . . . FLSA Collective Members shall be deemed to have expressly waived and relinquished, to the fullest extent permitted by law, the provisions, rights, and benefits they may have otherwise had relating to the claims identified in this paragraph.

*Id.* Meanwhile, S-L releases all counterclaims and third-party claims asserted against Plaintiffs

---

[4] SSI has provided Plaintiffs' Counsel with an estimate that the settlement administration expenses will total $10,500. *See* Exhibit A. If such expenses exceed $10,500, the additional monies will be paid to SSI by Plaintiffs' Counsel. *See* Agreement at § 2.2.

[5] Any unused portion of the $15,000 reserve fund will be contributed to the United Way of Central Carolinas. *See* Agreement at § 1.9.

and their business entities.  *See id.* at § 3.6(b).

Because this is an FLSA collective settlement, Federal Rule of Civil Procedure 23's class action notice protocols do not apply.  *See* p. 9 *infra* (citing cases).  Notwithstanding, in order to facilitate the distribution of settlement funds, Plaintiffs' Counsel have agreed that each Plaintiff's settlement check will be accompanied by a Notice form that, *inter alia*, informs each Plaintiff of the settlement, explains the manner in which his/her individual settlement payment is calculated, and recites the release language.  *See* Agreement at § 2.4(b) and Ex. C.

The FLSA carries a two-year limitations period that can be extended to three years if the FLSA violation is "willful."  *See* 29 U.S.C. § 255(a).  Meanwhile, a claimant who opts-in to an FLSA collective action does not toll the running of the limitations period until his/her "consent form" is filed with the court.  *See id.* at § 256(b).  With these principles in mind, the Agreement defines each individual Plaintiff's "Applicable Workweeks" as the weeks worked during the time period (i) beginning on the date falling three years prior to the filing of his/her consent form and (ii) ending on either October 20, 2021 (for Plaintiffs who currently are IBOs) or the date on which the Plaintiff ceased being an IBO.  *See* Agreement at § 1.3.

All Plaintiffs worked a combined total of 42,464 Applicable Workweeks.  Thus, each Applicable Workweek is worth a net amount of $89 ($3,797,544 *divided by* 42,464 Applicable Workweeks).  Moreover, the average net payout per Plaintiff stands at $11,472 ($3,797,544 *divided by* 331 Plaintiffs).

Notably, the above "net payout" figures represent that Plaintiffs' recoveries *free and clear* of attorney's fees and expenses.  Some courts have observed that, in evaluating the fairness of FLSA settlements, "the relevant settlement amount is the total amount of the settlement even though the total settlement amount includes attorney's fees."  *Solkoff v. Pennsylvania State*

6

*University*, 435 F. Supp. 3d 646, 655 (E.D. Pa. 2020); *accord Devine v. Northeast Treatment Centers, Inc.*, 2021 WL 4803819, 2021 U.S. Dist. LEXIS 197924, \*5-6 (E.D. Pa. Oct. 14, 2021). Here, the inclusion of attorney's fees and expenses increases the payout-per-Applicable Workweek to $138 ($5,884,500 *divided by* 42,464 Applicable Workweeks) and increases the average payout-per-Plaintiff to $17,777 ($5,884,500 *divided by* 331 Plaintiffs).

### 3. Major Litigation Risks.

S-L is represented by skilled lawyers who, absent settlement, were prepared to raise defenses that might have resulted in Plaintiffs either losing or recovering less than the settlement amount. The major risks are summarized below:

First, Plaintiffs would recover nothing if the jury determined that S-L properly classified them as non-employee/independent contractors. In this regard, Plaintiffs' fate turns on the six-factor "economic realities" test described in *Schultz v. Capital International Securities, Inc.*, 466 F.3d 298, 304-05 (4th Cir. 2006), and extensively analyzed in the Court's September 1 Order, *see* Doc. 673 at 8-19. It is very difficult to predict how the jury would weigh and analyze the economic reality factors.

Second, even if Plaintiffs are employees, they would recover nothing if the jury determined that they fall within either the FLSA's motor carrier exemption, *see* Doc. 673 at 19-22, or outside sales exemption, *see id.* at 22-23. The applicability of these exemptions is unclear. In other actions arising out of the food distribution industry, employers have successfully asserted such defenses against employee distributors. *See*, *e.g.*, *Meza v. Intelligent Mexican Marketing, Inc.*, 720 F.3d 577, 578-88 (5th Cir. 2013) (outside sales); *Castillo v. Lara's Trucking Inc.*, 2017 U.S. Dist. LEXIS 20003 (S.D. Fla. Feb. 10, 2017 (motor carrier); *McCartt v. Kellogg USA, Inc.*, 139 F. Supp. 3d 843, 856-60 (E.D. Ky. 2015) (outside sales); *Glanville v. Dupar, Inc.*,

2009 U.S. Dist. LEXIS 88408 (S.D. Tex. Sep. 25, 2009) (motor carrier).

Third, even if Plaintiffs are employees falling outside of any exemption, the parties sharply disagree regarding their actual work hours. For example, during discovery, S-L produced an expert report analyzing the "handheld scan" data of 27 sample IBOs and opining, *inter alia*, that Plaintiffs often worked fewer than 40 hours per week. *See* ECF No. 653-3 at 40-42. While Plaintiffs disagree with this analysis, it cannot be denied that proving actual work hours can be difficult in FLSA litigation.

Fourth, Plaintiffs' potential damages would be significantly diminished if the jury determined that S-L did not "willfully" violate the FLSA. Such a finding, would result in a two-year – rather than three-year – limitations period. *See* 29 U.S.C. § 255(a). Plaintiffs bear the burden of proving willfulness, *see Calderon v. GEICO General Insurance Co.*, 809 F.3d 111, 130 (4th Cir. 2015), and satisfying this burden is no easy task. As the Fourth Circuit has observed, "only those employers who 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]' have willfully violated the statute." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 358 (4th Cir. 2011) (quoting *McLaughlin v. Richmond Shoe Co.*, 486 U.S. 128, 133 (1988)).

Finally, once the evidence is presented and/or on appeal, S-L could renew its challenge to the collective certification of this case.

**B. ARGUMENT**

**1. Judicial Review of FLSA Settlements.**

District courts within the Fourth Circuit repeatedly explain that FLSA settlements must be judicially approved for fairness. *See Kirkpatrick v. Cardinal Innovations Healthcare Solutions*, 352 F. Supp. 3d 499, 502 (M.D.N.C. 2018); *Duprey v. The Scotts Company LLC*, 30

F. Supp. 3d 404, 407-08 (D. Md. 2014); *Patel v. Barot*, 15 F. Supp. 3d 648, 653-54 (E.D. Va. 2014). Where – as here – a collective FLSA action is settled on behalf of opt-in plaintiffs who already have joined the action, Federal Rule of Civil Procedure 23's class action notice protocols do not apply, and the settlement can be reviewed in a single step. *See Haskett v. Uber Technologies, Inc.*, 780 Fed. Appx. 25, 27-28 (4th Cir. 2019); *Beasley v. Custom Communications, Inc.*, 2017 U.S. Dist. LEXIS 219975, *4 n. 2 (E.D.N.C. Oct. 24, 2017).

Collective FLSA settlements should be approved if the Court determines that: "(1) FLSA issues are actually in dispute; (2) the proposed settlement to those issues is fair and reasonable in light of relevant factors from Rule 23; and (3) the proposed attorneys' fees are reasonable." *Thaxton v. Bojangles' Restaurants, Inc.*, 2020 U.S. Dist. LEXIS 225834, *5 (W.D.N.C. Mar. 4, 2020) (citing *Duprey*, 30 F. Supp. 3d at 408); *see, e.g., Nix v. Adams Beverages of North Carolina, LLC*, 2021 U.S. Dist. LEXIS 73333 (W.D.N.C. Apr. 16, 2021). As discussed below, each of these requirements is satisfied:

### 2. FLSA Issues Are Actually in Dispute.

The requirement that "FLSA issues are actually in dispute" is easily satisfied. As reflected in the Court's various opinions and as summarized at pages 7-8 *supra*, the parties sharply disagree regarding Plaintiffs' status as employees under the FLSA, the applicability of the FLSA's motor carrier and outside sales exemptions, and the extent of Plaintiffs' overtime work hours. In fact, the Agreement explicitly provides that S-L has settled this lawsuit notwithstanding its strongly-held position that it would win at trial and is not conceding any liability or damages in any event. *See* Agreement at pg. 1 and § 3.9.

### 3. The Settlement is "Fair and Reasonable."

In determining whether the settlement is "fair and reasonable," North Carolina district

courts repeatedly view the settlement against the same factors utilized in reviewing Rule 23 class action settlements. These factors include:

> (1) the extent of discovery that has taken place; (2) the stage of the proceedings, including the complexity, expense and likely duration of the litigation; (3) the absence of fraud or collusion in the settlement; (4) the experience of counsel who have represented the plaintiffs; (5) the probability of plaintiffs' success on the merits and (6) the amount of the settlement in relation to the potential recovery.

*Kirkpatrick v. Cardinal Innovations Healthcare Solutions*, 352 F. Supp. 3d 499, 502-03 (M.D.N.C. 2018); *see*, *e.g.*, *Dickey v. R.R. Donnelley & Sons, Co.*, 2021 WL 1169245, 2021 U.S. Dist. LEXIS 57981, *5-6 (M.D.N.C. Mar. 26, 2021); *Thaxton*, 2020 U.S. Dist. LEXIS 225834, at *6; *Beasley*, 2017 U.S. Dist. LEXIS 219975, at *5-6. In considering these factors, courts remain mindful of the "strong presumption in favor of finding a settlement fair." *Kirkpatrick*, 352 F. Supp. 2d at 503 (internal quotations omitted).

Here, each of the factors supports a finding that the settlement is "fair and reasonable":

<u>*Factor 1 – Extent of Discovery*</u>: This factor favors approval because, as discussed at page 3 *supra*, discovery has been extensive.

<u>*Factor 2 – Stage of the Proceedings, Including the Complexity, Expense and Likely Duration of the Litigation*</u>: This factor favors approval because, absent settlement, this litigation would spawn a collective jury trial that would least several weeks, would require parties and witnesses to travel to Charlotte from throughout the United States, and would require the Court to resolve competing proposals regarding, *inter alia*, the appropriate scope of "representative" trial evidence. *See generally Stillman v. Staples, Inc.*, 2009 WL 1437817, 2009 U.S. Dist. LEXIS 42247, *52-77 (D.N.J. May 15, 2009) (discussing and analyzing representative testimony in context of FLSA collective trial). Also, the Court would be required to resolve the parties' anticipated *Daubert* challenges to expert testimony and numerous *in limine* motions. Finally, as

the Court recently observed, some important issues might need to be bifurcated from the initial trial and decided at a later stage. *See* ECF No. 673 at 22 n. 15 (certain aspects of S-L's motor carrier defense might be decided "individually" after initial trial); *id.* at 24 n. 17 ("individualized damages" issues might be decided after initial trial); *id.* at 24 n. 18 (whether some Plaintiffs are "absentee owners" might be determined outside of trial).

Factor 3 – Absence of Fraud or Collusion:  This factor favors approval because the settlement was overseen by an experienced mediator after the completion of extensive discovery and adversarial motion practice. *See generally* pp. 4-5 *supra*.

Factor 4 – Experience of Plaintiffs' Counsel:  This factor favors approval because both W&S and Woolf McClane are experienced counsel with substantial experience litigating employment rights lawsuits in the federal courts. *See* Winebrake Dcl. at ¶¶ 3-19; Declaration of Chad Hatmaker ("Hatmaker Dcl.") at ¶ 3 and Ex. 1.

Factor 5 – Probability of Plaintiffs' Success on the Merits:  This factor favors approval because, although Plaintiffs believe they could prevail at trial, S-L feels equally strongly about Plaintiffs' challenges in proving their claims as well as S-L's defenses.  As summarized at pages 7-8 *supra*, Plaintiffs could not prevail without defeating several independent defenses that S-L was poised to raise at trial.

Factor 6 – Amount of the Settlement in Relation to the Potential Recovery:  This factor favors approval because, when viewed against the various litigation risks, the settlement delivers substantial monies to Plaintiffs.  As discussed at pages 6-7 *supra*, each Applicable Workweek is worth a gross amount of $138 and a net amount of $89.  These payouts compare favorably with Plaintiffs' damages analysis.  Specifically, during discovery, Plaintiffs' Counsel retained Liesl M. Fox, Ph.D. to analyze the compensation data of 27 sample Plaintiffs and determine, *inter alia*,

the weekly unpaid minimum and overtime wages associated with a range of average weekly work hours. *See generally* Report of Liesl M. Fox, Ph.D. ("Fox Report"), attached in relevant part as Exhibit B. Notably, the gross payout of $138 per Applicable Workweek coincides with the wages that a Plaintiff would recover by winning the lawsuit, proving a "willful" violation, and proving around 47 work hours per week. *See* Fox Report (Ex. B) at Table 3. Meanwhile, the net payout of $89 per Applicable Workweek coincides with the wages that a Plaintiff would recover by winning the lawsuit and proving 43-44 work hours per week. *See id.*

The settlement also achieves a fair result when viewed on a "payout-per-Plaintiff" basis. Specifically, the average gross payout per Plaintiff stands at $17,777, while the average net payout per Plaintiff stands at $11,472. *See* pp. 6-7 *supra*. As such, the settlement delivers real economic benefits to Plaintiffs and furthers the public policy goals underlying the FLSA's collective litigation mechanism. *See* generally ECF No. 673 at 25-26 (discussing public policy).

*Summary*: In sum, each of the six pertinent factors demonstrate that the settlement is "fair and reasonable."

### 4. The Proposed Attorney's Fees Are Reasonable.

The third requirement to be considered by the Court is the reasonableness of the fees to be recovered by Plaintiffs' Counsel. As previously noted, Plaintiffs' Counsel seek a fee of $2,000,000, which constitutes 33.33% of the $6,000,000 settlement fund. *See* Agreement at § 3.2(a).

"The Fourth Circuit generally considers twelve factors in judging the reasonableness of an award of attorneys' fees in FLSA cases":

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations

imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Kirkpatrick*, 352 F. Supp. 3d at 503-04 (citing *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978)); *see, e.g.*, *Dickey*, 2021 U.S. Dist. LEXIS 57981, at *9-10; *Hood v. Uber Technologies, Inc.*, 2019 WL 93546, 2019 U.S. Dist. LEXIS 670, *21-22 (M.D.N.C. Jan. 3, 2019); *Beasley*, 2017 U.S. Dist. LEXIS 219975, at *7-8.

As discussed below, the above factors weigh in favor of approving the requested attorney's fee:

*Factor 1 – Time and Labor Expended*: This factor favors approval because Plaintiffs' Counsel have dedicated at total of 9,193 attorney and non-attorney/paralegal hours to this litigation. *See* Winebrake Dcl. at ¶ 28 (summarizing 4,256 total hours); Hatmaker Dcl. at ¶¶ 5-6 (summarizing 4,937 hours). In fact, the requested $2,000,000 fee results in an average rate of only $217 ($2,000,000 *divided by* 9,193 hours). Such an average hourly rate is reasonable. *See, e.g.*, *Hood*, 2019 WL 93546, 2019 U.S. Dist. LEXIS 670, at *23 (approving fee that "results in an average rate of approximately $300 dollars per hour"); *Reynolds v. Fidelity Investments Institutional Operations Co., Inc.*, 2020 WL 92092, 2020 U.S. Dist. LEXIS 2718, *9 (M.D.N.C. Jan. 8, 2020) (approved $1,000,000 fee based on 1,758.4 attorney and non-attorney hours for an average of $568/hour); *Kirkpatrick*, 352 F. Supp. 3d at 506-07 (approved $250,000 fee based on 870.8 attorney and non-attorney hours for an average of $287/hour).

Moreover, even if non-attorney/paralegal hours are removed entirely from the analysis, Plaintiffs' Counsel have dedicated at total of 8,110 *attorney* hours to this litigation. *See* Winebrake Dcl. at ¶ 28 (summarizing 4,206 attorney hours); Hatmaker Dcl. at ¶ 5(a)-(d)

(summarizing 3,904 attorney hours). This equates to an average attorney rate of only $246 ($2,000,000 *divided by* 8,110 hours). This represents an excellent value for the collective and demonstrates that the fee's reasonableness would be confirmed by a "lodestar cross-check" regardless of the hourly attorney rates utilized by the Court.[6]

*Factor 2 – Novelty and difficulty of the questions raised*: This factor favors approval because as discussed at pages 7-8 *supra*, this collective litigation raised difficult and hotly contested issues.

*Factor 3 – Skill Required to Properly Perform the Legal Services Rendered*: This factor favors approval because, for over three years, Plaintiffs' Counsel have gone "head-to-head" with one of the Nation's largest and well-regarded law firms and, along the way, have briefed and argued various complex motions. *See* pp. 2-4 and 7-8 *supra*. Moreover, this litigation required Plaintiffs' Counsel to manage over 2 million pages of S-L documents and locate therein evidence supporting Plaintiffs' FLSA claim. This project, standing alone, required persistence and skill.

*Factor 4 – Opportunity Costs in Pressing the Instant Litigation*: This factor favors approval because Plaintiffs' Counsel have worked on a pure contingency basis and have dedicated themselves to the litigation. *See generally* Winebrake Dcl.; Hatmaker Dcl. As recently observed in another FLSA collective action, "[c]lass and collective wage and hour cases require intensive resources and – particularly when counsel operate, as here, on a contingency basis – pursuing these cases involves opportunity costs and risk." *Reynolds*, 2020 U.S. Dist. LEXIS 2718, at *9.

---

[6] As observed by Judge Osteen, the "percentage-of-fund" method is the "preferred" method for reviewing fees in common fund class action settlements, and the "lodestar" method "serve[s] as a cross-check to ensure that the percentage award is fair and reasonable." *Kruger v. Novant Health, Inc.*, 2016 WL 6769066, 2016 U.S. Dist. LEXIS 193107, *7 (M.D.N.C. Sept. 29, 2016).

_Factors 5 and 12 – Customary Fee for Like Work and Fee Awards in Similar Cases_:

This factor favors approval because, in other FLSA collective actions, North Carolina district courts have approved attorney's fees equaling one-third of the total settlement fund. _See_, _e.g._, _Dickey_, 2021 U.S. Dist. LEXIS 57981, at *9-14; _Reynolds_, 2020 U.S. Dist. LEXIS 2718, at *5-13; _Hood_, 2019 U.S. Dist. LEXIS 670, at *21-23; _Kirkpatrick_, 352 F. Supp. 3d at 503-07; _Beasley_, 2017 U.S. Dist. LEXIS 219975, at *6-9; _see also Thaxton_, 2020 U.S. Dist. LEXIS 225834, at *7-9 (approving 32% fee). In sum, "the requested award here – one-third of the settlement fund – aligns with awards approved by many Fourth Circuit courts." _Reynolds_, 2020 U.S. Dist. LEXIS 2718, at *12.

_Factor 6 – Expectations at the Outset of the Litigation_: This factor favors approval because "a one-third share is a reasonable expectation where Class Counsel took on a risk of non-payment even as they advance significant costs to pursue the litigation." _Reynolds_, 2020 U.S. Dist. LEXIS 2718, at *10. Moreover, such an expectation is confirmed by the retainer agreement between Plaintiffs' Counsel and Mode, which expressly contemplates a 33.33% contingency fee. _See_ Winebrake Dcl. at ¶ 3 n. 1 and Ex. A.

_Factor 7 – Time Limitations Imposed by the Client or Circumstances_: This factor favors approval because, throughout this litigation, the Court has required all counsel to comply with strict case management deadlines.

_Factor 8 – Amount in Controversy and Results Obtained_: This factor favors approval because, as explained at pages 6-7 and 11-12 _supra_, the settlement enables Plaintiffs to recover a substantial portion of their alleged unpaid wages. This represents an excellent result when viewed against the significant litigation risks.

_Factor 9 – Experience, Reputation and Ability of Attorney_: This factor favors approval

because Plaintiffs' Counsel are experienced employment lawyers who have had substantial success representing clients in the federal courts.  *See* Winebrake Dcl. at ¶¶ 3-19; Hatmaker Dcl. at ¶ 3 and Ex. 1.

*Factor 10 – Undesirability of the Case within the Legal Community*:  This factor presumably is neutral.  On one hand, many law firms are unwilling or unable to risk thousands of attorney hours and tens of thousands of dollars working on a contingency fee basis.  On the other hand, such risk-taking is common among plaintiffs-side lawyers.

*Factor 11 – Nature and Length of the Professional Relationship Between Attorney and Client*:  This factor is "inconsequential" where, as here, Plaintiffs' Counsel have no pre-existing relationship with the Plaintiffs.  *See Reynolds*, 2020 U.S. Dist. LEXIS 2718, at *11-12.

*Summary*:  In sum, ten of the twelve pertinent factors support approval of the requested $2,000,000 attorney's fee.  The remaining two factors are either neutral (Factor 10) or "inconsequential" (Factor 11).

## 5. The Proposed Litigation Expenses Are Reasonable.

North Carolina district courts reviewing FLSA collective settlement also review any litigation expenses for reasonableness.  *See*, *e.g.*, *Reynolds*, 2020 U.S. Dist. LEXIS 2718, at *13.  Here, Plaintiffs' Counsel seek the reimbursement of $86,956 in litigation expenses.  These expenses are detailed and supported in the accompanying declarations, *see* Winebrake Dcl. at ¶ 29 and Ex. D; Hatmaker Dcl. at ¶ 7 and Ex. 2, and were reasonably incurred considering the duration, scope, and complexity of this nationwide collective action.

## 6. The Proposed Service Awards Are Reasonable.

Courts reviewing FLSA collective settlement also review any service awards for reasonableness.  *See*, *e.g.*, *Reynolds*, 2020 U.S. Dist. LEXIS 2718, at *13-16.  Here, the

settlement calls for Originating Plaintiff Mode to receive a $15,000 service award and for 30 other Plaintiffs who sat for depositions to receive individual $2,500 service awards each. *See* Agreement at § 3.3. In class/collective litigation, such service payments "compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011). Service awards

> are particularly appropriate in the employment context. In employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers. . . . Although this Court has no reason to believe that [the defendant] has or will take retaliatory action towards either [Plaintiff] or any of the plaintiffs in this case, the fear of adverse consequences or lost opportunities cannot be dismissed as insincere or unfounded.

*Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187-188 (W.D.N.Y. 2005) (internal citations omitted).

Here, the requested $15,000 service award to Mode is warranted. At the outset of this litigation, Mode informed other IBOs of the litigation, which led to several "early" opt-in forms being filed with the Court. In FLSA collective litigation, early opt-in plaintiffs are extremely important because they enable plaintiffs' counsel to obtain the declarations necessary to support a conditional certification motion. Such was the case here. *See* ECF No. 143 at 7 (referencing opt-in declarations). In addition, Mode has been an especially diligent advocate for other IBOs. He sat for an all-day deposition, responded to extensive written discovery, attended (via Zoom) the all-day Spring 2020 mediation session, and has been in regular contact with the undersigned counsel throughout the litigation, providing valuable information both before and after the lawsuit was filed.

17

Mode's requested $15,000 service award falls within the range of awards approved by North Carolina district courts in both FLSA collective settlements, *see*, *e.g.*, *Myers v. Loomis Armored US, LLC*, 2020 WL 1815902, 2020 U.S. Dist. LEXIS 62941, *18 (W.D.N.C. April 8, 2020) ($20,000 award); *Beasley*, 2017 U.S. Dist. LEXIS 219975, at *9-10 ($15,000 awards to two plaintiffs and $10,000 award to third plaintiff), and in other types of class actions, *see*, *e.g.*, *Gaston v. LexisNexis Risk Solutions Inc.*, 2021 WL 2077812, 2021 U.S. Dist. LEXIS 97538, *21-22 (W.D.N.C. May 24, 2021) (Bell, J.) ($20,000 award in Driver Privacy Protection Act); *Sims v. BB&T Corp.*, 2019 U.S. Dist. LEXIS 75839, *18 (M.D.N.C. May 6, 2019) ($20,000 award in ERISA class action); *Kruger*, 2016 U.S. Dist. LEXIS 193107, at *17-18 ($25,000 award in ERISA class action).

Finally, the $2,500 service awards to each of the 30 Plaintiffs who participated in depositions also are warranted. These depositions generally lasted an entire day and required substantial advance preparation. Also, each deponent was required to answer written interrogatories and locate and produce pertinent documents (including tax return documents) in advance of the depositions. The entire collective has benefitted by these Plaintiffs' dedication to the litigation, and the $2,500 service awards are well-deserved. *See Myers*, 2020 U.S. Dist. LEXIS 62941, at *18 ($4,000-$5,000 awards to opt-ins who participated in discovery and sat for depositions).

## C. CONCLUSION

For all the above reasons, Plaintiffs respectfully ask the Court to grant this motion and approve the settlement of this action.

Date:  November 5, 2021

Respectfully,

Peter Winebrake
R. Andrew Santillo
Mark J. Gottesfeld
Michelle L. Tolodziecki
Winebrake & Santillo, LLC
715 Twining Road, Suite 211
Dresher, PA 19025
(215) 884-2491

Chad Hatmaker
Keith J. Coates
Hugh Bright
Woolf, McClane, Bright, Allen & Carpenter, PLLC
Post Office Box 900
Knoxville, TN  37901
(865) 215-1000

*For Plaintiffs*

# Exhibit 1



Thomas A. Warren
President

Toll Free: (866) 385-6216
Fax: (850) 385-6008
info@settlementservicesinc.com
www.settlementservicesinc.com

Post Office Drawer 1657
Tallahassee, Florida 32302
2032-D Thomasville Road
Tallahassee,  Florida  32308

October 25, 2021

**<u>CONFIDENTIAL</u>**

**<u>VIA EMAIL</u>**
Pete Winebrake, Esq.
Winebrake & Santillo, LLC
715 Twining Road, Suite 211
Dresher, PA 19025
(215) 884-2491
pwinebrake@winebrakelaw.com
www.winebrakelaw.com

Re:  <u>Settlement Administration Estimate</u>

Pete,

Below is a cost estimate[1] for the administration of your pending settlement based on the information you provided to me via email, with a list of the assumed duties and related variables. Please note that we have made specific assumptions that affect the overall estimated cost.  If you believe that any of the variables we chose are inaccurate or unrealistic, please let us know and we will happily revise our estimate.

1. <u>Case Start-up, Data Handling and Initial Programming</u>.  The Collective Member data will be sent to us via email or secure upload in a <u>single (1)</u> Excel spreadsheet that will include the name, last known address, SSN and award amounts for each Collective Member.  We will document and track all activity related to each Collective Member, including mailings, undeliverable mail, etc.  Any additional spreadsheets received will result in increased administration costs.   Assumption:  approximately 331 Collective Members.  Estimated Cost:  $1,500.

---

[1] Please note that providing estimates requires us to rely on certain information provided by the client as well as make a number of significant assumptions.  Accordingly, these estimates are not intended to limit SSI's actual fees and expenses, which due to the scope of actual services or changes to the underlying facts or assumptions, may be less or more than estimated.

2. <u>Award Calculations</u>.  The award calculations will be provided by Counsel.  Estimated Cost: $0.

3. <u>Qualified Settlement Fund (QSF) Administration</u>.  We will establish a QSF through the IRS, obtain a unique Employer Identification Number for the QSF, and establish a <u>non-interest-bearing</u> bank account for the Fund.  We will also be responsible for making all electronic filings of any necessary forms.  Assumptions:  1) the QSF will be open in no more than two calendar years; 2) awards will be paid in a single (1) round in mid-December 2021; 3) the awards will be 1099-MISC income only; 4) awards will be reported to the taxing authorities when issued; 5) we will verify SSN's, EIN's or TIN's with the Social Security Administration (SSA); and 6) after the uncashed checks become stale, leftover funds will revert to the Defendant or be paid to a cy pres beneficiary and the account will be closed shortly thereafter.  Estimated cost: $4,000.

4. <u>OFAC Review</u>.  We will perform an OFAC review prior to issuing awards to any Collective Member and will perform outreach to those from whom we require additional information.  Estimated Cost: $300.

5. <u>Paying Attorney's Fees and Costs, Mailing Service Award Check</u>. We will issue wires or mail via FedEx checks for the attorney's fees and costs.  We will also print and mail the Service Award check(s) with a 1099-MISC tax form.  Assumption: the check(s) will be mailed via regular USPS First-Class mail.  Estimated Cost: $400.

6. <u>Mailing of Award Check Packets</u>.  We will design, print, and mail award checks with applicable tax forms to all Collective Members.  Assumptions: 1) approximately 331 Award Check Packets mailed; and 2) all Award Check Packets will be mailed via regular USPS First-Class mail.  Estimated Cost: $1,750.

7. <u>Processing of Returned Undeliverable Award Check Packets</u>.  We will trace all Award Check Packets returned as undeliverable and mail letters requesting the Collective Member call us to confirm their identity.  Upon confirmation we will remail or reissue their Award Check Packet.  Approximately 40 Award Check Packets returned as undeliverable.  Estimated Cost:  $450.

8. <u>Follow-Up Re: Uncashed Checks</u>.  Uncashed checks will be reissued upon request after the expiration of 90 days from the initial check mailing date.  No additional follow-up from SSI will be required.  Estimated Cost: $250.

9. <u>Weekly Statistics Reports</u>.  We will provide weekly reports during the check cashing period which will include number of checks cashed and uncashed and the number of Award Check Packets returned as undeliverable, and any other information as required by the Parties.  Estimated Cost: $350.

10. <u>Miscellaneous Reports, Conferencing and Supervision</u>.   Estimated Cost:  $1,500.

11. <u>Conclusion</u>.  We estimate that the services discussed above, based on the assumptions specified, will cost approximately $10,500.

12. <u>Optional Duty -- Tax Forms</u>.  If checks are not mailed until early 2022, we will be responsible for printing and mailing the 1099-MISC tax forms to award recipients. Assumption: tax forms will be sent in a single round.  Estimated Cost:  $900 (including postage).

13. <u>Optional Duty -- Processing of Returned Tax Forms</u>.  Estimated Cost: $350.

Please let us know if there are any additional duties or services that need to be added to our estimate, or if you need us to revise this estimate in any way.

For your information, our hourly rates are:

| | |
|---|---|
| Data Entry: | $40 to $45 an hour |
| Misc. Clerical: | $40 to $45 an hour |
| Claims Processing Staff: | $40 to $45 an hour |
| Phone Agents: | $50 to $63 |
| Programming: | $125 an hour |
| Case Management: | $75 to $90 an hour |
| Senior Case Management: | $160 an hour |

Sincerely,

Robert Hyte
Director of Operations



# TERMS AND CONDITIONS

The following Terms and Conditions apply to all services provided by Settlement Services, Inc. ("SSI") to its Client(s) as set forth in the attached Proposal:

**1. SERVICES.** Subject to the terms hereof, SSI agrees to provide the services specified in the Proposal attached hereto (the "Proposal"). Such services are hereinafter referred to as "Services." The parties agree and understand that none of the Services constitute legal advice.

**2. CHARGES FOR SERVICES.**

**2.1. FEES.** As full compensation for the Services, the Client agrees to pay SSI its fees as outlined in the Proposal. Fees may include mark-ups and in some cases, SSI may receive a rebate (or credit) from a publication vendor. All fees will be listed in the fee section of SSI's invoices. The Client acknowledges that the fees contained in the Proposal were negotiated at arm's length and may vary depending on the circumstances and the length of the case for which the Services are being provided hereunder. Additionally, the Client acknowledges that the fees quoted in the Proposal are, unless otherwise specifically agreed to by SSI, estimates, based on information provided to SSI by the Client, and no representation is made by SSI that the estimated fees shall equal the actual fees charged by SSI to the Client. SSI's hourly rates may be adjusted from time to time by SSI in its reasonable discretion, although rates generally are changed no more frequently than on an annual basis.

**2.2. EXPENSES.** The Client agrees to pay SSI for expenses reasonably incurred by SSI in connection with the performance of the Services. These will be listed in the expense (non-fee) section of SSI's invoices and may include, but not be limited to, postage, post office box, brokerage fees, costs of messenger and delivery service, travel, translation, filing fees, and other similar expenses. The items listed in the expense section of SSI's invoice will be billed at cost except for certain internal expenses, such as copies and faxes, which will be charged in accordance with SSI's current standard rate.

**2.3. PAYMENT.** SSI shall invoice the Client for its fees and expenses on a regular basis, and the Client shall pay SSI within thirty (30) days of its receipt of each such invoice, through wire transfer or other payment method approved in writing in advance by SSI. Late payments are subject to a 1.5% monthly interest charge. Notwithstanding the foregoing, SSI may require advance payment for certain expenses associated with print notice, media publication, and postage. Where the Client requires services that are unusual or beyond the normal business practices of SSI, or are otherwise not provided for in the Proposal, the cost of such services shall be charged to the Client at a competitive rate. Client agrees that it will use its best efforts to include provisions reasonably acceptable to SSI in any relevant court order, settlement agreement or similar document that provide for the payment of SSI's fees and expenses hereunder. No agreement to which SSI is not a party shall reduce or limit the full and prompt payment of SSI's fees and expenses as set forth herein and in the Proposal.

**3. BANK ACCOUNTS.** Client agrees that, at its request, SSI shall be authorized to establish accounts with financial institutions as agent for the Client or as otherwise agreed to between Client and SSI. All Client accounts established by SSI, unless otherwise instructed by Client, shall be deposit accounts of commercial banks with capital exceeding $1 billion and an S&P rating of "A" or higher ("Approved Bank"). In some cases, SSI may derive financial benefits resulting from settlement funds and other moneys on deposit or invested with a bank, including for example discounts or credits provided on certain banking services and service fees. It is acknowledged and agreed that SSI shall have no responsibility or liability for any diminution of a settlement fund that may result from any deposit made with a bank including any losses resulting from a default by the Approved Bank or other credit losses. In the event the Client fails to provide direction or is otherwise unresponsive to SSI following a period of nine (9) months from SSI's last communication, in the absence of court-ordered instructions otherwise, Client authorizes SSI to take all reasonable and necessary actions to close the case for which SSI is providing Services hereunder, including but not limited to transferring, returning or otherwise disposing of any remaining funds in a bank account in a manner that is reasonable and appropriate under the circumstances.

**4. TERMINATION.** Either party may terminate these Terms and Conditions upon written notice to the other party in the event of any material breach by either party hereto, if the party receiving such notice (i) fails to cure such breach within thirty (30) days after notice by the non-breaching party or (ii) in the case of any breach which requires more than thirty (30) days to effect a cure, fails to commence and continue in good faith efforts to cure such breach, provided that such cure shall be effected no later than ninety (90) days after receipt of such notice of such breach. Any such termination shall be effective at the end of such thirty (30) days or ninety (90) days, as the case may be. Waiver of any such material breach by either party hereto shall not be construed as limiting any right of termination for a subsequent default or material breach. Termination of these Terms and Conditions shall in no event relieve the Client of its obligation to make any payments due and payable to SSI in respect of Services rendered prior to termination. In the event that Services are terminated, and upon Client's written request, SSI shall work with Client to facilitate the transfer of data, files or other materials furnished by Client to SSI or received by SSI in connection with the Services. Client agrees to pay for such transfer in accordance with SSI's then existing rates for such services.

**5. INDEPENDENT CONTRACTOR.** SSI shall perform the Services as an independent contractor of Client and nothing herein shall be construed, either directly or indirectly, to create a joint venture partnership, agency or employment relationship between SSI and client.

**6. CONFIDENTIAL INFORMATION.** In connection with the provision of Services, each of the Client and SSI on behalf of themselves and their respective employees, agents and representatives, agree to keep confidential all information received from the disclosing party that is marked or otherwise identified in writing as confidential or proprietary, or which the receiving party should reasonably recognize from the circumstances surrounding the disclosure to be confidential or proprietary ("Confidential Information"); provided however that in the event of a request to disclose Confidential Information in connection with a legal, governmental or administrative proceeding, prompt notice of such request shall be given to the disclosing party so that the disclosing party may seek an appropriate protective order or other remedy, or waive compliance with this Section. If the Client seeks a protective order or other remedy, SSI, at the expense of the Client, will cooperate with and assist the Client in such efforts. If the Client fails to obtain a protective order or waives compliance with this Section, or SSI reasonably believes that it is legally required to produce any such confidential information, SSI will disclose only that portion of the material that its legal counsel determines it is required to disclose, at the expense of the Client. Confidential Information shall not include: (a) information that is or becomes generally known or available to the public by publication, commercial use or otherwise through no fault of the receiving party; (b) information that is known by the receiving party prior to the time of disclosure to the receiving party; (c) information that is obtained from a third party who, to the receiving party's knowledge, has the right to make such disclosure without restriction; or (d) information independently developed by the receiving party. This provision shall survive expiration or termination of these Terms and Conditions.

Rev. 10/17



**7.  OWNERSHIP RIGHTS.**  The Client and SSI each understand that the software programs and other materials furnished by SSI or developed, used, or enhanced by SSI during the performance of the Services are the sole property of SSI.  The term "program" shall include, without limitation, data and claim processing programs, check printing programs, specifications, applications, routines, sub-routines, procedural manuals, and documentation.  The Client agrees that any ideas, concepts, know-how or techniques relating to data processing or the claims management software used, developed, or enhanced by SSI during the performance of the Services shall be the exclusive property of SSI.  Client further agrees not to disclose, copy, reveal, decompile, or reverse engineer, in whole or in part, the software programs or any other programs or materials furnished to Client by SSI.  Fees and expenses paid by the Client to SSI do not vest in the Client any rights in any of material or property furnished by SSI as such material is only being made available for the Client's use during and in connection with the Services provided by SSI hereunder. This provision shall survive expiration or termination of these Terms and Conditions.

**8.  LIMITATION ON DAMAGES.**  Under no circumstances will SSI be liable to the Client for any special, consequential or incidental damages incurred by the Client relating the performance of Services hereunder, regardless of whether the Client's claim is for breach of warranty, contract, tort (including negligence), strict liability or otherwise.  In no event shall SSI's liability to the Client for any claims, losses, costs, fines, penalties or damages, including court costs and reasonable attorney's fees (collectively, "Losses"), whether direct or indirect, arising out of or in connection with the performance of Services hereunder, exceed the total amount billed or billable to the Client for the portion of the particular Services which gave rise to the Losses.  This provision shall survive expiration or termination of these Terms and Conditions.

**9.  INDEMNIFICATION.**  Client shall indemnify and hold harmless SSI, its parent company, and their directors, officers, employees, affiliates and agents against any Losses incurred by SSI arising out of or in connection with or related to (a) any gross negligence or willful misconduct by the Client, its employees, agents or representatives, or any misrepresentations made by such persons to third parties in connection with the Services provided hereunder; (b) any breach of these Terms and Conditions by the Client; (c) the handling or processing of any claim, data or payment by SSI in accordance with the Client's instructions, or applicable court order, law and/or regulation; (d) the transfer by or on behalf of Client of any data (including personal information) to SSI; or (e) SSI following any instructions and/or directions from Client in providing the Services. This provision shall survive expiration or termination of these Terms and Conditions.

**10.  FORCE MAJEURE.**  To the extent performance by SSI of any of its obligations hereunder is substantially prevented by reason of any act of God, strike, lock-out or other industrial or transportation disturbance, fire, lack of materials, law, regulation or ordinance, terrorism, war or war conditions, or by reason of any other matter beyond SSI's reasonable control, then such performance shall be excused and at SSI's option, be deemed suspended during the continuation of such prevention and for a reasonable time thereafter.

**11.  NOTICE.**  Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, or sent by registered mail, postage prepaid, or overnight courier.  Any such notice shall be deemed given when so delivered personally, or, if mailed, five (5) days after the date of deposit in the United States mail, or, if sent by overnight courier, one (1) business day after delivery to such courier.  Notice should be provided to a responsible officer or principal of the Client and SSI, as the case may be.

**12.  RETURN/DESTRUCTION OF DOCUMENTS.**  Upon the conclusion of the case and in the absence of court-ordered retention instructions, SSI will return or destroy all documents and information received by SSI in connection with the Services provided hereunder in accordance with its internal corporate records and information management policies.  SSI shall bill the Client for storage in accordance with the Proposal or otherwise at SSI's then standard rates.  This provision shall not pertain to routine data back-ups.

**13.  GOVERNING LAW; DISPUTE RESOLUTION; JURISIDICION.**  These Terms and Conditions will be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of law provisions).  In the event there is a dispute arising out of, relating to or in connection with these Terms and Conditions, the parties agree to attempt in good faith to resolve the dispute through negotiations between senior officers of each of the parties' respective organizations with the authority to settle the relevant dispute.  If the dispute cannot be resolved amicably in a timely manner, the parties agree to submit to the jurisdiction of the court supervising the underlying case for which the Services are being provided.  In the event the underlying case is not being adjudicated by a court, or the court in the underlying case declines to exercise jurisdiction, the parties agree that the dispute shall be conclusively determined by arbitration as provided by the rules of JAMS, or its successor, located in New York, New York.  The parties agree to cooperate with JAMS and with one another in selecting an arbitrator from the JAMS panel of neutrals and in scheduling the arbitration proceedings.  The arbitrator's decision and authority shall be controlled by the terms of these Terms and Conditions.  The parties agree that they will share equally in the costs of arbitration.  This provision shall survive expiration or termination of these Terms and Conditions.

**14.  CLIENT DATA.**  Client represents and warrants that prior to the transfer by or on behalf of Client of any data to SSI, Client has provided all notices and/or obtained all necessary consents and approvals from all persons, entities and/or authorities in accordance with all applicable laws, regulations and/or court orders.  Client further represents and warrants that in order to provide the Services, SSI is permitted to process any such data it receives by or on behalf of Client in accordance with Client's instructions, or applicable court order, law and/or regulation.

**15.  SEVERABILITY.**  Any term or provision in these Terms and Conditions held to be invalid or unenforceable by any court, such term or provision shall be severed here from and shall not affect the legality or enforceability of the remaining terms and provisions.

**16.  ASSIGNMENT.**  These Terms and Conditions and the rights and obligations of SSI and the Client hereunder shall bind and inure to the benefit of their respective successors and assigns.

**17.  GENERAL.**  These Terms and Conditions, together with the Proposal, contain the entire agreement between the parties with respect to the subject matter hereof, and supersede and replace any existing agreement entered into by SSI and the Client relating generally to the subject matter hereof.  These Terms and Conditions may be modified only in a writing signed by SSI and the Client.  The paragraph headings herein are included only for convenience, do not in any manner modify or limit any of the provisions herein and may not be used in the interpretation of these Terms and Conditions.

Rev. 10/17

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| JARED MODE, on behalf of himself and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>S-L DISTRIBUTION COMPANY, LLC,<br>S-L DISTRIBUTION COMPANY, INC., and<br>S-L ROUTES, LLC,<br><br>        Defendants. | No: 3:18-cv-00150-RJC-DSC |

**Report of Liesl M. Fox, Ph.D.**

I am a Senior Consultant and Partner at Quantitative Research Associates, a firm that provides statistical and computing consulting services, where I have been employed since 1997. I have been a statistical consultant for over twenty-five years, including conducting analyses in the fields of litigation and medical research, and have testified as an expert witness. My curriculum vitae is attached hereto in Appendix D.[1]

I specialize in data analysis and the application of statistical methodology to various fields of study. My responsibilities also include database preparation and management. I have worked with data related to different areas of employment, including damages calculations. As noted in my curriculum vitae, I have often been asked to serve as an expert witness in cases involving

---

[1] My time is billed at the rate of $400 per hour.

1

collective and/or class action wage claims similar to the claims currently before the Court in this action. The work discussed in this report, namely, the review and use of available data to analyze plaintiffs' claims, including determining the amount of potential damages owed to the plaintiffs, is similar to work I have done and testified to prior to preparing this report.

<u>Introduction</u>

Based on my review of the Complaint-Class/Collective Action, I understand that the plaintiffs in this case collect snack foods from the Defendants' warehouses, distribute the product to stores on an assigned delivery route, perform basic merchandising duties, and, at times, collect payments from customers. Plaintiffs complain that they should have been compensated as employees of the Defendants, rather than as contracted Independent Business Operators ("IBO"). Therefore, plaintiffs allege that they are owed damages under the Fair Labor Standards Act ("FLSA").

The plaintiffs claim that as employees of the Defendants, there were weeks for which they were compensated less than the mandated $7.25 per hour minimum wage. Further, the plaintiffs claim that they were not compensated at the mandated rate of time-and-a-half for any hours worked over 40 during a work week. I have been asked by Counsel for the Plaintiffs in this action to calculate the amount of damages owed to the plaintiffs for minimum wage and overtime wage violations while they were misclassified as IBOs by the Defendants.

It is my understanding that because the plaintiffs were classified as IBOs, records of the total amount of time worked each week were not maintained. Therefore, I was asked to calculate damages for minimum wage violations within the range of 25 to 65 hours per week. I was also asked to calculate damages for overtime wage violations within the range of 41 to 65 hours per week. For both the minimum wage and overtime wage damages calculations, I was asked to

2

calculate damages for each plaintiff beginning three years prior to the date the plaintiff's consent form was filed ("Three-Year Period"), and beginning two years prior to the date the plaintiff's consent form was filed ("Two-Year Period"). For both the Three-Year Period and the Two-Year Period, damages are calculated through December 20, 2020. However, if additional data is provided that allows for the calculation of damages beyond December 20, 2020, then I can update my analyses and supplement this report accordingly.

Records were produced for a sample of 27 plaintiffs. However, I have been advised that there are currently 331 individuals that are part of the collective action. Therefore, I have been asked to analyze the data produced for the sample of 27 plaintiffs in order to extrapolate damages to the entire collective action.

I am not offering an opinion on the number of hours the plaintiffs actually worked each week. Further, I am not offering an opinion on whether the plaintiffs should have been classified as contracted IBOs or as employees of the Defendants.

Conclusions

For the Three-Year Period, I have concluded that the 27 plaintiffs whose data I have reviewed could be owed as much as $200,328.70 for minimum wage violations and as much as $1,032,480.75 for overtime wage violations.[2] If liquidated damages were awarded, then those amounts would be doubled. Alternatively, if pre-judgment interest were awarded, then the 27 plaintiffs would be owed as much as $6,604.75 in interest for minimum wage violations and as much as $36,926.97 in interest for overtime wage violations.

---

[2] The $200,328.70 for minimum wage violations and $1,032,480.75 for overtime wage violations are calculated under the assumption of plaintiffs working 65 hours per week, the maximum number of hours worked per week I was asked to consider.

3

For the Two-Year Period, I have concluded that the 25 plaintiffs[3] whose data I reviewed could be owed as much as $128,805.30 for minimum wage violations and as much as $719,471.50 for overtime wage violations.[4] If liquidated damages were awarded, then those amounts would be doubled. Alternatively, if pre-judgment interest were awarded, then the 25 plaintiffs would be owed as much as $4,607.54 in interest for minimum wage violations and as much as $27,986.45 in interest for overtime wage violations.

Information Relied Upon

In order to conduct the analyses and calculate the damages discussed in this report, I reviewed the following documents and files:

- *Complaint-Class/Collective Action*, filed on March 22, 2018;
- Electronic files "Copy of 000484__118111908v1_Supplemental Production of Settlement Sheet Data - CONFIDENTIAL (002).xlsx" and "Copy of J M MODE DISTRIBUTION LLC - CONFIDENTIAL.xlsx" ("Settlement Sheet Data")
- "SL-Mode -- Spreadsheet Explanations for Mediation Purposes.pdf"; and,
- "CHART-DISCOVERY OPT-IN SAMPLE-FOR DR. FOX.pdf".

Calculation of Effective Hourly Rate

The Settlement Sheet Data was used to determine the net income that each plaintiff received for each week the plaintiff worked.[5] For each week that a plaintiff worked, the net income was calculated as the sum of the amounts included in the "Payments Made", "Cash Sales", and "Pay to IBO" columns, less the amount shown in the "Payments Rcvd" column, for that

---

[3] Plaintiffs Lindell Davis and John Tubertini did not work within two years prior to their filing dates.

[4] The $128,805.30 for minimum wage violations and $719,471.50 for overtime wage violations are calculated under the assumption of plaintiffs working 65 hours per week, the maximum number of hours worked per week I was asked to consider.

[5] Only weeks for which product was charged to the plaintiff (i.e., the amount recorded for "Total Purchases" was greater than $0.00) were considered to be weeks worked.

4

week.[6] The effective hourly rate is calculated as the net income for the week divided by the assumed number of hours that the plaintiff worked during the week.[7]

<u>Damages for Minimum Wage Violations</u>

Plaintiffs allege that for some weeks worked, the total compensation received for the week resulted in an effective hourly rate that was less than the federal minimum wage of $7.25 per hour. I analyzed the effective hourly rate for all weeks worked for each assumed number of hours worked, from 25 hours per week through 65 hours per week. For weeks where the effective hourly rate was less than $7.25 per hour, damages were calculated by multiplying the difference between the effective hourly rate and $7.25 by the assumed number of hour worked per week.

For example, for the week beginning April 24, 2016, the Settlement Sheet Data records that Plaintiff Jared Mode was compensated a total of $106.89 ( $106.89 "Payments Made" + $0.00 "Cash Sales" + $0.00 "Pay to IBO" - $0.00 "Payments Rcvd" = $106.89). If the Court determines that Plaintiff Mode worked 55 hours per week, then the effective hourly rate for the week is $1.94 ($106.89 ÷ 55 hours = $1.94 per hour). Thus, if damages for minimum wage violations are allowed, Plaintiff Mode would be owed $292.05 for the week beginning April 24, 2016 ($7.25 - $1.94 = $5.31; $5.31 x 55 hours = $292.05).

---

[6] As explained in "SL-Mode -- Spreadsheet Explanations for Mediation Purposes.pdf", the "Payments Made" and "Pay to IBO" columns record amounts that the Defendants paid to the plaintiffs during the week. The column "Cash Sales" is identified as the amount of product sales paid directly to the plaintiff during the week. The sum total of these three columns, then, would be the total amount of compensation received by the plaintiff for the week. Further, the column "Payments Rcvd" is identified as the total amount that the plaintiff paid to the Defendants during the week towards accumulated balances owed for prior weeks where sales income did not cover the total amount of product and other charges levied. Thus, the "Payments Rcvd" is subtracted as expenses from the total amount of compensation received in order to determine the net income for the plaintiff for the week.

[7] I was asked by Counsel for the Plaintiffs to assume that the net income was compensation for all hours worked during the week.

5

<u>Damages for Overtime Wage Violations</u>

Plaintiffs allege that because they were incorrectly classified as IBOs, they were not paid at the overtime rate of time-and-a-half for any overtime hours worked in a week. Thus, for each week that a plaintiff worked, damages were calculated at one-half the effective hourly rate for all assumed hours worked over 40 during the week.[8] If the effective hourly rate for the week was below the federal minimum wage of $7.25 per hour, then overtime damages for the week were calculated at the rate of $3.63 per hour ($7.25 ÷ 2 = $3.63).

For example, for the week beginning February 19, 2017, the Settlement Sheet Data records that Plaintiff Joseph Perilli received a net income of $1,193.74 ($370.52 "Pay to IBO" + $3,282.29 "Cash Sales" + $0.00 "Payments Made" - $2,459.07 "Payments Rcvd" = $1,193.74). If the Court determines that Plaintiff Perilli worked 55 hours per week, then the effective hourly rate for the week is $21.70 ($1,193.74 ÷ 55 hours = $21.70 per hour). Thus, if damages for overtime wage violations are allowed, Plaintiff Perilli would be owed $162.75 for 15 overtime hours worked (55 hours worked - 40 regular hours = 15 overtime hours worked) during the week beginning February 19, 2017 ($21.70 ÷ 2 = $10.85; $10.85 x 15 hours = $162.75).[9]

<u>Calculations of Pre-Judgment Interest</u>

It is my understanding that under the FLSA, liquidated damages can be awarded if a violation is found to be willful. Alternatively, if it is determined that a violation occurred, but the

---

[8] This "half-rate" calculation, the use of one-half the effective hourly rate to calculate overtime damages, is the methodology I use to calculate damages for overtime wage violations in this report. However, if damages were to be awarded using the full "time-and-a-half" calculation, while still allowing the net income for the week to compensate for all hours worked during the week, then the damages for overtime wage violations will be approximately triple the amount obtained using the "half-rate" calculation (since "half-rate"=0.5 x hourly rate of pay, and "time-and-a-half"=1.5 x hourly rate of pay, then 3 x "half-rate" damages ≈ "time-and-a-half" damages).

[9] If damages were to be calculated at time-and-a-half for all overtime hours worked, while still allowing the net income for the week to compensate for all hours worked during the week, then Plaintiff Perelli would be owed $488.25 for 15 overtime hours worked during the week beginning February 19, 2017 ($21.70 per hour x 1.5 = $32.55; $32.55 x 15 hours = $488.25).

6

violation was not willful, pre-judgment interest may be awarded. I have been asked to calculate pre-judgment interest as described in 28 U.S.C. § 1961. For each week for which damages were found for the plaintiff, interest was calculated from the date the damages should have been paid[10] through January 22, 2021, compounding annually. The interest rate for each week was the weekly average 1-year constant maturity (nominal) Treasury yield, as published by the Federal Reserve System, for the Friday immediately prior to the date the damages should have been paid.[11]

For example, Plaintiff Mode's account for the week beginning April 24, 2016 would have been settled on May 4, 2016, the Wednesday immediately following the end of the work week. The average 1-year constant maturity (nominal) Treasury yield on April 29, 2016, the Friday immediately preceding May 4, 2016, was 0.58%. Compounding annually over the 4.72 years between May 4, 2016 and January 22, 2021 results in a total of 2.77% in interest owed on damages calculated for the week beginning April 24, 2016. Thus, if the Court determined that Plaintiff Mode is owed $292.05 for minimum wage violations for the week beginning April 24, 2016, as discussed above, then Plaintiff Mode could be awarded an additional 2.77% ($8.09) in pre-judgment interest.

Results of Damages Calculations

Table 1 and Table 2 show the total amount of damages and pre-judgment interest for minimum wage and overtime wage violations calculated for the 27 plaintiffs for whom data was provided.[12] Table 1 shows the calculated damages and pre-judgment interest for each assumed

---

[10] I have been advised by Counsel for the Plaintiffs that accounts were settled on the Wednesday immediately following the end of the work week.

[11] The interest rates used in the calculation of pre-judgment interest are shown in Appendix C. Rates were obtained using the Data Download Program at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15, as instructed at https://www.dol.gov/agencies/owcp/dlhwc/InterestRate.

[12] Since liquidated damages are equal to the amount of calculated damages, a separate column for liquidated damages was not included in Tables 1 and 2.

number of hours worked for the Three-Year Period, where damages for each plaintiff begin three years prior to the date the plaintiff's consent form was filed. Table 2 shows the calculated damages and pre-judgment interest for each assumed number of hours worked for the Two-year Period, where damages for each plaintiff begin two years prior to the date the plaintiff's consent form was filed. Appendix A contains a summary of the damages for each of the 27 plaintiffs for the Three-Year Period. Appendix B contains a summary of the damages for each of the 27 plaintiffs for the Two-Year Period.

For the Three-Year Period, assuming 65 hours worked per week, the maximum number of hours worked per week I was asked to consider, Table 1 shows that the 27 plaintiffs would be owed $200,328.70 for minimum wage violations and $1,032,480.75 for overtime wage violations.[13] If liquidated damages were awarded, then those amounts would be doubled. Alternatively, if pre-judgment interest were awarded, then the 27 plaintiffs would be owed an additional $6,604.75 in interest for minimum wage violations and $36,926.97 in interest for overtime wage violations.

For the Two-year Period, assuming 65 hours worked per week, the maximum number of hours worked per week I was asked to consider, Table 2 shows that the 25 plaintiffs[14] who worked within two years prior to their opt-in date would be owed $128,805.30 for minimum wage violations and $719,471.50 for overtime wage violations.[15] If liquidated damages were awarded, then those amounts would be doubled. Alternatively, if pre-judgment interest were awarded, then

---

[13] If damages were to be calculated at time-and-a-half for all overtime hours worked, while still allowing the net income for the week to compensate for all hours worked during the week, then the 27 plaintiffs would be owed $3,096,876.00 for overtime wage violations, assuming 65 hours worked per week.

[14] Plaintiffs Lindell Davis and John Tubertini did not work within two years prior to their filing dates.

[15] If damages were to be calculated at time-and-a-half for all overtime hours worked, while still allowing the net income for the week to compensate for all hours worked during the week, then the 25 plaintiffs would be owed $2,158,031.00 for overtime wage violations, assuming 65 hours worked per week.

8

the 25 plaintiffs would be owed an additional $4,607.54 in interest for minimum wage violations and $27,986.45 in interest for overtime wage violations.

Extrapolation to the Collective Action

It is my understanding data was not provided for the entire collective.[16] Therefore, in order to estimate damages for all 331 individuals currently in the collective action, I calculated the average number of weeks worked by the plaintiffs for whom data was provided. I also calculated the average amount of damages and pre-judgment interest owed per week for minimum wage violations, and the average amount of damages and pre-judgment interest owed per week for overtime wage violations.[17] Table 3 shows the results of those analyses for the Three-Year Period, and Table 4 shows the results for the Two-Year Period.

The results shown in Table 3 allows for the estimation of damages for all individuals in the collective action for the Three-Year Period. Specifically, Table 3 indicates that the plaintiffs worked an average of 144 weeks. Additionally, assuming that the Court determines that the plaintiffs worked 55 hours per week, then Table 3 shows that the plaintiffs were owed an average of $39.99 in damages and $1.31 in pre-judgment interest per week for minimum wage violations. Further, Table 3 shows that the plaintiffs were owed an average of $186.30 in damages and $6.67 in pre-judgment interest per week for overtime wage violations. Thus, for the Three-Year Period, assuming 55 hours worked per week, the estimated total amount of damages for the 331 individuals currently in the collective action is $1,906,083.36 in damages with $62,439.84 in pre-judgment interest for minimum wage violations, and $8,879,803.20 in damages with $317,918.88

---

[16] If additional data is provided for the remaining plaintiffs in the collective, then damages could be calculated for each of the plaintiffs in the collective using the same methodology discussed in this report. If such data is provided, then I may supplement this report accordingly.

[17] Since liquidated damages are equal to the amount of calculated damages, a separate calculation for the average amount of liquidated damages per week was not necessary.

9

in pre-judgment interest for overtime wage violations (e.g., $39.99 per week for minimum wage violations x 144 weeks worked = $5,758.56 per individual; $5,758.56 x 331 individuals = $1,906,083.36).[18,19]

Similarly, the results shown in Table 4 allows for the estimation of damages for all individuals in the collective action for the Two-Year Period. Specifically, Table 4 indicates that the plaintiffs worked an average of 106 weeks. Additionally, assuming that the Court determines that the plaintiffs worked 55 hours per week, then Table 4 shows that the plaintiffs were owed an average of $37.93 in damages and $1.34 in pre-judgment interest per week for minimum wage violations. Further, Table 4 shows that the plaintiffs were owed an average of $191.12 in damages and $7.44 in pre-judgment interest per week for overtime wage violations. Thus, for the Two-Year Period, assuming 55 hours worked per week, the estimated total amount of damages for the estimated 308 individuals[20] in the collective action is $1,238,338.64 in damages with $43,748.32 in pre-judgment interest for minimum wage violations, and $6,239,685.76 in damages with $242,901.12 in pre-judgment interest for overtime wage violations (e.g., $37.93 per week for

---

[18] For the Three-Year Period, if liquidated damages were awarded rather than pre-judgment interest, then the total damages for the collective action would be $3,812,166.72 for minimum wage violations and $17,759,606.40 for overtime wage violations, assuming 55 hours worked per week.

[19] For the Three-Year Period, assuming 65 hours per week, the maximum number of hours worked per week that I was asked to consider, the estimated total amount of damages for the 331 plaintiffs currently in the collective is $2,450,406.24 in damages with $80,552.16 in pre-judgment interest for minimum wage violations, and $12,628,100.16 in damages with $451,854.72 in pre-judgment interest for overtime wage violations. If liquidated damages were awarded rather than pre-judgment interest, then the total damages for the collective action would be $4,900,812.48 for minimum wage violations and $25,256,200.32 for overtime wage violations. If damages were to be calculated at time-and-a-half for all overtime hours worked, while still allowing the net income for the week to compensate for all hours worked during the week, then the collective would be owed an estimated total of $37,877,627.52 for overtime wage violations, assuming 65 hours worked per week.

[20] There were 25 of the 27 (93%) individuals for whom data were provided who worked within two years prior to their filing dates. Assuming that only 93% of the 331 individuals in the collective action worked within the Two-Year Period, then an estimated 308 individuals would be part of the collective action for the Two-Year Period.

10

minimum wage violations x 106 weeks = \$4,020.58; \$4,020.58 x 308 individuals = \$1,238,338.64).[21,22]

<u>Concluding Remarks</u>

I was provided data for a sample of only 27 plaintiffs, including Plaintiff Mode. It is my understanding that the Defendants did not produce data for the entire collective. The analysis of the data produced thus far would allow for the extrapolation of damages to all plaintiffs included in the collective action. If similar data were provided for the remaining plaintiffs, damages could be calculated for each plaintiff in the collective using the same methodology discussed in this report. Additionally, I was provided data that allowed for damages to be calculated through December 20, 2020. If additional data is provided for weeks worked after December 20, 2020, or for the remaining plaintiffs in the collective, then I may supplement this report accordingly.

The opinions that I express herein are based on my education, training, professional consultations, experience and expertise as detailed in my curriculum vitae, other information reasonably relied upon by members of my profession, and my own analyses.

_____                     _____
Liesl M. Fox, Ph.D.                                                      March 2, 2021
                                                                                  Date

---

[21] For Two-Year Period, if liquidated damages were awarded, rather than pre-judgment interest, then the total damages for the collective action would be \$2,476,677.28 for minimum wage violations and \$12,479,371.52 for overtime wage violations, assuming 55 hours worked per week.

[22] For the Two-Year Period, assuming 65 hours per week, the maximum number of hours worked per week that I was asked to consider, the estimated total amount of damages for the estimated 308 plaintiffs is \$1,587,345.76 in damages with \$56,807.52 in pre-judgment interest for minimum wage violations, and \$8,867,196.80 in damages with \$344,762.88 in pre-judgment interest for overtime wage violations. If liquidated damages were awarded rather than pre-judgment interest, then the total damages for the collective action would be \$3,174,691.52 for minimum wage violations and \$17,734,393.60 for overtime wage violations. If damages were to be calculated at time-and-a-half for all overtime hours worked, while still allowing the net income for the week to compensate for all hours worked during the week, then the collective would be owed an estimated total of \$26,597,019.68 for overtime wage violations, assuming 65 hours worked per week.

11

Table 1
Total Damages and Pre-Judgment Interest for the Three-Year Period

| Hours Worked per Week | Minimum Wage Violations | | Overtime Wage Violations | |
|---|---|---|---|---|
| | Damages | Pre-Judgment Interest | Damages | Pre-Judgment Interest |
| 25 | $56,457.00 | $1,814.24 | - | - |
| 26 | $59,119.06 | $1,899.62 | - | - |
| 27 | $61,804.08 | $1,986.12 | - | - |
| 28 | $64,536.36 | $2,074.58 | - | - |
| 29 | $67,304.65 | $2,164.51 | - | - |
| 30 | $70,113.60 | $2,255.97 | - | - |
| 31 | $72,965.01 | $2,348.96 | - | - |
| 32 | $75,894.08 | $2,445.13 | - | - |
| 33 | $78,873.30 | $2,543.27 | - | - |
| 34 | $81,874.38 | $2,642.00 | - | - |
| 35 | $84,886.90 | $2,741.11 | - | - |
| 36 | $87,934.32 | $2,841.60 | - | - |
| 37 | $91,039.98 | $2,943.70 | - | - |
| 38 | $94,190.22 | $3,046.96 | - | - |
| 39 | $97,385.34 | $3,151.82 | - | - |
| 40 | $100,640.80 | $3,259.02 | - | - |
| 41 | $103,958.37 | $3,368.08 | $64,291.94 | $2,301.67 |
| 42 | $107,320.92 | $3,478.79 | $125,603.46 | $4,496.61 |
| 43 | $110,754.67 | $3,591.80 | $184,143.27 | $6,592.36 |
| 44 | $114,244.24 | $3,706.94 | $240,105.16 | $8,595.79 |
| 45 | $117,799.65 | $3,824.44 | $293,659.95 | $10,512.69 |
| 46 | $121,384.34 | $3,943.22 | $344,968.26 | $12,348.29 |
| 47 | $124,998.85 | $4,063.15 | $394,167.62 | $14,109.13 |
| 48 | $128,648.64 | $4,184.03 | $441,400.24 | $15,798.82 |
| 49 | $132,357.82 | $4,307.11 | $486,784.44 | $17,422.39 |
| 50 | $136,123.00 | $4,432.92 | $530,435.50 | $18,983.74 |
| 51 | $139,946.04 | $4,560.59 | $572,450.23 | $20,486.56 |
| 52 | $143,823.16 | $4,690.64 | $612,932.76 | $21,934.08 |
| 53 | $147,768.77 | $4,822.90 | $651,968.59 | $23,329.91 |
| 54 | $151,779.42 | $4,957.49 | $689,642.38 | $24,677.12 |
| 55 | $155,854.05 | $5,094.40 | $726,025.50 | $25,977.06 |
| 56 | $160,005.44 | $5,234.24 | $761,198.88 | $27,234.97 |
| 57 | $164,215.86 | $5,376.67 | $795,211.72 | $28,450.11 |
| 58 | $168,485.36 | $5,521.23 | $828,144.72 | $29,627.45 |
| 59 | $172,807.46 | $5,667.88 | $860,028.54 | $30,766.91 |
| 60 | $177,168.00 | $5,816.38 | $890,939.80 | $31,871.76 |
| 61 | $181,633.60 | $5,968.12 | $920,919.30 | $32,942.72 |
| 62 | $186,172.36 | $6,122.55 | $950,026.88 | $33,982.38 |
| 63 | $190,782.90 | $6,279.79 | $978,287.52 | $34,991.98 |
| 64 | $195,502.08 | $6,440.46 | $1,005,770.16 | $35,973.08 |
| 65 | $200,328.70 | $6,604.75 | $1,032,480.75 | $36,926.97 |

## Table 2
## Total Damages and Pre-Judgment Interest for the Two-Year Period

| Hours Worked per Week | Minimum Wage Violations | | Overtime Wage Violations | |
|---|---|---|---|---|
| | Damages | Pre-Judgment Interest | Damages | Pre-Judgment Interest |
| 25 | $36,603.75 | $1,262.55 | - | - |
| 26 | $38,309.44 | $1,321.32 | - | - |
| 27 | $40,029.12 | $1,380.90 | - | - |
| 28 | $41,782.16 | $1,442.03 | - | - |
| 29 | $43,564.96 | $1,504.56 | - | - |
| 30 | $45,367.50 | $1,567.95 | - | - |
| 31 | $47,190.99 | $1,632.31 | - | - |
| 32 | $49,065.28 | $1,699.02 | - | - |
| 33 | $50,972.46 | $1,767.22 | - | - |
| 34 | $52,902.98 | $1,835.99 | - | - |
| 35 | $54,839.75 | $1,905.08 | - | - |
| 36 | $56,806.20 | $1,975.35 | - | - |
| 37 | $58,799.66 | $2,046.30 | - | - |
| 38 | $60,816.72 | $2,117.84 | - | - |
| 39 | $62,869.56 | $2,190.70 | - | - |
| 40 | $64,968.40 | $2,265.64 | - | - |
| 41 | $67,103.47 | $2,341.80 | $44,867.60 | $1,746.72 |
| 42 | $69,271.86 | $2,419.33 | $87,650.82 | $3,412.19 |
| 43 | $71,484.49 | $2,498.35 | $128,496.24 | $5,002.28 |
| 44 | $73,727.72 | $2,578.83 | $167,537.76 | $6,522.40 |
| 45 | $76,005.45 | $2,660.92 | $204,895.25 | $7,976.31 |
| 46 | $78,306.72 | $2,744.13 | $240,681.90 | $9,368.68 |
| 47 | $80,633.20 | $2,828.33 | $274,993.11 | $10,704.11 |
| 48 | $82,986.24 | $2,913.43 | $307,928.72 | $11,985.43 |
| 49 | $85,379.56 | $3,000.10 | $339,573.24 | $13,216.47 |
| 50 | $87,817.00 | $3,088.97 | $370,002.30 | $14,400.19 |
| 51 | $90,289.38 | $3,179.18 | $399,287.68 | $15,539.38 |
| 52 | $92,794.00 | $3,271.04 | $427,503.12 | $16,636.74 |
| 53 | $95,334.28 | $3,364.21 | $454,705.16 | $17,694.54 |
| 54 | $97,887.42 | $3,458.06 | $480,946.34 | $18,715.39 |
| 55 | $100,469.05 | $3,552.97 | $506,282.70 | $19,700.01 |
| 56 | $103,110.56 | $3,650.31 | $530,775.52 | $20,652.53 |
| 57 | $105,798.84 | $3,749.90 | $554,454.66 | $21,572.72 |
| 58 | $108,518.58 | $3,850.83 | $577,376.10 | $22,464.15 |
| 59 | $111,268.69 | $3,953.17 | $599,561.72 | $23,326.54 |
| 60 | $114,040.20 | $4,056.61 | $621,067.80 | $24,162.79 |
| 61 | $116,885.76 | $4,162.66 | $641,921.07 | $24,973.06 |
| 62 | $119,767.26 | $4,270.28 | $662,158.42 | $25,759.49 |
| 63 | $122,706.36 | $4,380.19 | $681,807.86 | $26,523.33 |
| 64 | $125,724.16 | $4,492.60 | $700,910.64 | $27,265.39 |
| 65 | $128,805.30 | $4,607.54 | $719,471.50 | $27,986.45 |

Table 3
Average Number of Weeks Worked, Damages per Week, and Pre-Judgment Interest per Week
For the Three-Year Period

| Hours Worked per Week | Number of Weeks Worked | Minimum Wage Violations | | Overtime Wage Violations | |
|---|---|---|---|---|---|
| | | Damages per Week | Pre-Judgment Interest | Damages per Week | Pre-Judgment Interest |
| 25 | 144 | $14.49 | $0.47 | - | - |
| 26 | 144 | $15.17 | $0.49 | - | - |
| 27 | 144 | $15.86 | $0.51 | - | - |
| 28 | 144 | $16.56 | $0.53 | - | - |
| 29 | 144 | $17.27 | $0.56 | - | - |
| 30 | 144 | $17.99 | $0.58 | - | - |
| 31 | 144 | $18.72 | $0.60 | - | - |
| 32 | 144 | $19.48 | $0.63 | - | - |
| 33 | 144 | $20.24 | $0.65 | - | - |
| 34 | 144 | $21.01 | $0.68 | - | - |
| 35 | 144 | $21.78 | $0.70 | - | - |
| 36 | 144 | $22.56 | $0.73 | - | - |
| 37 | 144 | $23.36 | $0.76 | - | - |
| 38 | 144 | $24.17 | $0.78 | - | - |
| 39 | 144 | $24.99 | $0.81 | - | - |
| 40 | 144 | $25.83 | $0.84 | - | - |
| 41 | 144 | $26.68 | $0.86 | $16.50 | $0.59 |
| 42 | 144 | $27.54 | $0.89 | $32.23 | $1.15 |
| 43 | 144 | $28.42 | $0.92 | $47.25 | $1.69 |
| 44 | 144 | $29.32 | $0.95 | $61.61 | $2.21 |
| 45 | 144 | $30.23 | $0.98 | $75.36 | $2.70 |
| 46 | 144 | $31.15 | $1.01 | $88.52 | $3.17 |
| 47 | 144 | $32.08 | $1.04 | $101.15 | $3.62 |
| 48 | 144 | $33.01 | $1.07 | $113.27 | $4.05 |
| 49 | 144 | $33.96 | $1.11 | $124.91 | $4.47 |
| 50 | 144 | $34.93 | $1.14 | $136.11 | $4.87 |
| 51 | 144 | $35.91 | $1.17 | $146.90 | $5.26 |
| 52 | 144 | $36.91 | $1.20 | $157.28 | $5.63 |
| 53 | 144 | $37.92 | $1.24 | $167.30 | $5.99 |
| 54 | 144 | $38.95 | $1.27 | $176.97 | $6.33 |
| 55 | 144 | $39.99 | $1.31 | $186.30 | $6.67 |
| 56 | 144 | $41.06 | $1.34 | $195.33 | $6.99 |
| 57 | 144 | $42.14 | $1.38 | $204.06 | $7.30 |
| 58 | 144 | $43.23 | $1.42 | $212.51 | $7.60 |
| 59 | 144 | $44.34 | $1.45 | $220.69 | $7.90 |
| 60 | 144 | $45.46 | $1.49 | $228.62 | $8.18 |
| 61 | 144 | $46.61 | $1.53 | $236.31 | $8.45 |
| 62 | 144 | $47.77 | $1.57 | $243.78 | $8.72 |
| 63 | 144 | $48.96 | $1.61 | $251.04 | $8.98 |
| 64 | 144 | $50.17 | $1.65 | $258.09 | $9.23 |
| 65 | 144 | $51.41 | $1.69 | $264.94 | $9.48 |

Table 4
Average Number of Weeks Worked, Damages per Week, and Pre-Judgment Interest per Week
For the Two-Year Period

| Hours Worked per Week | Number of Weeks Worked | Minimum Wage Violations | | Overtime Wage Violations | |
|---|---|---|---|---|---|
| | | Damages per Week | Pre-Judgment Interest | Damages per Week | Pre-Judgment Interest |
| 25 | 106 | $13.82 | $0.48 | - | - |
| 26 | 106 | $14.46 | $0.50 | - | - |
| 27 | 106 | $15.11 | $0.52 | - | - |
| 28 | 106 | $15.77 | $0.54 | - | - |
| 29 | 106 | $16.45 | $0.57 | - | - |
| 30 | 106 | $17.13 | $0.59 | - | - |
| 31 | 106 | $17.81 | $0.62 | - | - |
| 32 | 106 | $18.52 | $0.64 | - | - |
| 33 | 106 | $19.24 | $0.67 | - | - |
| 34 | 106 | $19.97 | $0.69 | - | - |
| 35 | 106 | $20.70 | $0.72 | - | - |
| 36 | 106 | $21.44 | $0.75 | - | - |
| 37 | 106 | $22.20 | $0.77 | - | - |
| 38 | 106 | $22.96 | $0.80 | - | - |
| 39 | 106 | $23.73 | $0.83 | - | - |
| 40 | 106 | $24.53 | $0.86 | - | - |
| 41 | 106 | $25.33 | $0.88 | $16.94 | $0.66 |
| 42 | 106 | $26.15 | $0.91 | $33.09 | $1.29 |
| 43 | 106 | $26.99 | $0.94 | $48.51 | $1.89 |
| 44 | 106 | $27.83 | $0.97 | $63.25 | $2.46 |
| 45 | 106 | $28.69 | $1.00 | $77.35 | $3.01 |
| 46 | 106 | $29.56 | $1.04 | $90.86 | $3.54 |
| 47 | 106 | $30.44 | $1.07 | $103.81 | $4.04 |
| 48 | 106 | $31.33 | $1.10 | $116.24 | $4.52 |
| 49 | 106 | $32.23 | $1.13 | $128.19 | $4.99 |
| 50 | 106 | $33.15 | $1.17 | $139.68 | $5.44 |
| 51 | 106 | $34.08 | $1.20 | $150.73 | $5.87 |
| 52 | 106 | $35.03 | $1.23 | $161.38 | $6.28 |
| 53 | 106 | $35.99 | $1.27 | $171.65 | $6.68 |
| 54 | 106 | $36.95 | $1.31 | $181.56 | $7.07 |
| 55 | 106 | $37.93 | $1.34 | $191.12 | $7.44 |
| 56 | 106 | $38.92 | $1.38 | $200.37 | $7.80 |
| 57 | 106 | $39.94 | $1.42 | $209.31 | $8.14 |
| 58 | 106 | $40.97 | $1.45 | $217.96 | $8.48 |
| 59 | 106 | $42.00 | $1.49 | $226.34 | $8.81 |
| 60 | 106 | $43.05 | $1.53 | $234.45 | $9.12 |
| 61 | 106 | $44.12 | $1.57 | $242.33 | $9.43 |
| 62 | 106 | $45.21 | $1.61 | $249.97 | $9.72 |
| 63 | 106 | $46.32 | $1.65 | $257.38 | $10.01 |
| 64 | 106 | $47.46 | $1.70 | $264.59 | $10.29 |
| 65 | 106 | $48.62 | $1.74 | $271.60 | $10.56 |